**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JERRY CARR** | ) |
| | ) |
| **and** | ) |
| | ) |
| **SHARON M. CARR,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) **Civil Action Number 1:06CV01893 (JR)** |
| | ) |
| **v.** | ) |
| | ) |
| | ) |
| **GEORGE YUND, ET AL.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**DEFENDANTS GEORGE YUND AND RANDY FREKING'S MOTION TO
DISMISS AND MOTION FOR ORDER PERMANENTLY ENJOINING
PLAINTIFFS FROM FILING SUIT AGAINST DEFENDANTS YUND AND FREKING
PURSUANT TO 28 U.S.C. § 1651**

Pursuant to Rules 12(b)(6) and 12(b)(2) of the Federal Rules of Civil Procedure, Defendants George Yund and Randy Freking move to dismiss this action for failure to state a claim upon which relief can be granted, and for want of personal jurisdiction over the defendants. Defendants further move this Court for an order under the All Writs Act, 28 U.S.C. § 1651, permanently enjoining Plaintiffs from filing suit against them in any court without first obtaining leave of the Court. A supporting memorandum is attached.

Respectfully Submitted,

_____
STANLEY M. BRAND
D.C. Bar # 213082
ANDREW D. HERMAN
D.C. Bar # 462334
BRAND LAW GROUP, PC
923 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 662-9700
*Counsel for Defendants Yund and Freking*

Dated:  January 10, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JERRY CARR** | ) |
| | ) |
| **and** | ) |
| | ) |
| **SHARON M. CARR,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) **Civil Action Number 1:06CV01893 (JR)** |
| | ) |
| **v.** | ) |
| | ) |
| | ) |
| **GEORGE YUND, ET AL.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS**
**GEORGE YUND AND RANDY FREKING'S MOTION TO**
**DISMISS AND MOTION FOR ORDER PERMANENTLY ENJOINING**
**PLAINTIFFS FROM FILING SUIT AGAINST DEFENDANTS YUND AND FREKING**
**PURSUANT TO 28 U.S.C. § 1651**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants George Yund and

Randy Freking request that this Court dismiss Plaintiff United States' Complaint for failure to

state a claim upon which relief can be granted and, pursuant to Federal Rule of Civil Procedure

12(b)(2) for want of personal jurisdiction over the defendants.  As set forth in this Memorandum

of Points and Authorities, Defendants further move this Court for an order under the All Writs

Act, 28 U.S.C. § 1651, permanently enjoining Plaintiffs from filing suit against them in any court

without first obtaining leave of the Court.

## INTRODUCTION

This action represents the third time in as many decades that Plaintiffs Jerry and Sharon Carr have attempted to bring claims against Defendants Yund and Freking and several of their co-defendants under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq*. (hereinafter "RICO").  The last attempt concluded with a July 10, 1991, Order from Judge John M. Manos in the United States District Court for the Northern District of Ohio permanently enjoining the Carrs from filing any action against the defendants in the Southern District of Ohio without leave of the court.  A copy of Judge Manos' Opinion and Order are attached hereto as Exhibit A.

The only difference between this action and the litigation prompting Judge Manos' 1991 Order is that the Carrs have apparently encountered additional people they allege are conspiring against them.  This attempt to resurrect claims long ago dismissed should be dismissed again as untimely, barred by *res judicata,* and pursued inappropriately in this venue.

Defendants also respectfully request that this Court recognize – as did Judge Manos – the time and expense incurred each time they and the courts are forced to deal with this frivolous litigation.  The filing of this action justifies an order pursuant to this Court's authority under the All Writs Act permanently enjoining the Plaintiffs from filing any action against defendants Yund or Freking in this or any other court without first obtaining leave of the Court.

## FACTUAL BACKGROUND

The following are matters of public record that in some cases are admitted in the Complaint.  Plaintiffs are former employees of Champion International Corporation.  (Complaint, p.6.).  Sharon Carr (formerly Sharon Rennick) was terminated from the corporation on November 12,

1984, for assaulting a fellow employee with a razor blade. (Exhibit A, p. 2). Jerry Carr was

subsequently terminated for threatening co-workers he accused of harassing Sharon. (*Id.*). Jerry

and Sharon filed lawsuits against Champion concerning their discharges, lawsuits which resulted

in trials in federal court and dismissals because those lawsuits were found to be without merit.

Copies of the judgment entries are attached as Exhibits B and C. Defendants Yund and Freking

were the attorneys who represented Champion in the litigation filed by the Plaintiffs.

(Complaint, p. 6).

Defendant Yund is an attorney licensed to practice in Ohio since 1977. He has practiced

law continuously since that time with Frost & Jacobs LLP and its successor by merger, Frost

Brown Todd LLC. His practice is devoted primarily to representation of employers in labor and

employment law matters. Defendant Freking is an attorney admitted to practice in Ohio since

1982, who practiced as a labor and employment lawyer with Frost & Jacobs until he left to start

his own firm in 1990, where he has practiced ever since.

In March 1987, a former employee of Cincinnati Bell Telephone named Leonard T.

Gates ("Gates") filed an action (No. C-1-87-227) in the Southern District of Ohio in connection

with his discharge from employment with Cincinnati Bell. Gates had been discharged as a result

of workplace harassment. Yund defended Cincinnati Bell in Gates' lawsuit. Gates lost after

trial, and a copy of the dismissal and Sixth Circuit Order affirming the trial court's decision are

attached as Exhibit D. In retaliation for his dismissal from employment, Gates conducted a

smear campaign against Cincinnati Bell, making sensational accusations of wiretapping.

Cincinnati Bell sued Gates in Ohio state court for business defamation (Hamilton County Court

of Common Pleas Case No. A8900494), and won a jury verdict clearing its name. A copy of the

complaint in that action is attached as Exhibit E.

Memorandum in Support of Defendant's Motion to Dismiss -- 3

Although the Carrs' lawsuits and Gates' legal history are unrelated, the Carrs fantasize that they must have lost their legal challenges against Champion not because their claims lacked merit, but because defense counsel for their former employer was the same as the counsel for the local telephone company wrongly accused of wiretapping.  Thus, in 1989 the Carrs filed the first RICO action against Yund, Freking and several other defendants in the Southern District of Ohio, making the same allegations against Yund and Freking as contained in the present Complaint.  That case was dismissed on April 26, 1990, by Judge S. Arthur Spiegel.  A copy of Judge Spiegel's decision is attached as Exhibit F.

The Plaintiffs tried again on May 21, 1990, alleging identical RICO conspiracy claims. (Exhibit A).  The only difference between the actions was that the 1990 complaint added Judge Spiegel and other Southern District of Ohio judges and employees as defendants.  (*Id.* at 4). Given the number of Southern District of Ohio judges and employees named as defendants, the case was assigned by the Sixth Circuit to Judge Manos in the Northern District Court of Ohio. (*Id.*).  Judge Manos dismissed the case and entered an order under the All Writs Act that the Plaintiffs be forever barred from suing the defendants in the Southern District of Ohio.  (*Id.*). The order also enjoined the Carrs from filing suit against any state or federal judge, or any officer or employee of the court for actions taken in the course of their official duties, in <u>any</u> court.  (*Id.*).  The Complaint filed recently in this Court adds nothing new in terms of the allegations made against Yund and Freking, and those allegations were dismissed for the first and second times more than fifteen years ago.

The Carrs are vexatious litigators and this lawsuit should be dismissed.  Additionally, Yund and Freking should not be put to the burden and expense of continuing to have to respond.

This Court should issue an order that forbids either Plaintiff from ever filing a lawsuit against Yund or Freking in any court without leave.

## <u>ARGUMENT</u>

### I.    <u>The Complaint Fails to State a Claim Upon Which Relief can Be Granted.</u>

In their Complaint, Plaintiffs make their third attempt to bring a RICO conspiracy action against Yund and Freking.  The Carrs' Complaint fails to state a claim upon which relief can be granted for a variety of reasons, two of which are clearly dispositive, and discussed in this motion.  First, a federal court found that *res judicata* barred this action 15 years ago and nothing alleged in the Complaint justifies a different conclusion here.  Second, the U.S. Supreme Court has held that the statute of limitations for a RICO claim is four years and the allegations involving Yund and Freking occurred in the 1980s.  For these reasons, the Carrs' claims against Defendants Yund and Freking should be dismissed with prejudice for a third and final time.

### A.    <u>Plaintiff Claims are Barred by the Doctrine of *Res Judicata*.</u>

Of course, *res judicata* requires that a judgment on the merits in a prior suit bars a second suit involving identical parties or their privies based on the same cause of action.  *Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002).  *Res judicata* plays a central role in advancing the "purpose for which civil courts have been established - the conclusive resolution of disputes within their jurisdictions."  *Montana v. United States*, 440 U.S. 147, 153 (1979).  As the Supreme Court observed in *Montana,* "[t]o preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions."  *Id.* at 153-54.

"Whether two cases implicate the same cause of action turns on whether they share the same 'nucleus of facts.'" *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984).  In pursuing this inquiry, the court will consider "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" *I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co.*, 723 F.2d 944, 949 n.5 (D.C. Cir. 1983).

The Carrs' current attempted action against Yund and Freking is identical to the RICO conspiracy alleged in their first lawsuit in 1986 before Judge Spiegel and the second lawsuit which was dismissed by Judge Manos.  Exhibit A, pp. 2-4; Complaint, pp. 6-9.  Judge Manos' decision was a final judgment on the merits.  See FRCP 41(b) ("Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.").  *Res judicata* clearly bars Plaintiffs' RICO claims against Yund and Freking and as a result their claims should be dismissed with prejudice.

**B.    The Four Year Statute of Limitations Applicable to RICO Actions Bars Plaintiffs' Claims Against Yund and Freking.**

Even if Plaintiffs' claims were not barred by *res judicata*, the statute of limitations for the purported RICO claims against Yund and Freking expired decades ago.  In *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143 (1987), the Supreme Court held that the statute of limitations for RICO conspiracy claims is four years from the date the plaintiff knows or has reason to know of the RICO injury which is the basis of his action.  *See also Rotella v. Wood*, 528 U.S. 549 (2000).

All of the allegations against Yund and Freking in Plaintiffs' Complaint occurred while they were representing Plaintiffs' former employer, Champion International.  (Complaint, pp. 6-9).  All of those events occurred in the 1980s.  (*Id.* at 6).  Plaintiffs clearly were aware of whatever factual basis existed for their complaint prior to 2002 since they filed two actions in the Southern District of Ohio in 1986 and 1990 asserting the same facts and cause of action.  For this additional reason, Plaintiffs' claims against Yund and Freking should be dismissed.

## II.    Alternatively, the Court Also Lacks In Personam Jurisdiction over Yund and Freking.

The District of Columbia long-arm statute, D.C. Code § 13-423, is the only basis upon which personal jurisdiction may be exercised over defendants who do not reside within or maintain a place of business in the District of Columbia.  *Reuber v. United States*, 750 F.2d 1039, 1040 (D.C. Cir. 1984); *Robertson v. Merola*, 895 F. Supp. 1, 3 (D.D.C. 1995).  The District of Columbia long-arm statute provides that a Court may exercise personal jurisdiction over those who have (1) transacted business in the District of Columbia; (2) contracted to supply services in the District of Columbia; (3) caused a tortious injury in the District of Columbia by an act or omission in the District; or (4) caused a tortious injury in the District of Columbia by an act or omission outside the District while regularly doing or soliciting business or engaging in any other persistent course of conduct in the District.  D.C. Code § 13-423(a)(1)-(4) (2006).  For there to be personal jurisdiction under the long-arm statute, the plaintiff must allege some specific facts evidencing purposeful activity by defendants in the District of Columbia by which they invoked the benefits and protections of its laws, and specific acts connecting the defendants with the forum.  *See, e. g.*, *Cellutech v. Centennial Cellular Corp.*, 871 F. Supp. 46, 48 (D.D.C. 1994).

Plaintiffs have provided no specific acts connecting Yund[1] or Freking to this forum in any jurisdictionally sufficient way, nor can they.  Neither Defendant lives or has ever lived in the District, nor maintains a place of business here.  None of the allegations against Yund or Freking occurred in the District of Columbia.

**III.    Defendants Yund and Freking Moves That This Court Permanently Enjoin Jerry and Sharon Carr from Bringing Any Action Against Them in Any Federal District Court Without First Obtaining Leave From The Court.**

In his 1991 order, Judge Manos permanently enjoined the Plaintiffs from "filing any action in the United States District Court for the Southern District of Ohio without obtaining leave of the Court.  They are further enjoined from filing in any court, an action against any state or federal judge, or any officer or employee of any court, for actions taken in the course of their official duties."  Exhibit A.  Judge Manos issued this injunctive order pursuant to his authority under the All Writs Act, 28 U.S.C. § 1651.

As licensed attorneys, Yund and Freking are officers of the court.  Thus, arguably pursuant to the terms of Judge Manos' order, the Plaintiffs are forbidden from filing suit against Yund and Freking for actions taken in the course of their "official duties."  While Judge Manos may have intended his order to protect Yund and Freking and the other attorneys sued in the 1990 litigation, it is admittedly ambiguous as to what the judge would define as the "official duties" of an attorney.  Thus, this Court should clarify Judge Manos' order by permanently enjoining the Plaintiffs from filing any action against Yund or Freking without first obtaining leave from the court, and expressly provide that any attempt to do so is punishable by contempt.

---

[1] Yund is admitted to the D.C. Circuit Court of Appeals because he briefed and argued one case in that court in 2003.

The Court may issue such an order pursuant to its authority under the All Writs Act, 28

U.S.C. § 1651.  The All Writs Act is frequently used by federal district courts to enjoin litigants

who are abusing the court system by harassing their opponents or repeatedly filing baseless

complaints.  *See e.g.*, *Harrelson v United States*, 613 F.2d 114 (1980, 5th Cir. Tex.); *Smith v*

*Educ. People, Inc.*, 233 F.R.D. 137 (2005, S.D.N.Y.); *Perry v Gold & Laine, P.C.*, 371 F. Supp

2d 622 (2005, D.N.J.).

## CONCLUSION

For the reasons set forth herein, the defendants respectfully requests that the Court

dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a

claim upon which relief can be granted and pursuant to Rule 12(b)(2) for lack of personal

jurisdiction over the defendants.  Additionally, Defendants Yund and Freking request that the

Court permanently enjoin the Plaintiffs from filing any suit against George Yund or Randy

Freking in any court without obtaining leave of the Court.


Respectfully Submitted,

_____
STANLEY M. BRAND
D.C. Bar # 213082
ANDREW D. HERMAN
D.C. Bar # 462334
BRAND LAW GROUP, PC
923 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 662-9700
*Counsel for Defendants Yund and Freking*

Dated:  January 10, 2007


Memorandum in Support of Defendant's Motion to Dismiss -- 9

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2007, a true and accurate copy of a *Motion To Dismiss And Motion For Order Permanently Enjoining Plaintiffs From Filing Suit Against Defendants Yund And Freking* was filed on behalf of the Defendants George Yund and Randy Freking. Notice of this filing will be sent to all parties through the Court's electronic filing system. Parties may access this filing through the Court's system.

Daniel J. Hendy also served a copy of the foregoing upon the following parties via regular U.S. Mail, first-class postage pre-paid:

Jerry L. Carr
1261 South Hills Blvd.
Hamilton, OH 45013
***Pro Se Plaintiff***

Sharon M. Carr
1261 South Hills Blvd.
Hamilton, OH 45013
***Pro Se Plaintiff***

Deborah Brenneman, Esq.
Thompson, Hine & Flory
312 Walnut Street, Suite 1400
Cincinnati, OH 45202
***Co-Defendant***

Kevin Callahan
U.S. Dept. of Justice
950 Penn. Avenue, N.W.
Washington, DC 20530
***Co-Defendant***

Lisa Frank
Supervisory Litigation Support
U.S. Dept. of Justice
US Post Office & Courthouse
Cincinnati, OH 45202
***Co-Defendant***

Agent James Turgal
Agent Rick Coy
Agent Anthony Ott
F.B.I.
550 Main Street
Cincinnati, OH 45202
***Co-Defendants***

Mrs. G. Messina
Internal Revenue Service
Employee No. 19-01665
Centralized OIC
PO Box 9011
Holtsville, NY 11742
***Co-Defendant***

Hon. Susan J. Dlott
United States District Court for the Southern District of Ohio
US Post Office & Courthouse
Cincinnati, OH 45202
***Co-Defendants***

Aaron Handelman, Esq.
Eccleston & Wolf
2001 S. Street, N.W., Suite 310
Washington, D.C. 20009
***Counsel for Defendant Judge Patricia Oney***

Stephen D. Brandt
Green & Green
Fifth Third Center, Suite 950
Dayton, OH 45402-1769
***Co-Defendant***

Joe Kidd, Inc.
1065 Ohio Pike
Cincinnati, OH 45245
***Co-Defendant***

James A. Whitaker, Esq.
226 Reading Road
Mason, OH 45040
***Counsel for James A. Whitaker, Esq.***

Charles Rittgers, Esq.
12 East Warren Street
Lebanon, OH 45036
***Counsel for*** Charles Rittgers, Esq.

Charles Detmering
PO Box 53540
Cincinnati, OH 45253-0540
***Co-Defendant***

Thomas L. McCally
Carr Maloney, P.C.
1615 L Street, NW
5th Floor
Washington, DC 20036
***Counsel for Butler County***

Michael Miller
PO Box 18667
Fairfield, OH 45018
***Co-Defendant***

Andrea Hicks, Esq.
226 Reading Road
Mason, OH 45040
***Co-Defendant***

Christopher "Kip" Schwartz
1920 N Street, N.W., Suite 800
Washington, D.C. 20036
***Counsel for Shawn Sweeny and Jake Sweeny, Inc.***

Robert C. Reichert, Esq.
9500 Kings Automall Road
Cincinnati, OH 45249
***Counsel for Defendant, Robert C. Reichert, Esq.***

John R. Wykoff, Esq.
State Farm Insurance
1000 Tri-State Building
432 Walnut Street
Cincinnati, OH 45202
***Co-Defendant***

Dan Ferguson, Esq.
Butler County Prosecutor
Government Service Center
315 High Street, 11th Floor
Hamilton, OH 45012-0515
***Co-Defendant***

Roger Fisker, Psychologist
222 High Street
Hamilton, OH 45013
***Co-Defendant***

Pat Garretson
616 Dayton Street
Hamilton, OH 45013
***Co-Defendant***

Jason A. Showen, Esq.
226 Reading Road
Mason, OH 45040
***Counsel for Jason A. Showen, Esq.***

/s/Andrew D. Herman
Andrew D. Herman

Exhibit A

Judge Manos' July 10, 1991 Order and Opinion

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

FILED
KENNETH J. MURPHY
CLERK

91 JUL 10 PM 12:08

SHARON RENNICK
JERRY CARR,

  Plaintiffs,

v.

STATE OF OHIO ATTORNEY
GENERAL, ANTHONY CELEBREZZE,
et al.,

  Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. C2-90-160

Judge John M. Manos

ORDER

  Pursuant to the Memorandum of Opinion issued in the above-captioned case this date, plaintiffs' motion to amend the complaint is denied; the case is dismissed, and the motion to bar further litigation is granted. Plaintiffs are permanently enjoined from filing any action in the United States District Court for the Southern District of Ohio without obtaining leave of the court. They are further enjoined from filing in any court, an action against any state or federal judge, or any officer or employee of any court, for actions taken in the course of their official duties. In seeking leave of court, plaintiffs must file a motion certifying that the new complaint was never previously dismissed on the merits.

  IT IS SO ORDERED.

          _____
          UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

FILED
KENNETH J. MURPHY
CLERK
91 JUL 10 PM 12:08
U.S. DISTRICT COURT

SHARON RENNICK
JERRY CARR,

       Plaintiffs,

v.

STATE OF OHIO ATTORNEY
GENERAL, ANTHONY CELEBREZZE,
et al.,

       Defendants.

CASE NO. C2-90-560

Judge John M. Manos

MEMORANDUM OF OPINION

    On May 21, 1990, plaintiffs, Sharon Rennick and Jerry Carr, filed the above-captioned case against approximately 135 defendants in the United States District Court for the Southern District of Ohio, Eastern Division.  The case was originally assigned to Judge James L. Graham.  Because several judges in the Southern District of Ohio were named as defendants, Chief Judge Gilbert S. Merritt of the United States Court of Appeals for the Sixth Circuit reassigned the case to Judge John M. Manos of the United States District Court for the Northern District of Ohio.[1]  The case is before the court on plaintiffs' motion to amend the complaint and on defendants' motions to dismiss.  Also, several defendants move the court to bar plaintiffs from filing any further actions without leave of the court.  For the following reasons, plaintiffs' motion

---

1.    Judge John M. Manos was assigned to hold district court in the Southern District of Ohio, Eastern Division (Columbus, Ohio) to hear this case.  See 28 U.S.C. § 292(b).

1



to amend is denied; the case is dismissed, and the motion to bar further litigation is granted.

I.

Plaintiffs are former employees of Champion International Corporation, a company that operates a paper mill. Rennick was discharged on November 12, 1984 for assaulting Williams Jones, a co-worker, with a razor knife. Carr was discharged for threatening co-workers he accused of harassing Rennick.

On November 16, 1984, Rennick and Carr filed grievances. Rennick's grievance was denied on October 23, 1985, by Labor Arbitrator Frank Keenan, who found she was discharged for just cause. Carr's grievance was decided in his favor on December 26, 1985, by Arbitrator Alvin Goldman, who ordered that he be reinstated because he was not terminated for just cause.

Subsequently, Rennick filed a complaint pursuant to 42 U.S.C. § 1981 against Champion and several former co-workers in the United States District Court for the Southern District of Ohio, Western Division. Judge Herman J. Weber presided over the trial. On April 15, 1988, the jury returned a verdict in favor of defendants, and awarded $5,000 in compensatory damages and $10,000 in punitive damages to defendant Jones for injuries he sustained from Rennick's assault on November 12, 1984. She appealed to the Sixth Circuit Court of Appeals which affirmed.

On November 6, 1989, plaintiffs filed an action in the United States District Court for the Southern District of Ohio, Western Division, alleging violations of the Racketeer Influenced and

2

Corrupt Organisations Act, 18 U.S.C. § 1961 et seq. (hereinafter "RICO").  On April 26, 1990, Judge S. Arthur Spiegel, to whom the case was assigned, dismissed the complaint for failing to comply with Fed. R. Civ. P. 8(a) and 12(b)(6).    Order Dismissing Complaint, Ronnick, et al. v. Frost & Jacobs et al., No. C-1-89-749, (N.D. Ohio. Apr. 26, 1990).  The court ruled that plaintiffs failed to state a claim upon which relief can be granted because the defendants were not provided with fair and adequate notice of the charges against them.  Id. at 5.  Defendants' motions for sanctions pursuant to Fed. R. Civ. P. 11 were denied.    Judge Spiegel ruled:

> We hereby deny these motions at this time since the plaintiffs have prepared their pleadings without the benefit of counsel and may be unfamiliar with the rules of this Court.  The plaintiffs are cautioned, however, that even pro se pleadings are governed by the Federal Rules of Procedure. . . .  If any future pleadings of the plaintiffs are found to violate this Rule, the Court may impose sanctions upon the plaintiffs which may include requiring the plaintiffs to pay the other parties' reasonable expenses in responding to the pleadings including reasonable attorney fees.

Id. at 4.  The court gave plaintiffs twenty days to amend their complaint to comply with Fed. R. Civ. P. 8(a).    Id. at 4. Plaintiffs did not amend and did not appeal the dismissal.

This case was filed in the Southern District of Ohio, Eastern Division, on May 21, 1990, pursuant to 18 U.S.C § 1961, 42 U.S.C. 1985(3), 42 U.S.C. § 1981, 42 U.S.C. § 2000(e), and O.R.C § 4123.90.  The complaint is virtually the same as the previous one with the exception that it adds Judge Spiegel and others as defendants.  As before, plaintiffs allege that Frost and Jacobs,

3

the law firm representing Champion, set up a network of organized crime in Cincinnati, Ohio.  Among the defendants are eight attorneys who formerly represented plaintiffs and allegedly conspired with Frost & Jacobs to extort $50,000 in legal fees. Plaintiffs sue United States District Judges, United States Court of Appeals Judges, Ohio State Court of Common Pleas Judges, and judicial employees for conspiracy to obstruct justice and claim that the assessment of filing fees by the Clerk of Courts is a conspiracy to extort money.  Plaintiffs seek $250,000,000 in compensatory damages and $750,000,000 in punitive damages.

On June 21, 1991, this court scheduled and held a conference in Columbus, Ohio to allow plaintiffs, who are before this court pro se, the opportunity to cure the defects in the complaint and respond to the defendants' motions to dismiss.  The court stated that because the complaint was confusing, vague and asserted conclusions without factual predicates, the court could not identify any basis for their legal assertions.

To plead a RICO violation, a plaintiff must show that the defendant conducted or participated in the conduct of the affairs of an enterprise which affects interstate commerce and that this participation exhibited a pattern of racketeering activity through at least two acts which occurred within ten years of each other and which are related and exhibit continuity or a threat of continuity. See H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S. Ct. 2893 (1989),  United States v. Jenkins, 902 F.2d 459, 463 (6th Cir. 1990), United States v. Young, 906 F.2d 615 (11th Cir.

4

1990).  Because none of these appeared in the complaint, the court afforded plaintiffs an opportunity to orally present the factual base for their charges.  Both plaintiffs commented, but said nothing other than what is in their complaint.

Plaintiffs stated that their action under 42 U.S.C. § 1985(3) was based on the assessment of filing fees by the Clerk of Courts and his staff.  To state a cause of action under this section, plaintiffs must allege:

(1)  a conspiracy,

(2)  to deprive any person or a class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws,

(3)  an act by one of the conspirators in furtherance of the conspiracy, and

(4)  a personal injury, property damage or a deprivation of any right or privilege of a citizen of the United States.

Gillespie v. Civiletti, 629 F.2d 637, 641 (9th Cir. 1980), citing, Griffen v. Breckenridge, 403 U.S. 88, 102-03, 91 S. Ct. 1790, 1798 (1971).  Plaintiffs offered no facts to support this charge.

## II.

In the motion to amend their complaint, plaintiffs demand a "criminal investigation and a grand jury for indictment on criminal charges," based on the allegation that they are the victims of continuous threats of irreparable injury and death.  Motion for Leave to File Amended Complaint, Rennick, et al. v. State of Ohio Attorney General, et al., No. C2-90-360 (N.D. Ohio filed July 16, 1990).

5

Leave to amend a complaint "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). However, if plaintiffs do not articulate facts which are a proper subject for relief, the district court may deny the motion. See Foman v. Davis, 371 U.S. 173, 182, 83 S. Ct. 227, 230 (1962). A civil complaint is not the means by which to initiate a criminal investigation. Therefore, their motion to amend is denied.

### III.

A number of defendants filed motions to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) asserting that the complaint fails to state a claim upon which relief can be granted because it alleges the same legal arguments and factual matters dismissed on the merits by Judge Spiegel. Defendants, therefore, assert that this action is barred by the doctrine of res judicata.

A dismissal pursuant to Fed. R. Civ. P. 12(b)(6) is an adjudication on the merits unless the case is dismissed without prejudice. Craighead v. E.F. Hutton & Co., 899 F.2d 485, 495 (6th Cir. 1990). Because Judge Spiegel dismissed the case with prejudice, the dismissal is an adjudication on the merits. The doctrine of res judicata mandates:

> [I]f the second action is upon the same cause as the former one, the judgment on the merits in the first case is an absolute bar to the subsequent action between the same parties, not only in respect to every matter which is actually offered, but also as to every ground of recovery which might have been presented.

White v. Colgan Elec. Co., Inc., 781 F.2d 1214, 1216 (6th Cir. 1986), quoting, Baltimore S.S. Co. v. Phillips, 274 U.S. 316, 47

6

S. Ct. 600 (1927).  The court finds no material differences between the case before it and the case before Judge Spiegel.  Because res judicata is an affirmative defense which bars relitigation, the complaint is dismissed.

Moreover, the forty-four page complaint is rambling, unintelligible, and does not set forth specific facts underlying the claims for relief.  Many defendants named are not mentioned in the many charges of the complaint.  Accordingly, it shall be dismissed for failure to comply with Fed. R. Civ. P. 8(a).[2] Because the complaint fails to set forth a short and plain statement of the claim showing plaintifs are entitled to relief, the dismissal is with prejudice.

---

2.  Fed. R. Civ. P. 8(a) provides:

A pleading which sets forth a claim for relief . . . shall contain

. . .

(2)  a short and plain statement of the claim showing that the pleader is entitled to relief . . .

Ordinarily, in a dismissal for failure to comply with Rule 8, the pleader is given an opportunity to amend the complaint.  See Kappus v. Western Hills Oil, Inc., 24 F.R.D. 123, 128 (E.D. Wis. 1959).  However, a court need not grant leave to amend if it would be futile to do so.  Brown v. Califano, 75 F.R.D. 497, 499 (D.D.C. 1977); Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962).

7

## IV.

This court next considers whether plaintiffs shall be enjoined from further litigation without leave of court. Two sources authorize courts to enjoin prolific litigators. <u>Kersh v. Borden Chemical, Div. of Borden, Inc.</u>, 689 F.Supp. 1442 (E.D.Mich. 1988). First, federal courts "have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions." <u>In re Martin-Trigona</u>, 737 F.2d 1254, 1261 (2d Cir. 1984), <u>cert. denied</u>, 474 U.S. 1061, 106 S. Ct. 807 (1986). More frequently, federal courts invoke the second source, the All Writs Act, 28 U.S.C. § 1651, to enjoin vexatious litigation.[3] The Sixth Circuit Court of Appeals has approved this "method for handling the complaints of prolific litigators. . . ." <u>Filipas v. Lemons</u>, 835 F.2d 1145, 1146 (6th Cir. 1987).

---

3.    28 U.S.C. § 1651 provides in part:

    (a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

8

Litigiousness alone does not support an injunction restricting further litigation. Pavilonis v. King, 626 F.2d 1075, 1079 (1st Cir. 1980), cert. denied, 449 U.S. 829, 101 S.Ct. 96 (1980). "Ultimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties." Safir v. United States Lines, Inc., 792 F.2d 19, 24 (2nd Cir. 1986), cert. denied, 479 U.S. 1099, 107 S. Ct. 1323 (1987). The Second Circuit Court of Appeals established the following test to determine whether to restrict a litigant's future access to the courts:

(1)  the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits;

(2)  the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?;

(3)  whether the litigant is represented by counsel;

(4)  whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and

(5)  whether other sanctions would be adequate to protect the courts and other parties.

Safir, 792 F.2d at 24.

All factors of the Safir test are present in this case. Plaintiffs have a history of attempting to relitigate cases previously decided. This is the second frivolous RICO action filed against a multitude of defendants, many of whom are not mentioned

9

in any claim.  It is plaintiffs' third action alleging that their employment termination in 1984 violated 42 U.S.C. § 1981.[4]  The trial of her 42 U.S.C. § 1981 action afforded Rennick a full opportunity to litigate this claim.  Plaintiffs persistently refuse to accept the finality of judicial decisions and proceed to sue every judicial officer who issues a decision adverse to their interests.[5]  The plaintiffs, who are before the court pro se, clearly do not demonstrate a good faith expectation of prevailing. Despite repeated judicial comment and instruction on how to amend their complaint to comply with Rule 8(a), plaintiffs do not state clear and understandable operative facts.  The court finds that plaintiffs' repetitious and frivolous suits constitute an abuse of the judicial system.

## V.

Accordingly, plaintiffs are permanently enjoined from filing any action in the United States District Court for the Southern District of Ohio without obtaining leave of the court.  They are further enjoined from filing in any court,[6] an action against any state or federal judge, or any officer or employee of any court,

---

4.  The court questions Carr's standing to assert any claim because he was subsequently reinstated to the job from which he was separated.

5.  This behavior alone justifies the use of the injunction because such repeated litigation is costly to the defendants and wastes scarce judicial resources.  See Harrelson v. United States, 613 F.2d 114 (5th Cir. 1980).

6.  Gordon v. United States Department of Justice, 558 F.2d 618 (1st Cir. 1977), Rudnicki v. McCormack, 210 F.Supp 905, 911 (D.Mass. and R.I. 1962).

10

for actions taken in the course of their official duties.  In seeking leave of court, plaintiffs must file a motion certifying that the new complaint was never previously dismissed on the merits.

IT IS SO ORDERED.

_John M. Mans_
UNITED STATES DISTRICT JUDGE

Exhibit B

April 15, 1998 Order

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SHARON RENNICK,

            Plaintiff

        v.                          C-1-84-1487

CHAMPION INTERNATIONAL
CORPORATION, *et al.*,

            Defendants

## ORDER

This matter is before the Court following the presentation of evidence at a trial held from March 7, 1988 until March 15, 1988. Plaintiff's claims brought under 42 U.S.C. § 1981 and defendant Jones' Counterclaims for damages were tried to a jury. Plaintiff's claims under 42 U.S.C. § 2000e *et seq.* were tried to the Court. Plaintiff seeks damages and injunctive relief arising from violations of her rights under those statutes. The jury found for defendants on the Section 1981 claims and further awarded Jones $15,000 on his counterclaims. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court does submit herewith its Findings of Fact and Conclusions of Law.

## I. Introduction

The plaintiff's Complaint alleged violations of her rights secured by 42 U.S.C. § 1981, 42 U.S.C. § 1985(3), 42 U.S.C. § 2000e *et seq.* (Title VII) and various state laws.

*119*

- 2 -

She named as defendants her prior employer, Champion International Corporation ("Champion"), and four individuals employed by Champion, two of whom held supervisory positions.

In its Order denying defendants' Motion for Summary Judgment, the Court granted the individual defendants a judgment of dismissal against the plaintiff as to her claims under Title VII because the plaintiff had filed no charges of discrimination against them either with the Equal Employment Opportunities Commission ("EEOC") or the Ohio Civil Rights Commission ("OCRC"). The Court further dismissed plaintiff's claims under 42 U.S.C. § 1985(e) and the pendent state claims.

The case then proceeded to trial on the remaining claims of discrimination in private employment on the basis of race under 42 U.S.C. § 1981 and discrimination on the basis of race and sex under Title VII. The circumstances which formed the basis of plaintiff's allegations under both statutes are almost identical. Therefore, all evidence and testimony was presented at the trial. Only the claims as to race discrimination under § 1981 and the counterclaims of Jones were given to the jury. The Court now considers plaintiff's claims of race and sex discrimination under Title VII.

At trial, plaintiff claimed two types of discriminatory behavior by defendant Champion under Title VII: a hostile work environment and retaliatory discharge.

- 3 -

## II. Findings of Fact

1.    Plaintiff is a white female citizen of the United States who resides within the jurisdiction of the Court.    The Court's jurisdiction over the subject matter of this action is not contested.

2.    Plaintiff was employed by defendant Champion from 1981 until her discharge in November, 1984.    At all relevant times, she was employed in the trim-pack department of Champion at its Hamilton, Ohio paper mill.

3.    Two of the defendants at trial, Lewis "Wormey" Wilson and William "WaWa" Jones, were plaintiff's co-workers in the trim-pack department.    Defendant Joseph Stephens was their direct supervisor.    Defendant Dave Stewart was Stephens' direct supervisor.

4.    The trim-pack department was a large, open area filled with large machines and industrial vehicles.    For protection, employers were required to wear steel-toed shoes.    Between 60 and 70 workers were present during each shift.    The work was physical; bad language, crude jokes and insults were bantered about constantly.

5.    On June 26, 1984, plaintiff was involved in a water fight, near the trim-pack department, with a co-worker named Howard.    At that time, a rumor was circulating the paper mill that plaintiff was in some way associated with Howard. Another rumor was circulating that Howard was black.    Shortly after the waterfight, Wilson asked plaintiff if she knew she was playing around with a "nigger" and stated that she should, instead fool around with him as he "would make it worth her while."

6.    On June 27, 1984, Jones put a polka-dot rag on a stick
and hung it near plaintiff's work station.  He had done this
on several prior occasions referring to it as a "crying
towel" to be used by one of plaintiff's rejected suitors.
Plaintiff had frequent visitors and was popular with her
co-workers.  Jones had chosen this particular rag at random
from a box of similar rags.

Plaintiff reacted violently to the hanging of the "flag"
because she presumed a connection between it, Wilson's
comments of the day before, and the rumors about she and
Howard.  Plaintiff's co-worker, Juanita Croucher, took her
into Stephens' office, her direct supervisor, where both
Croucher and Stephens attempted to calm plaintiff by forcing
her to sit down.  By all accounts, she was hysterical.

While in the office, plaintiff complained to Stephens
about Wilson's comments and Jones' action.  Stephens, who had
attended a one-day training session on harassment, determined
that the best course of action was to make an oral report to
his superior, Stewart.

7.    Plaintiff also complained to Stewart, Stephens' direct
supervisor, about Wilson's comments and about an "improper
sexual act" and about Jones' "flag."  Stewart reported the
complaints to John Qualls in Labor Relations.

8.    At the time of the incident, John Qualls was Supervisor
of Labor Relations.  He met twice with plaintiff.  On June
27, plaintiff complained to him that Wilson had accused her
of sexual intimacy with a black man, had made another

offensive remark and that Stephens had violently shaken her while she was in his office.  Qualls met again with plaintiff and plaintiff's union representative on June 29 at which time it was suggested to plaintiff that she could receive counselling through the company program.

Qualls reported the complaints to his supervisor, Thomas Eberwein, who told him to investigate the matter, to talk with Earl Hillman and Stewart, both supervisors, who were told to look into it.  They reported to Qualls that the Wilson and Jones incidents had been handled appropriately, that Stephens had denied shaking plaintiff and Croucher, an eyewitness, had corroborated Stephens' statement.  Qualls believed the oral reprimand to Wilson was sufficient.  Qualls did not report to plaintiff because it was the company's policy not to do so.

Qualls testified that it was the company's policy not to tolerate any type of harassment and that he did not believe plaintiff's civil rights had been violated.

9.   At the time of the incident, Thomas Eberwein was Manager of Employee Relations at the paper mill.  He also met with plaintiff several times and was aware of her allegations.  He instructed several supervisors to investigate.  He testified, stating that Wilson and Jones should have been reprimanded in writing but admitted that he never followed up on the matter after referring it to his subordinate, John Qualls, as was his practice.

- 6 -

10.   Wilson received a verbal reprimand from Stephens and Hillman.  He was warned "not to say anything to her again or there would be disciplinary action."  Both told him "never to bother or harass" plaintiff.

11.   Jones was not reprimanded as a result of plaintiff's complaints.  He testified that he took it upon himself not to talk to her anymore.

12.   On June 29, 1984, plaintiff's time card was switched with the time card of Howard.  Stephens straightened it out immediately.

13.   On June 30, 1984, plaintiff sustained a back injury at work and was away from the paper mill for several months. She received workers' compensation.  During that time, plaintiff filed the present lawsuit, filed claims of discrimination with the OCRC and the EEOC, and conferred with another co-worker, Jerry Carr, concerning other internal avenues of redress.

14.   Plaintiff returned from her disability leave in the Fall of 1984.  She was initially assigned to the Tri-County plant performing only light work due to her medical condition. Eventually she returned to the Hamilton paper mill.

     Upon her return, she was described as withdrawn and beligerent.  Her co-workers avoided her in response to this attitude.

15.   On October 29, 1984, several days after returning to work at the paper mill, plaintiff was wearing gym shoes in an area where steel-toed shoes were required.  A co-worker

reported her to Stephens who asked his co-supervisor Dick Brockman to warn her and tell her to wear the correct shoes. When plaintiff returned to the work area from getting her shoes, she approached Jones from behind and slashed him with a knife she had obtained from her locker. The jury determined this act of plaintiff to be a battery and awarded Jones total damages of $15,000.00.

Jones reported the injury to Stephens who saw to it that he was taken to a hospital and plaintiff was taken to the medical department.

16.    During the next few days, Cathy Chapel, a loss prevention specialist, investigated the incident and reported her findings directly to Thomas Eberwein. Plaintiff was suspended pending the investigation and was requested to report to the paper mill to discuss the incident. She refused to discuss the matter upon which Champion informed her she could be accompanied and advised by an attorney at all discussions. Plaintiff refused to meet with company representatives. She did not respond in any manner to their requests and presented no justification for her action of slashing Jones.

By letter of November 12, 1984, plaintiff was terminated because of her violent attack on a fellow employee in violation of Mill Rules 2.24 and 2.25.

Eberwein testified that under the union contract, an aggressor would be terminated. Eberwein, Qualls and Stewart testified that in making the determination that plaintiff be

discharged, they individually considered and rejected the events of June as sufficient to provoke or justify plaintiff's attack on Jones.     This Court finds no justification for plaintiff's slashing of Jones.

### III. Conclusions of Law

Plaintiff claims violations of her rights pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e and 42 U.S.C. § 1981, specifically that Champion permitted and encouraged harassment which created a hostile work environment and perpetrated a retaliatory discharge on the basis of sex and race.

In *Moore v. Sun Oil Co. of Pa.*, 636 F.2d 154 (6th Cir. 1980), the Court instructs that when both equitable and legal claims are presented pursuant to Title VII and § 1981, the plaintiff shall have a right to a jury trial on the legal claims stated pursuant to § 1981 and the facts common to both the legal and equitable claims.

The Court submitted a special verdict to the jury as follows:

> We, the Jury, unanimously find in the above-entitled and numbered case, the following special verdict:
>
> 1.    Do you find by a preponderance of the evidence that defendant, Champion International Corporation, intentionally discriminated against the plaintiff because of race?
>
>                  X     No
>
> 2.    Do you find by a preponderance of the evidence that any of the defendants, Champion International Corporation, William Jones, Joseph

- 9 -

> Stephens, David Stewart, or Lewis
> Wilson, subjected plaintiff to a
> concerted pattern of racial
> harassment?
>
>          __X__    No as to each defendant

The jury specifically found that defendant Champion did not subject plaintiff to a concerted pattern of racial harassment. Accordingly, in ruling upon the plaintiff's claim of racial discrimination against defendant Champion pursuant to §2000e, the Court, bound by the jury's determination of the facts, finds that defendant Champion acted reasonably in responding to plaintiff's complaints in June, and did not violate plaintiff's rights to be free from harassment because of race pursuant to 42 U.S.C. § 2000e.

Plaintiff's claims of sexual harassment derive from Title VII's proscription that it "shall be an unlawful employment practice for an employer . . . to discriminate against an individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1) (§703(a)(1) of Title VII). Plaintiff is alleging that defendant Champion permitted, condoned, or acquiesced in the continual acts of sexual harassment by its employees, thus humiliating plaintiff and creating an offensive work environment.

A plaintiff may establish a violation of Title VII prohibiting sex discrimination in employment by proving that discrimination based on sex has created a hostile or abusive

work environment. *Meritor Savings Bank, FSB v. Vinson*, 106 S. Ct. 2399 (1986). The EEOC guidelines emphasize that the trier of fact must determine the existence of sexual harassment in light of "the record as a whole" and "the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred." *Id.* at 2405. The Supreme Court further noted that "the mere existence of a grievance procedure and a policy against discrimination coupled with a plaintiff's failure to invoke that procedure will not insulate an employer from liability" but all relevant factors must be considered. *Id.* at 2408.

In *Rabidue v. Osceola Refining Company*, 805 F.2d 611 (6th Cir. 1985), the United States Court of Appeals for the Sixth Circuit addressed a claim asserting a Title VII violation based upon an alleged sexually discriminatory work environment. After reviewing the definition of sexual harassment contained in the EEOC guidelines (29 C.F.R. § 1604.11(a)) and reviewing the appropriate case law, the Court concluded that, in a Title VII action alleging offensive work environment sexual harassment, a plaintiff must assert and prove that: (1) she belongs to a protected class; (2) she was subjected to unwelcome verbal or physical conduct of a sexual nature; (3) the harassment complained of was based upon sex; (4) "the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or

- 11 -

offensive working environment that affected seriously the
psychological well-being of the plaintiff;" and (5) "the
existence of respondeat superior liability." *Id.* at 619.

Plaintiff, a woman, is a member of a protected class who
was subjected to unwelcome verbal or physical conduct. The
comments by Wilson about any physical involvement she had
engaged in and his suggestions about future liaisons were
offensive to her. Whatever touching occurred in Stephens'
office was offensive to her as was the hanging of the "flag."
All of this conduct is based on sex, including the "flag"
hanging. The replacement of her time card also was based on
sex. Although evidence of other offensive sexual conduct was
brought out at trial, plaintiff testified that everything
which was part of the lawsuit centered around Wilson's
remarks, Jones' flag and Stephens' conduct during the
interviews in his office. Prior to that, she had experienced
no significant problem with the company or a co-employee.
Plaintiff has fulfilled the first three elements required to
prove a Title VII action alleging offensive work environment
sexual harassment.

The *Rabidue* Court analyzed at length the fourth element
of its test, requiring proof that the harassment unreasonably
interfered with plaintiff's work performance and created an
intimidating, hostile, or offensive working environment that
seriously affected plaintiff's psychological well-being. The
Court first noted that proof of a sexually hostile or
intimidating environment would require evidence demonstrating

- 12 -

that plaintiff's injury resulted from a series, rather than a single or isolated incident, which "occurred with some frequency." *Rabidue, supra,* at 620. In evaluating the asserted abusive conduct, the Court found that the standard must be one by which the trier of fact review the "totality of the circumstances" from "the perspective of a reasonable person's reaction to a similar.environment under essentially like or similar circumstances."

This Court finds that plaintiff failed to establish the fourth element. The comments of Wilson and the actions of Jones were isolated incidents, not the multiple, varied and frequent offensive exposures required to prove this element. All the incidents proposed by plaintiff to support her claim happened within a very short time-span. There was no independent evidence presented at trial suggesting they were related. Besides denying any discriminatory or insulting motive for his own actions, Jones testified that he was not even aware of Wilson's actions of the day before. This Court finds that plaintiff failed to prove her allegation that Stephens shook her.

Considering the environment, none of the alleged conduct suggests the intimidation Courts have required to establish this element. The only conduct which did not occur in the middle of a large, loud industrial department populated by over 60 people, happened in an office with windows and a woman eyewitness present. Viewed in their totality, the incidents fall far short of being a concerted pattern of

harassment.

Plaintiff also failed to prove the fifth element of the *Rabidue* test which requires that plaintiff demonstrate respondeat superior liability. Plaintiff must prove that "the employer, through its agents or supervisory personnel, knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Rabidue, supra*, at 621. Plaintiff's supervisors were made aware of her complaints concerning all incidents by her direct supervisor and by plaintiff herself. Supervisors were instructed to investigate and address all situations. Wilson's conduct, probably the most offensive, was addressed most seriously. Although there was testimony that he, perhaps, should have received more severe disciplinary action than a verbal reprimand, the supervisors believed that he had been sufficiently warned.

The Court notes, at this point, that although plaintiff was familiar with the grievance procedure in place at the Hamilton paper mill, she never filed a formal grievance regarding any offensive conduct which forms the basis of this lawsuit electing instead to meet personally with her supervisors. They were reasonably available to her considering the number of meetings she had with them prior to going on disability leave some 72 hours after the first incident occurred.

Having failed to prove the last two elements, the Court finds that plaintiff failed to prove either that a hostile work environment was present or that defendant Champion

- 14 -

condoned or permitted the existence of such an environment in violation of Title VII.

Turning to plaintiff's discriminatory discharge claim, it is a classic disparate treatment, retaliatory discharge claim under Title VII. Plaintiff is claiming that she was discharged because she filed claims with the EEOC and OCRC charging discrimination on the basis of race and sex.

At the outset, the Court notes that the jury was instructed on the elements of retaliatory discharge and failed to find that defendant Champion discriminated against the plaintiff in that regard on the basis of race.

A recent Sixth Circuit case dealing with a retaliatory discharge under Title VII, is *Jackson v. Pepsi Cola*, 783 F.2d 50 (6th Cir. 1986). The opinion in that case teaches that the *McDonnell Douglas* model is to be applied. Plaintiff must establish a prima facie case by showing that (1) she filed a charge of discrimination, (2) she was subsequently subjected to an adverse employment action, and (3) there is a causal link between the filing of the charge and the adverse employment action. *Id.* at 54. Plaintiff could also establish a prima facie case by demonstrating that the employer treated her less favorably than other similarly situated employees because of the filing of her charges. *Smith v. Pan Am World Airways*, 706 F.2d 771 (6th Cir. 1983).

The Court finds that plaintiff failed to establish a prima facie case of discriminatory, retaliatory discharge on the basis of race or sex. The first two *Jackson* elements

- 15 -

were undisputed: plaintiff filed charges and was later discharged from her job. Plaintiff totally failed, however, to prove any causal link between the filing of the charges and her discharge. She was discharged because she violently attacked a fellow employee with a knife. Although her supervisors admitted to being aware of the EEOC and OCRC charges and the filing of this lawsuit prior to her discharge, the company gave her every opportunity to defend her actions against Jones which she declined to do. As evidenced in her termination letter, the company felt it was compelled, under the union contract, to discharge her especially since no justification was introduced for her actions. Further, the Court finds that workers would be afraid to work with her after the unprovoked attack on Jones.

Plaintiff's supervisors Stewart, Eberwein and Qualls testified that while they were aware of the allegations of discrimination alleged in her charges, they failed to see any connection between them and the attack on Jones.

Further, plaintiff failed to demonstrate that she was treated less favorably than other similarly situated employees. Plaintiff failed to produce evidence of any employee who had violently caused serious injury to a fellow employee and was not discharged.

Since the plaintiff failed to establish a prima facie case, the Court need not proceed to determine whether defendant Champion articulated a legitimate non-discriminatory reason for the discharge, however, this

- 16 -

Court finds the attack on Jones by plaintiff was just cause to discharge her and was not pretextual.

The Court concludes that the discharge was not the result of discriminatory retaliation or otherwise in violation of Title VII.

### IV. Conclusion and Order

For the reasons stated in the foregoing opinion, the Court finds and concludes that plaintiff has failed to sustain any of the claims which she has asserted. Therefore, the Clerk of Courts is hereby **DIRECTED** to enter a judgment indicating that defendant prevailed in this case and plaintiff takes nothing.

IT IS SO ORDERED.

_____
Herman J. Weber, Judge
United States District Court

AO 450 (Rev. 5/85)   Judgment in a Civil Case   ⊕

# United States District Court

~~SOUTHERN~~ DISTRICT OF ~~OHIO~~

SHARON RENNICK

## JUDGMENT IN A CIVIL CASE

V.

CHAMPION INTERNATIONAL CORPORATION, et al

CASE NUMBER:     C-1-84-1487

☒ **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☐ **Decision by Court.** This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

**THAT** the Court finds and concludes that the plaintiff has failed to sustain any of the claims which she has asserted. Judgment is entered indicating that defendant has prevailed in this case and plaintiff takes nothing.

Judge _____
Mag. _____
Journal _____
Motion # _____
Issue _____
Card _____
N/S _____
Docketed _____

_____
     April 15, 1988
*Date*

_____
     KENNETH L. MURPHY
*Clerk*

_____
*(By) Deputy Clerk*   D. A. Myers

120

# Exhibit C

October 8, 1987 Order

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JERRY LEE CARR,

      Plaintiff

vs                                        CASE NO. C-1-86-412

CHAMPION INTERNATIONAL
CORP.,

      Defendant

## ORDER

    This case is before the Court following a non-jury trial on the merits. The parties unanimously consented that all proceedings in this action, including trial and entry of final judgment, may be conducted by the United States Magistrate, and any appeal shall be taken to the United States Court of Appeals for the Sixth Circuit.

    Plaintiff Jerry Carr brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended (Title VII). Plaintiff alleged he was discharged from his employment with defendant Champion International Corp. (Champion) in retaliation for protesting acts of discrimination against another and for participating in a Title VII proceeding. Defendant denied retaliation and claims that its actions were taken for legitimate business purposes. At the conclusion of plaintiff's case-in-chief, we granted defendant's motion for dismissal under Fed. R. Civ. P. 41(b).

34

2

# FINDINGS OF FACT

The following facts were presented during plaintiff's case-in-chief. Defendant has not had an opportunity to offer rebuttal evidence.

1.  Plaintiff is a white male citizen of the United States who resides within the jurisdiction of the Court. The Court's jurisdiction over the subject matter of this action is not contested.

2.  Plaintiff was employed by defendant for approximately 18 years until his discharge on November 14, 1984. At all relevant times, he was employed as a second class electrician in Champion's maintenance department at its Hamilton, Ohio paper mill (Mill). During the Spring of 1984, plaintiff was also a union steward.

3.  On June 26, 1984, Sharon Rennick, a white female who worked in the trim-pak department at the Mill was involved in a "water fight" with John Howard, another trim-pak employee. A false rumor was then circulating that Howard was black. Howard, who is dark-skinned with black curly hair, is in fact white. Lewis "Wormy" Wilson, a white employee who observed the water fight, stated to Rennick, "If you want to play around with somebody, play with me, I'll make it worth your while."

4.  On June 27, 1984, Wilson approached Rennick and suggested that she was socializing with a black man, referring to Howard. Later that day another white employee, William "Wa-wa" Jones, placed a brown and white polka dot cloth at the end of a stick near Rennick's work station. Rennick took this to symbolize an interracial

3

relationship between herself and Howard.    Rennick was embarrassed.

5.    No further incidents occurred concerning teasing or harassment of Rennick due to her contact with Howard.    It was not unusual for employees in the trim-pak department to play practical jokes upon one another.

6.    Rennick consulted a supervisor, Joseph Stephens, about the remarks of Wilson and the actions of Jones. Rennick claimed Stephens "shook" her and told her the controversy was slowing up production.    Neither Stephens nor any other witness to this conversation testified because defendant was not required to offer evidence.

7.    On June 28, 1984, Rennick asked plaintiff to assist her in connection with the actions of Wilson and Jones. Plaintiff believed these incidents constituted harassment of Rennick.    Although Rennick had access to a union steward available in her department, she elected to approach plaintiff, a steward in another department, because a romantic relationship existed between them.    Plaintiff could have discussed this problem with Rennick during their meetings outside the workplace, but he instead chose to leave his workstation on numerous occasions to meet with Rennick.

8.    Plaintiff's supervisor, Mel Watterson, became concerned because plaintiff was leaving his assigned job duties to meet Rennick in the trim-pak department.    He initially informed plaintiff that he could not represent Rennick.    Plaintiff advised Watterson on June 28, 1984, that he had a personal interest in Rennick.    (Joint Ex. X). Watterson's notes document that plaintiff was away from his work area at least six times on June 27 and 28, and that plaintiff had a confrontation with Jones on June 27.

4

9. On June 29, 1984, plaintiff met with Watterson's supervisor, Lee Gentry, to obtain permission to represent Rennick. Gentry agreed that plaintiff, as union steward, could represent someone outside his department, but stated that plaintiff would have to obtain permission from a supervisor before meeting with Rennick during working hours. Pursuant to the normal rotation system for second class electricians, June 29 was the last day plaintiff was supervised by Watterson.

10. On or about July 1, 1984, plaintiff was advised by the union that someone else would handle Rennick's problem. Plaintiff approached the plant manager, who said he would do something about the problem. Plaintiff never filed a grievance on behalf of Rennick, although Rennick had allegedly asked him to do so.

11. Rennick was embarrassed in June 1984 concerning any implication by Wilson or Jones that she would associate with a black man. Rennick freely used racial epithets, other racially derogatory language and vulgarisms during her deposition and at trial. Although she sometimes placed these comments in the mouths of others, there were numerous instances where they freely flowed in her own statements. These remarks were not necessary to an understanding of her statements, but were often gratuitously added. Plaintiff exhibited the same tendency in his testimony. The interest Rennick and plaintiff sought to protect was to disassociate Rennick from any connection with a black male, because both Rennick and plaintiff found such association to be embarrassing.

12. After June 29 Rennick was on a physical disability leave from work due to a back problem and "nerves." She did not return until October 8, 1984. During the three weeks following her return to work, her duties were split between light duty at Champion's Tri-County location, some distance from the Mill, and her position at the Mill. On

5

October 25, 1984, union steward John Eversole filed a grievance on Rennick's behalf concerning complaints (unrelated to this case) she made while working at Tri-County.

13. On October 11, 1984, Rennick filed suit against Champion, alleging racial harassment. (Pl. Ex. 1). On October 16, 1984, Rennick filed a complaint with the Ohio Civil Rights Commission (OCRC) and the Equal Employment Opportunity Commission (EEOC), alleging racial harrassment at Champion. (Joint Ex. VII). All of the above related to the incidents of June 26 and 27, 1984. Plaintiff met with Rennick's attorney and offered to testify as a witness in these proceedings. However, defendant was not aware of plaintiff's offer until after plaintiff's discharge.

14. On October 28, 1984, plaintiff visited Rennick at her home at approximately 6:30 p.m. When Rennick left for work on the 11:00 p.m. - 7:00 a.m. shift, plaintiff remained at her residence with her child. On the morning of October 29, while at work, Rennick, without provocation, approached Jones from behind and slashed him with a razor-scraper while he was standing in an aisleway in the trim-pak department. Twenty-three stitches were required to close his wounds. Rennick was arrested by the police, and she told them to contact plaintiff at her residence. Rennick, who had received psychological counseling in October 1984, did not explain the reason for her attack on Jones during her testimony, other than to say that she believed he was "stalking" her; i.e., "sneaking around." There was no evidence that the razor attack was related to the events of June 1984.

15. Defendant suspended Rennick pending further investigation. The attack was regarded as a serious matter by defendant. It was the first such incident at the Mill. Rennick ultimately was discharged for attacking and injuring Jones.

6

16.  Plaintiff chose to remain at Rennick's residence on October 29, 1984, rather than report for work.  On October 30, at about 12:15 p.m., he began his lunch break by taking a circuitous route from his work location to the employee cafeteria, which took him through the trim-pak department where both Wilson and Howard were working.  He confronted Wilson from about 40 feet away and made a gesture with his finger across his throat and stated, "You're going to have to answer for this - you and four or five other people."  Wilson took this as a threat and shortly thereafter reported it to plant protection officials.  At about the same time, plaintiff confronted Howard, pointed at him and drew his finger across his throat.  Howard felt threatened, but was not sufficiently upset to report the event.

17.  Upon learning of the alleged threats by plaintiff, John Qualls, a supervisor in defendant's labor relations department, instituted an investigation.  As part of that investigation, he ordered plaintiff's supervisor, John Alder, to obtain plaintiff's version of the events.  On October 30, 1984, Alder met with plaintiff and his union steward. Plaintiff denied making any threats and asked Alder if he was being questioned because he was a witness for Rennick. Alder knew nothing about plaintiff being a witness.  Plaintiff asked him for the names of those he was accused of threatening.  Alder told him they were Howard, Wilson and others whose names he did not know.

18.  On October 30 and November 2, 1984, defendant mailed letters to plaintiff at Rennick's address after efforts to contact him at his residence were unsuccessful,[1] in order to give him a further opportunity to respond to the allegations that he threatened fellow employees.  As a result, Alder had a second meeting with plaintiff on November 7, during which plaintiff was asked for his

---

[1]  Plaintiff testified that he lived at his mother's residence.

7

version of the events. Plaintiff denied making any threats and refused to answer any questions about his whereabouts on October 30, citing Rennick's lawsuit and her attorney.

19. On November 8, 1984, plaintiff told Paul Connover, a supervisor, that Rennick had been told by co-workers that Wilson had threatened plaintiff. Defendant's labor relations department directed an investigation of that allegation. The two co-workers who allegedly heard the threat were questioned, but both denied hearing such a threat. Wilson was not disciplined because there was no evidence a threat had been made.

20. On November 14, 1984, Jack Winterhalter, manager of maintenance engineering, and Thomas Eberwein, manager of defendant's labor relations department, decided to discharge plaintiff from his employment due to the threats against Wilson and Howard. Although defendant was not required under its rules to discharge plaintiff for the threat, they felt plaintiff had not cooperated in the investigation. Both Wilson and Howard had provided statements concerning the threats and two other employees had observed plaintiff in the trim-pak department at the time the threats were made. Although plaintiff denied making threats, he refused to account for his whereabouts during the time in question. Winterhalter and Eberwein viewed the threats by plaintiff, known to have a "boyfriend-girlfriend" relationship with Rennick, as a continuation of the incident the preceding day when Jones was slashed by Rennick. They believed that Carr's gesture to Wilson and Howard and the accompanying words conveyed a threat of death. Carr had no remorse about it and they felt he would carry out the threat. They considered the circumstances serious enough to warrrant discharge.

8

21. On January 22, 1986, employee Glenna Sutton argued with two other employees in the ladies' restroom. Sutton allegedly drew a knife during the argument. During a meeting on January 29, 1986, Sutton told a supervisor she was having personal problems and the two other employees had been harassing her concerning these problems. She admitted drawing the knife. On February 6, 1986, Charles Wyatt, defendant's "calendars and embossers" general supervisor, issued a one week disciplinary suspension to Sutton.

22. On September 30, 1984, employee Earl Baker allegedly pushed another employee, called him "names," and asked him to leave the company property to fight. On October 4, 1984, a "rewinders" supervisor, Kellous Peters, issued a written reprimand to Baker.

23. On May 16, 1983, after a supervisor confronted him about leaving work early, employee Robert Stewart called the supervisor a "four-eyed goofball" and threatened to "deck" him if Stewart caught the supervisor outside the Mill. Stewart was immediately suspended. At a meeting a next day, Stewart admitted these facts. On May 24, 1983, trim-pak supervisor Earl Hillman issued a one day disciplinary suspension and a written reprimand to Stewart.

## OPINION

## Standard For Determining A Motion To Dismiss

In a non-jury case such as this, defendant may move for dismissal at the close of plaintiff's evidence on the ground that upon the facts and the law plaintiff has shown no right to relief. Fed. R. Civ. P. 41(b). ". . . [t]he court as trier of the facts may then determine them and render judgment against the plaintiff. . ." *Id*. This Rule is intended

9

to give the trial court the power to weigh the evidence and draw inferences from it at the conclusion of plaintiff's proof. *Bach v. Friden Calculating Machine Co., Inc.*, 148 F.2d 407 (6th Cir. 1945);   Rule 41(b) advisory committee note.

The court is not required to deny the motion to dismiss at the close of plaintiff's case-in-chief even if the evidence, viewed in a light most favorable to plaintiff, makes out a prima facie case if, from the record, the court is convinced that the evidence preponderates against plaintiff.   *Ellis v. Carter*, 328 F.2d 573, 577 (9th Cir. 1964); *United States v. Huck Manufacturing Co.*, 227 F. Supp. 791, 805 (E.D. Mich. 1964); *aff'd* 382 U.S. 197 (1965).   The trial judge should take an unbiased view of all the plaintiff's evidence and accord it such weight as he believes it is entitled to receive. *Chicago & N.W. Ry. Co. v. Froehling Supply Co.*, 179 F.2d 133 (7th Cir. 1950).   The court has the right to resolve conflicts in the evidence and grant or deny the motion accordingly. *United States v. Bartholomew*, 137 F. Supp. 700 (D. Ark. 1956).

An involuntary dismissal under Rule 41(b) for insufficiency of evidence operates as an adjudication on the merits.   The court must make findings of fact as provided by Fed. R. Civ. P. 52(a).  Fed. R. Civ. P. 41(b).

## Standard For Proving Retaliation

Plaintiff has the burden of proving retaliation by a preponderance of the evidence.   Proof of retaliatory intent is crucial.   *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 92 (6th Cir. 1982); *Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1257 (6th Cir. 1981).   Because of the difficulty of proving motive, the Supreme Court has made available a special order of proof in employment discrimination cases, the initial stage of which is described as plaintiff's prima facie case.   *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248

10

(1981); *Askin v. Firestone Tire & Rubber Co.*, 600 F. Supp. 751, 753-754 (E.D. Ky. 1985), *aff'd*, 785 F.2d 307 (6th Cir. 1986).

In order to establish a *prima facie* case of retaliation under Title VII, plaintiff must produce evidence that: 1) he engaged in activity protected by Title VII and/or participated in a Title VII investigation, proceeding, or hearing; 2) he was the subject of adverse employment action; and 3) there is a causal link between his protected activity or participation in a Title VII investigation, proceeding, or hearing and the adverse employment action. *Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co.*, 783 F.2d 50, 54 (6th Cir. 1986). Plaintiff may also establish a *prima facie* case by demonstrating that his employer treated him less favorably than other similarly situated employees because of his engagement in protected activity or participation in a Title VII investigation, proceeding or hearing. *See Smith v. Pan Am World Airways*, 706 F.2d 771 (6th Cir. 1983); *Long v. Ford Motor Company*, 496 F.2d 500 (6th Cir. 1974). In what is essentially a claim of disparate punishment, plaintiff must introduce evidence to show that similarly situated employees were not punished for rule violations similar to those committed by plaintiff. *Nichelson v. Quaker Oats Co.*, 752 F.2d 1153, 1156 (6th Cir. 1985); *Jacobs v. Martin Sweets Co., Inc.*, 550 F.2d 364 (6th Cir.), *cert. denied*, 431 U.S. 971 (1977).

By establishing a prima facie case, plaintiff creates a rebuttable presumption that the employer unlawfully discriminated against him. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252 (1981). This presumption is a procedural device that temporarily ceases plaintiff's burden of producing evidence; it denotes that an issue of fact has been created for determination by the trier of fact. *Askin v. Firestone Tire & Rubber Co.*, 600 F. Supp. 751, 754-55 (E.D. Ky. 1985), *aff'd*, 785 F.2d 307 (6th Cir. 1986)..

11

Once plaintiff establishes a prima facie case, the burden of going forward shifts to defendant to articulate a legitimate reason for its actions. *Board of Trustees v. Sweeney*, 439 U.S. 24 (1978). It is sufficient if defendant's evidence raises a genuine issue of fact as to whether it discriminated against plaintiff. *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 254-255.

Where defendant articulates a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case," 450 U.S., at 255, n.10, "and the factual inquiry proceeds to a new level of specificity." *Id.* at 255. *See also U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714-715 (1983).[2] The "factual inquiry" referred to by the Supreme Court is whether defendant intentionally discriminated against plaintiff. *Aikens*, *supra* at 715. In other words, did defendant treat plaintiff less favorably because of a retaliatory motive. *Id.* "The plaintiff retains the burden of persuasion. . . . (He) may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. "In short, the district court must decide which party's explanation of the employer's motivation it believes." *Aikens*, 460 U.S. at 716.

## Plaintiff Failed to Establish that He Engaged in Conduct Protected by Title VII

In order to violate Title VII, the harassment of which an employee complains must consist of more than the utterance of a racial epithet or sporadic incidents of racial slurs. *Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d

---

[2]    Although the presumption of discrimination, as a procedural device, drops from the case at this point, a permissible inference may still be drawn by the trier of fact from the evidence introduced in plaintiff's case-in-chief on the substantive issue of discrimination. *Askin v. Firestone Tire & Rubber Co.*, 600 F. Supp. at 754, 755.

12

1250 (6th Cir. 1985), *cert. denied*, 106 S. Ct. 1197 (1986). The employee must be subjected to a concerted pattern of harassment which his employer knew about and did not attempt to stop. *Howard v. National Cash Register Co.*, 388 F. Supp. 603 (S.D. Ohio 1975) (Rubin, J.). An action lies where the employer creates "a working environment heavily charged with ethnic or racial discrimination," *Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d at 1254, *citing Roergs v. EEOC*, 454 F.2d 234 (5th Cir. 1971), *cert. denied*, 406 U.S. 957 (1972), or where the harassment is "sufficiently pervasive as to alter the conditions of employment and create an abusive working environment." *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982).

The two June 27, 1984, incidents of alleged harassment in this case (*see* Finding 4., p. 2 *supra*) are not sufficient to constitute a concerted pattern of harassment.[3] Because the alleged incidents occurred on one day, and no further incidents followed, the employer cannot be charged with condoning harassment.

In addition, the rights plaintiff claims to have assisted Rennick to vindicate are not rights enforced by Title VII. Viewing the evidence in its entirety, Rennick was embarrassed to be thought to associate with a black man. Neither she nor plaintiff were concerned with vindicating Rennick's right to associate with a member of another race. Rather, the evidence, including their demeanor and language on the stand, establishes that it is more likely than not they were prejudiced against black persons and that they considered the incidents of June 27 to be an insult to

---

[3] Wilson's comment to Rennick of June 26 has no racial overtones. *See* Finding 3, p. 2 *supra*.

13

Rennick.[4]    Title VII is not intended to vindicate an individual's right to disassociate herself from members of another race.

## Plaintiff Failed To Establish A Causal Link
## Between His Discharge and Protected Activity

Plaintiff also failed to establish by a preponderance of the evidence that there existed a causal link between his discharge in November 1984 and plaintiff's assistance to Rennick following the isolated incidents of June 1984. Plaintiff threatened the lives of two employees just one day after his girlfriend, Rennick, had seriously wounded another employee in an unprovoked attack with a razor. Although Rennick had discrimination charges pending against defendant at the time, there is no evidence that defendant sought to retaliate against plaintiff for assisting Rennick. Rather, the evidence shows no action by defendant against plaintiff whatsoever until plaintiff created a situation that left defendant no choice but to take disciplinary action.

Plaintiff testified that he did not seek out or threaten Wilson and Howard.  He claims that he coincidently found himself in the trim-pak area on October 30 and made a gesture that consisted of placing his thumb under his chin and moving the thumb upward and outward.   Plaintiff referred to it as "flipping him a thumb," which he claimed was the equivalent of saying, "Go to hell." However, plaintiff never offered this explanation to defendant prior to discharge.  Defendant had statements from Howard and Wilson that plaintiff made a gesture indicating cutting the throat.  Plaintiff admits accompanying the gesture with the statement, "You're going to have to answer for this - you

---

[4]   The main concern of both Rennick and plaintiff appeared to be that, as a result of the June 27 incidents, Rennick was viewed as, in their words, "a nigger lover."

14

and four or five other people."   Clearly defendant was reasonable in interpreting this incident, which occurred the day after Rennick slashed Jones, as a threat upon the lives of Wilson and Howard.

## Plaintiff's Testimony Was Not Credible

Plaintiff was impeached numerous times during his own testimony and by the testimony of others.   Based upon his demeanor and the content of his testimony, said testimony is deemed not to be credible.   Specific examples include, but are not limited to, the following.

Plaintiff testified he had a "casual relationship" with Rennick during 1984 and denied a romantic involvement. The evidence reveals that it is more likely than not that he and Rennick were involved romantically from June 1984. On October 29 and 30, 1984, plaintiff spent the night at Rennick's residence.   He claimed he did so because she did not have time to leave her child at her mother's residence on the way to work as she normally did, and it was necessary for him to stay with the child.   However, plaintiff admitted his car was at Rennick's residence; thus, he could have taken the child to Rennick's mother's residence. Defendant was unable to locate plaintiff at his own residence in October and November, but did find him at Rennick's residence.   It appears that plaintiff was residing with Rennick at that time, and that their relationship was more than casual.

Plaintiff's testimony that it was necessary to meet with Rennick constantly at work to discuss her harassment claim, while he was seeing her constantly outside work hours during the same time period, is not credible.

Plaintiff testified that on October 30, 1984, it was necessary for him to take a circuitous route from his work location to the employee cafeteria, which route took him

15

through the trim-pak department where he encountered Wilson and Howard by happenstance. This testimony is incredible. After hearing plaintiff's description of his route and seeing him diagram it on a chart of the company premises, we do not believe his testimony. We believe it is more likely than not that he intentionally went to the trim-pak department to threaten Wilson and Howard.

At his unemployment compensation hearing, plaintiff was asked if he made a gesture toward Wilson or Howard and he responded, "no." At trial plaintiff testified that he "flipped them the thumb." We believe neither statement is true. Rather, we believe that plaintiff drew his finger across his throat in a threatening gesture, as Wilson and Howard described.

## The Incidents Referred To By Plaintiff Are Not Similar

Plaintiff has cited three incidents as situations where other employees in a similar position were treated differently.

The Sutton incident (Finding 21, pp. 7,8, *supra*) occurred more that one year after the incident that gave rise to this case. It involved a different department and different supervisor. Sutton admitted her involvement (drawing a knife), whereas plaintiff denied his involvement. Sutton's action was in immediate response to harassment by two other employees over her "personal problems." She was suspended for one week, most of which she spent in a hospital. (Pl. Ex. 3). In the instant case, plaintiff had threatened revenge over Rennick's attack on Jones and her subsequent hospitalization. Neither Rennick nor plaintiff related this attack to any harassment on the part of either Wilson or Howard. Jones had already been seriously injured by an unprovoked attack by Rennick, and it was reasonable for defendant to believe others would be injured unless

16

plaintiff was removed permanently from company property.

The Baker incident (Finding 22, p. 8, *supra*) occurred at a time in close proximity to the incident involving plaintiff, but involved a different supervisor. The Stewart incident (Finding 23, p.8, *supra*) occurred more than a year before the incident involving plaintiff, in the same department (trim-pak), but under a different supervisor. Both incidents involved calling another an uncomplementary name and threatening to fight outside company property. These incidents were not nearly as serious as that involving plaintiff. While they involved the possibility of injury to an employee off company property, they did not involve a threat of death on company property.

For all the above reasons, we find that plaintiff failed to establish a prima facie case.

## Plaintiff Failed To Prove His Case
## By A Preponderance Of The Evidence

Assuming, *arguendo*, that plaintiff established a prima facie case, defendant articulated a legitimate reason for discharging plaintiff. (*See* Finding 20, p.7, *supra*). Plaintiff then failed to prove it was more likely than not that he was discharged in retaliation for activities protected by Title VII. Following the incidents of June 1984 involving Rennick, there is no evidence of discipline, unfavorable evaluations or comments by supervisors, or any other type of retaliatory action against plaintiff by defendant. Defendant's discharge of plaintiff was clearly a reasonable reaction to an incident generated by plaintiff, wherein he made a threat on the lives of two employees shortly after a third employee had been seriously wounded in an unprovoked attack by plaintiff's girlfriend. We have considered the fact that defendant had lesser penalties

17

available to it, i.e., reprimand or suspension instead of discharge, in determining whether the discharge was retaliatory, and we have found it was not. Under the foregoing circumstances, the severity of the discipline is within defendant's business judgment to determine.

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction over the subject matter of this action in accordance with 42 U.S. C. § 2000e *et seq.*, and all appropriate jurisdictional requirements have been met by plaintiff.

2.  Plaintiff failed to establish a prima facie case of retaliation because: a) he failed to prove that he was engaged in activities protected by Title VII or that he participated in a Title VII investigation, proceeding or hearing; b) he failed to prove that there was a causal link between his discharge and said protected activity; and c) he failed to prove that he was treated less favorably than similarly situated employees.

3.  Assuming, *arguendo*, that plaintiff established a prima facie case, defendant met its burden of going forward by establishing a legitimate, nondiscriminatory reason for plaintiff's discharge.

4.  Plaintiff failed to establish by a preponderance of the evidence that the reasons articulated by defendant were pretextual. Plaintiff also failed to establish that defendant intentionally retaliated against him.

18

# ORDER

It is therefore ORDERED that judgment be entered in favor of defendant and that plaintiff take nothing upon his complaint.

DATE: *10-7-87*

ROBERT A. STEINBERG
UNITED STATES MAGISTRATE

18

# ORDER

It is therefore ORDERED that judgment be entered in favor of defendant and that plaintiff take nothing upon his complaint.

DATE: 10-7-87

ROBERT A. STEINBERG
UNITED STATES MAGISTRATE

# Exhibit D

March 23, 1990 Sixth Circuit Order

FILED

MAR 23 1990

No. 88-4106

ONARD GREE~ ~..

UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

Sixth Circuit Rule 24 limits citation to specific situations. Please see Rule 24 before citing in a proceeding in a court in the Sixth Circuit. If cited, a copy must be served on other parties and the Court.
**This notice is to be _prominently_ displayed if this decision is reproduced.**

LEONARD T. GATES,

        Plaintiff-Appellant,

v.

CINCINNATI BELL TELEPHONE
COMPANY,

        Defendant-Appellee.

ON APPEAL FROM
THE UNITED STATES
DISTRICT COURT
FOR THE SOUTHERN
DISTRICT OF OHIO

———————————————————/

Before: MARTIN and BOGGS, Circuit Judges; and PECK, Senior Circuit Judge.

    PER CURIAM.  Leonard T. Gates appeals the judgment of the United States Magistrate against him in this retaliatory discharge suit brought under Title VII.  42 U.S.C. § 2000e *et seq*.[1]  We affirm.

    Gates was an employee of Cincinnati Bell Telephone Company from 1963 until 1986.  Gates received strong performance appraisals for many years and was promoted to supervisor in 1980.  However, in 1984, Cincinnati Bell had to transfer Gates from one department to another within its Seventh Street facility because of problems stemming from an extramarital affair Gates had with a subordinate, Peggy Geiger McKinney.  Gates discussed this affair and other sexual desires with his other subordinates, and he became involved in a disruptive feud with McKinney's husband.  These problems culminated in a petition by employees not to be required to work under Gates's supervision.  In addition, McKinney filed an internal complaint of sexual harassment

---

[1]The parties unanimously consented to conducting all proceedings before the magistrate.

against Gates in February, 1985. Gates reacted with hostility to this warning. Gates ultimately had to be transferred from the Seventh Street facility to a different location entirely in May, 1985.

In October, 1985, Gates was again transferred at his request to the Dana Garage. At Dana, Gates learned of alleged sexual harassment of one of his subordinates, Myra Stacey, allegedly because she was a lesbian. Gates arranged for Stacey to meet with his supervisor, Ed Drapp, who referred her to the Employee Assistance Program. Drapp arranged for Stacey to meet with Cincinnati Bell's personnel department which led to written warnings to the employees who had harassed Stacey. Drapp also instructed Gates to have a meeting with his subordinates about sexual harassment and discrimination, which Gates did. Stacey also filed a complaint with the Ohio Civil Rights Commission and later with the Equal Employment Opportunity Commission. Both organizations ultimately determined that there was no probable cause that Cincinnati Bell discriminated against Stacey.

In November, 1985, Drapp met with Mike Collini, an employee under Gates, at Collini's request. Collini stated that Gates was bothering him and interfering with his work to discuss Gates's involvement with federal agencies and how Gates was going to "get" Cincinnati Bell. Although Drapp was aware of Gates's past problems at other locations, he told Collini that he needed evidence that others in the crew felt the same way. Approximately one month later, Drapp met with two other employees under Gates and Randy Fischer, a union steward in whom Drapp had confidence. They told Drapp that other employees agreed with Collini, and they presented him with a petition requesting Gates's removal as supervisor. Drapp instructed Fischer to poll the employees on this petition. About two weeks later, Fischer told Drapp that a majority of the crew agreed with the petition.

Drapp recommended to his superior that Gates be transferred to a non-supervisory position. Gates was placed on probation and removed from supervisory duties. One week after his transfer, Gates filed a charge with the Equal Employment Opportunity Commission. Gates asserted that his transfer was in retaliation for protected activity, including assistance to Stacey.

While preparing to defend against Gates's charge, Cincinnati Bell's attorneys obtained affidavits from employees, many of whom had worked for Gates, to substantiate Cincinnati Bell's position. These affidavits confirmed the initial complaints against Gates and cited new ones. Among other things, they charged that Gates had pumped employees for information about one another by implying that their jobs were at risk, had failed to supervise their work properly, had discussed women in exploitative terms, and had exaggerated trivial situations into perceived crises. This information, together with the previous complaints against Gates, led to Gates's discharge upon the decision of Charles Schulze, the Cincinnati Bell Personnel Director.

After a bench trial, the trial court held that Cincinnati Bell had not taken retaliatory action against Gates. Gates appeals each of these determinations by the trial court. First, the court admitted into evidence the affidavits of employees who had worked for Gates at Dana, not for their veracity, but to show what Schulze relied on in dismissing Gates. Second, the trial court held that Gates failed to prove a *prima facie* case against Cincinnati Bell in regard to his actions with Stacey. The trial court found that sexual preference is not protected under Title VII, and that, even if it were, Gates's conduct regarding Stacey was too insignificant to be protected activity under Title VII. Third, the trial court found that Cincinnati Bell did not violate Title VII by discharging Gates because of hearsay information obtained while defending a charge of retaliatory action before the Equal Employment Opportunity Commission.

Gates argues first that the trial court improperly relied on the affidavits of the employees as true in reaching its decision. We disagree. The trial court properly limited its use of these affidavits to assessing what information was available to Schulze, whether Schulze believed the information, and whether Schulze relied on that information in discharging Gates. Gates relies on two statements by the trial court. First, the trial court stated, "Although no evidence was introduced to establish the truth of the affidavits, the evidence showed that the defendant retained reputable counsel and had no reason to doubt the veracity of the information contained in affidavits obtained by them." Second, the trial court stated, "[T]here is absolutely no evidence to support a conclusion that its reputable retained counsel falsified affidavits." These statements do not address the trial court's opinion of the veracity of the affidavits; they go to the reasonableness of Schulze in relying on them. Indeed, the trial court also stated, "I don't think any of these people have testified, so we don't know whether these affidavits are true or false." The trial court went on to reiterate that the issue was whether Schulze could rely on hearsay affidavits obtained by company attorneys in firing an employee. The trial court did not rely on the affidavits for their veracity.

The trial court also did not err by holding that Title VII does not bar an employer from discharging an employee based on information subsequently obtained in defending a charge of retaliatory action before the Equal Employment Opportunity Commission. Gates contends that allowing such discharges will chill employees from bringing complaints to the Equal Employment Opportunity Commission. Gates's theory is that employees will fear bringing such an action if an employer can respond by reviewing the past action of an employee to justify a discharge. Such an argument proves too much. An employer clearly could fire an employee if it discovered in the course of preparing for a hearing before the Equal Employment Opportunity Commission that the employee had embezzled. Further, it will be a brave employer

that fires an employee while the employee's action is pending before the Equal Employment Opportunity Commission. Such an action will clearly bring heightened scrutiny both from the Commission and from the court if the action later goes to litigation. On the record before us, the trial court's determination that the discharge of Gates was not retaliatory was not clearly erroneous.

Finally, Gates argues that the trial court erred in determining that his conduct in regard to his subordinate, Myra Stacey, was not protected by Title VII. It is doubtful whether sexual preference is protected under Title VII. *See DeSantis v. Pacific Telephone and Telegraph Co.*, 608 F.2d 327 (9th Cir. 1979); *Smith v. Liberty Mutual Ins. Co.*, 569 F.2d 325 (5th Cir. 1978). Even if it is, the trial court also made a factual finding that any activity by Gates was too insignificant to be protected. For example, Gates admitted that when he was confronted with the alleged discrimination against Stacey, he "wanted to go hide." On this record, the trial court's finding was not clearly erroneous.

The judgment of the trial court is affirmed.

AO 450 (Rev. 5/85)   Judgment in a Civil Case   ⊕

# United States District Court

———————————— DISTRICT OF ————————————

LEONARD T. GATES,

      V.

CINCINNATI BELL TELEPHONE COMPANY,

**JUDGMENT IN A CIVIL CASE**

CASE NUMBER:   C-1-87-0227

| | |
|---|---|
| Judge | |
| Mag. | |
| Journal | |
| Motion | |
| Issue | Crts |
| Card | |
| N/S | |
| Docketed | MG |

☐ **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court.** This action came to trial ~~or hearing~~ before the Court.   The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED   that judgment be entered in favor of defendant.

November 4, 1988
_____
*Date*

KENNETH J. MURPHY, JR.
_____
*Clerk*

*(By) Deputy Clerk*

39

# Exhibit E

January 19, 1989 Complaint

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

CINCINNATI BELL INC.                    :
201 East Fourth Street                  :
Cincinnati, Ohio  45202,                :
                                        :       CASE NO.
    and                                 :          AS900494
                                        :       JUDGE
CINCINNATI BELL TELEPHONE COMPANY :
201 East Fourth Street                  :
Cincinnati, Ohio  45202,                :

    and                                 :

JAMES WEST                              :
2645 Beechmar Drive                     :
Cincinnati, Ohio 45230,                 :

    and                                 :

PETER GABOR                             :
11570 Plumhill                          :
Cincinnati, Ohio 45249,                 :

    Plaintiffs,                         :

v.                                      :

LEONARD T. GATES                        :
7365 State Road                         :
Cincinnati, Ohio 45230,                 :

    and                                 :

ROBERT A. DRAISE                        :
12077 Elkwood Drive                     :
Cincinnati, Ohio  45240,                :

    Defendants.                         :



)
**COMPLAINT**

I.  **NATURE OF ACTION**

1.  This is an action for defamation, business
disparagement and intentional and negligent infliction of
emotional distress.  Plaintiffs seek a preliminary and permanent
injunction and compensatory and punitive damages, jointly and
severally, from the Defendants, for personal injury and other

injury, in an amount to be determined at trial, but which is in excess of $1,000,000.

## II.  PARTIES

2.  Plaintiff, Cincinnati Bell Inc. (hereinafter "CBI"), is a corporation organized and existing pursuant to the laws of the State of Ohio and maintains its principal place of business at 201 East Fourth Street, Cincinnati, Ohio.  CBI was formed in 1983 and operates as a holding company.  Its subsidiaries are engaged in a wide range of endeavors, primarily focused on the communications industry and telecommunications in particular.

3.  Plaintiff, Cincinnati Bell Telephone Company (hereinafter "CBT"), is CBI's largest subsidiary, providing telecommunication services in its operating territory of Southwestern Ohio, Northern Kentucky and Southern Indiana.  CBT is a corporation organized and existing pursuant to the laws of the State of Ohio and maintains its principal place of business at 201 East Fourth Street, Cincinnati, Ohio.  CBT was formerly known as "Cincinnati Bell Inc." and changed its name to Cincinnati Bell Telephone Company during a reorganization in 1983.  Under its current and former names, CBT has provided telecommunications services in its operating territory for nearly 100 years.  Plaintiffs CBI and CBT are hereinafter referred to collectively as "Cincinnati Bell."

4.  Plaintiff, James West ("West"), is currently employed by CBT in its Security Department.  He has, from time to time, been employed in other capacities in the company.

5.    Plaintiff, Peter Gabor ("Gabor"), is currently employed by CBT in its Distribution Services Department of the Network Services Group. He has, from time to time, been employed in other capacities in the company, and for the period 1973-1976 was employed by American Telephone and Telegraph Company.

6.    Defendant, Leonard T. Gates ("Gates"), is an individual residing in Hamilton County, Ohio. Gates is a former employee of CBT.

7.    Defendant, Robert A. Draise ("Draise"), is an individual residing in Hamilton County, Ohio. Draise is a former employee of CBT.

### III.  **BACKGROUND**

#### A.  Employment and Termination of Gates

8.    Gates was originally employed by CBT in 1963 and held various positions during his tenure with CBT. On May 15, 1986, CBT terminated Gates' employment for serious misconduct and forbade him to enter the property of Cincinnati Bell or any of its subsidiaries.

9.    At the time of his termination, Gates threatened Cincinnati Bell with retaliation and asserted that he would accuse Cincinnati Bell of illegal wiretapping. Prior to his termination, after he had been subjected to disciplinary action, Gates also threatened retaliation as follows: 1) that he would go to the IRS and Treasury Department; 2) that he would file charges and lawsuits, dragging others into the controversy; and 3) that if Cincinnati Bell were ever in litigation, he would "be there with bells on" as a hostile witness.

10. Following his termination, Gates filed an action in United States District Court for the Southern District of Ohio, Western Division, Case No. C-1-87-0227 against Cincinnati Bell for wrongful termination of employment and dismissal. On November 4, 1988, the United States District Court ruled that Cincinnati Bell's termination of Gates was for legitimate business reasons. In that decision Magistrate Steinberg made the following finding on Gates' veracity:

> "... plaintiff was not a credible witness in any respect. His demeanor while on the stand and seated at counsel table was not that of a credible witness. His testimony was impeached by numerous witnesses and by his prior deposition testimony more than twenty times.[1] When confronted with an inconsistent statement, plaintiff would prevaricate.

---

[1] Plaintiff was apparently deposed for a period of eight or nine days. He did not seek a protective order from the Court, thus the Court did not have an opportunity to limit the interrogation. Plaintiff is therefore entitled to the benefit of the doubt concerning inconsistent answers to questions spread over such a long period. Nevertheless, the nature of the specific questions, the content of plaintiff's response, and his demeanor in responding leave no doubt that his testimony was not credible."

## B. Employment and Termination of Draise

11. Draise was originally employed by CBT in 1966 and held various positions with the company. On August 21, 1979, CBT terminated Draise's employment due to his involvement in illegal wiretapping.

12. Draise pled guilty to illegal wiretapping in United States District Court for the Southern District of Ohio, Case No. M1-1-79-112.

13.  Draise lied to the Federal Bureau of Investigation on at least two occasions during the investigation of the illegal wiretapping which culminated in his conviction.

### IV.  STATEMENTS GIVING RISE TO PLAINTIFFS' CLAIMS

#### A.  Defamatory Statements by Gates as to Cincinnati Bell

14.  On repeated occasions, Gates has made false and defamatory statements about Cincinnati Bell.  Gates' false and defamatory statements include, but are not limited to, the following:

(a)  Gates stated that Cincinnati Bell supervisory level employees ordered him to place 1200 to 1500 illegal wiretaps during the period 1972 to 1984.

(b)  Gates stated that Cincinnati Bell conducted illegal wiretaps in order to remove a federal judge, to manipulate Board of Election computers, and to obtain unauthorized information from General Electric.

(c)  Gates stated that Cincinnati Bell placed various illegal wiretaps on attorneys and law firms in the city of Cincinnati.

(d)  Gates stated that Cincinnati Bell conducted illegal wiretaps on news people, including Nick Clooney and Al Schottlekotte.

(e)  Gates stated that Cincinnati Bell fired him in retaliation for his statements made to Congressman Gradison regarding illegal wiretaps and as a result of his assistance to two female employees in filing an EEOC complaint.

B.    Defamatory Statements by Draise as to Cincinnati Bell

15.    On repeated occasions, Draise has made false and
defamatory statements about Cincinnati Bell.  Draise's false and
defamatory statements include, but are not limited to, the
following:

(a)   Draise stated that Cincinnati Bell listened in on
private conversations and used the information obtained
therefrom for business advantage.

(b)   Draise stated that he performed 150 illegal
wiretaps at the direction of Cincinnati Bell between 1972
and 1979.

(c)   Draise stated that he was trying to tell the
public that "Ma Bell is not a clean mother."

(d)   Draise stated that Cincinnati Bell conducted
illegal wiretaps of General Electric during competition with
Pratt & Whitney in 1978.

(e)   Draise stated that in 1972 he was asked by
Sergeant Jerry Berry of the Cincinnati Police Intelligence
Unit to wiretap illegally a group known as the Black Muslims
on North Bend Road in Cincinnati, Ohio and stated that the
wiretap was "covered," meaning approved, by the Security
Department of Cincinnati Bell.

(f)   Draise stated that Cincinnati Bell arranged a
"deal" for him to be charged with a misdemeanor for his
illegal wiretapping which culminated in his conviction in
federal district court, with Draise agreeing in return that
he would not talk about illegal Cincinnati Bell wiretaps.

C.    <u>Defamatory Statements by Gates as to West</u>

16.    On repeated occasions, Gates has made false and
defamatory statements about West.   These false and defamatory
statements include, but are not limited to, the following:

(a)  Gates stated that in 1977 West began assigning him
to do illegal wiretaps of private citizens and businesses
that were not the subject of police investigations.

(b)  Gates stated that West ordered and authorized him
to tap illegally into computers at the Board of Elections.
Gates stated that West said the wiretap was authorized by
the FBI.

(c)  Gates stated that West ordered him to wiretap
illegally several dozen Cincinnati law firms.

(d)  Gates stated that he performed 1200 to 1500
illegal wiretaps under West's orders.

(e)  Gates stated that West said Cincinnati Bell in
rate case proceedings always asked for twice the amount it
really needed to maintain a profit.

(f)  Gates stated that in 1984 West ordered him to
wiretap illegally telephones at the General Electric plant
in Evendale.

(g)  Gates stated that West ordered him to wiretap
illegally United States District Court Judge Carl Rubin.

(h)  Gates stated that West ordered illegal wiretaps on
news media, including former TV news anchors Al
Schottlekotte in 1975 and Nick Clooney in 1982.

(i)  Gates stated that West monitored former City
Councilman Walter Beckjord's home telephone and further
stated that West ordered Gates to place illegal wiretaps on
the home and office of Elmer Dunaway, the office of former
City Councilman Jerry Springer, and the residences of James
Joseph and Harold Mills.

(j)  Gates stated that West ordered him to place
illegal wiretaps on the Hamilton County Board of Elections
on election nights in 1977, 1978, 1979, 1980 and 1981 and
that West stated that such wiretaps could change election
results.

(k)  Gates stated he installed lines at West's
residence for a listening device to allow undetected
monitoring of telephone calls.

D.    **Defamatory Statements by Gates as to Gabor**

17.  On repeated occasions, Gates has made false and
defamatory statements about Gabor.  These false and defamatory
statements include, but are not limited to, the following:

(a)  Gates stated that Gabor ordered him to place an
illegal wiretap on former President Gerald Ford when he was
in Cincinnati.

(b)  Gates stated that Gabor ordered the illegal
wiretap of United States District Court Judge Timothy Hogan
in 1984.

(c)  Gates stated that Gabor ordered him to place an
illegal wiretap at General Electric.

**E.    Defamatory Statements by Draise as to West**

18.    On repeated occasions, Draise has made false and
defamatory statements about West.  These false and defamatory
statements include, but are not limited to, the following:

(a)    Draise stated that West ordered him to place
wiretaps and that West, with Gabor, directed Cincinnati
Bell's wiretapping.

(b)    Draise stated that, after his termination by
Cincinnati Bell, West called several of his prospective
employers and blackballed him, and then laughed about it at
a Masonic meeting.

**F.    Defamatory Statements by Draise as to Gabor**

19.    On repeated occasions, Draise has made false and
defamatory statements about Gabor.  These false and defamatory
statements include, but are not limited to, the following:

(a)    Draise stated that he made a deal with the
Security Department, specifically Gabor, that if Gabor did
not talk about what Draise did resulting in his discharge,
Draise would not talk about illegal Cincinnati Bell wiretaps.

(b)    Draise stated that Gabor directed his illegal
wiretap operations and acknowledged that such work was
illegal.

(c)    Draise stated that Gabor ordered him to place
illegal wiretaps on former Hamilton County Commissioner
Allen Paul and on Charles Keating.

(d)    Draise stated that Gabor ordered him to place an
illegal wiretap on former columnist Frank Weikel.

## V.   CAUSES OF ACTION

### COUNT I

### Defamation by Gates as to Cincinnati Bell

20.   The Plaintiffs incorporate herein paragraphs 1 through 19 as if fully set forth herein.

21.   The statements contained in paragraph 14 hereinabove together with other false and defamatory statements made by Gates pertaining to Cincinnati Bell were false, tend to adversely affect the business and reputation of Cincinnati Bell, have caused it injury, and as such constitute defamation, including libel per se and slander per se.

22.   The statements contained in paragraph 14 hereinabove together with other false and defamatory statements made by Gates pertaining to Cincinnati Bell were made with actual malice and knowledge that they were false and/or with reckless disregard of whether or not they were false.

23.   As a result of the false and defamatory statements made by Gates, CBT was named as a defendant in four separate civil lawsuits filed in United States District Court for the Southern District of Ohio, now consolidated, and CBT employees West and Gabor and CBI were each named as defendants in the consolidated case (the "Federal Suit").

24.   As a direct and proximate result of the defamatory statements made by Gates, Cincinnati Bell has sustained damages in an amount to be shown at trial, but which exceeds $1,000,000.

## COUNT II

### Defamation by Draise as to Cincinnati Bell

25.  The Plaintiffs incorporate herein paragraphs 1 through 24 as if fully set forth herein.

26.  The statements contained in paragraph 15 hereinabove together with other false and defamatory statements made by Draise pertaining to Cincinnati Bell were false, tend to adversely affect the business and reputation of Cincinnati Bell, have caused it injury, and as such constitute defamation, including libel per se and slander per se.

27.  The statements contained in paragraph 15 hereinabove together with other false and defamatory statements made by Draise pertaining to Cincinnati Bell were made with actual malice and knowledge that they were false and/or with reckless disregard of whether or not they were false.

28.  As a result of the false and defamatory statements made by Draise, Cincinnati Bell and CBT employees West and Gabor have been named as defendants in the Federal Suit.

29.  As a direct and proximate result of the defamatory statements made by Draise, Cincinnati Bell has sustained damages in an amount to be shown at trial, but which exceeds $1,000,000.

## COUNT III

### Defamation by Gates as to West

30.  The Plaintiffs incorporate herein paragraphs 1 through 29 above as if fully set forth herein.

31.  The statements contained in paragraph 16 hereinabove together with other false and defamatory statements made by Gates

pertaining to West were false and tend to adversely affect West in his business, to defame his character, and have caused him injury and, as such, constitute defamation, including libel per se and slander per se.

32.  The statements contained in paragraph 16 hereinabove together with other false and defamatory statements made by Gates pertaining to West were made with actual malice and knowledge that they were false and/or with reckless disregard of whether or not they were false.

33.  As a result of the false and defamatory statements made by Gates, West has been named as a defendant in the Federal Suit.

34.  As the direct and proximate result of the defamatory statements made by Gates, West has sustained damages in an amount to be shown at trial, but which exceeds $1,000,000.

## COUNT IV
### Defamation by Gates as to Gabor

35.  The Plaintiffs incorporate herein paragraphs 1 through 34 above as if fully set forth herein.

36.  The statements contained in paragraph 17 hereinabove together with other false and defamatory statements made by Gates pertaining to Gabor were false and tend to adversely affect Gabor in his business, to defame his character, and have caused him injury and, as such, constitute defamation, including libel per se and slander per se.

37.  The statements contained in paragraph 17 hereinabove together with other false and defamatory statements made by Gates

pertaining to Gabor were made with actual malice and knowledge that they were false and/or with reckless disregard of whether or not they were false.

38.  As a result of the false and defamatory statements made by Gates, Gabor has been named as a defendant in the Federal Suit.

39.  As the direct and proximate result of the defamatory statements made by Gates, Gabor has sustained damages in an amount to be shown at trial but which exceeds $1,000,000.

### COUNT V

### Defamation by Draise as to West

40.  The Plaintiffs incorporate herein paragraphs 1 through 39 above as if fully set forth herein.

41.  The statements contained in paragraph 18 hereinabove together with other false and defamatory statements made by Draise pertaining to West were false and tend to adversely affect West in his business and to defame his character, and have caused him injury and, as such, constitute defamation, including libel per se and slander per se.

42.  The statements contained in paragraph 18 hereinabove together with other false and defamatory statements made by Draise pertaining to West were made with actual malice and knowledge that they were false and/or with reckless disregard of whether or not they were false.

43.  As a result of the false and defamatory statements made by Draise, West has been named as a defendant in the Federal Suit.

44.  As the direct and proximate result of the defamatory statements made by Draise, West has sustained damages in an amount to be shown at trial, but which exceeds $1,000,000.

## COUNT VI

### Defamation by Draise as to Gabor

45.  The Plaintiffs incorporate herein paragraphs 1 through 44 above as if fully set forth herein.

46.  The statements contained in paragraph 19 hereinabove together with other false and defamatory statements made by Draise pertaining to Gabor were false and tend to adversely affect Gabor in his business and to defame his character, and have caused him injury and, as such, constitute defamation, including libel per se and slander per se.

47.  The statements contained in paragraph 19 hereinabove together with other false and defamatory statements made by Draise pertaining to Gabor were made with actual malice and knowledge that they were false and/or with reckless disregard of whether or not they were false.

48.  As a result of the false and defamatory statements made by Draise, Gabor has been named as a defendant in the Federal Suit.

49.  As the direct and proximate result of the defamatory statements made by Draise, Gabor has sustained damages in an amount to be shown at trial, but which exceeds $1,000,000.

## COUNT VII

### Business Disparagement of Cincinnati Bell

50.  The Plaintiffs incorporate paragraphs 1 through 49 above as if fully set forth herein.

51.  The statements contained in paragraphs 14 and 15 hereinabove, together with other false and defamatory statements made by the Defendants pertaining to Cincinnati Bell, and the pattern of making such statements, were false and disparaging with respect to the services and business operations of Cincinnati Bell in violation of the common law of Ohio.

52.  The statements made by the Defendants as set forth in paragraphs 14 and 15 hereinabove together with other false and defamatory statements were made with actual malice and knowledge that they were false and/or reckless disregard of whether or not they were false, and were made deliberately and willfully with the knowledge that they were deceptive.

53.  As a result of the false and disparaging statements made by Gates and Draise, Cincinnati Bell, West, and Gabor have been named as defendants in the Federal Suit.

54.  As a direct and proximate result of the Defendants' disparaging statements about their services and business and the pattern of making such statements Cincinnati Bell has suffered and is about to suffer irreparable injury to business reputation and actual and special damages, in an amount to be shown at trial, but which exceeds $1,000,000.

## COUNT VIII

### Intentional Infliction of Emotional Distress
### Upon West and Gabor

55.   The Plaintiffs incorporate paragraphs 1 through 54 above as if fully set forth herein.

56.   The statements made by the Defendants pertaining to West and Gabor, set forth in paragraphs 16 through 19 hereinabove, together with other false and defamatory statements, inter alia falsely characterized West and Gabor as participants in numerous unauthorized and illegal wiretaps.  The statements, and the pattern of making such statements, were outrageous and beyond all bounds of decency and resulted in extreme and severe emotional distress to West and Gabor.

57.   The actions of the Defendants have implemented the threats made by Gates at the time of his discharge and are designed as a vendetta against persons who have taken steps allegedly adverse to his position, including West and Gabor.

58.   Defendants made the false statements with intentional or reckless disregard of the falsity of the statements and with the intent to inflict extreme embarrassment, humiliation, shame and severe emotional distress upon West and Gabor.

59.   As a result of the false and defamatory statements made by Gates and Draise, Cincinnati Bell, West, and Gabor have been named as defendants in the Federal Suit.

60.   As a direct and proximate result of the Defendants' extreme and outrageous conduct, West and Gabor have in fact suffered extreme public embarrassment, humiliation, shame, and

severe emotional distress, as well as injury to their personal
and business reputations. As such, West and Gabor are entitled
to compensatory damages in an amount to be shown at trial, but
which exceeds $1,000,000.

### COUNT IX

### Negligent Infliction of Emotional Distress

61. Plaintiffs incorporate herein paragraphs 1 through 60
above as if fully set forth herein.

62. The statements made by the Defendants pertaining to
West and Gabor, set forth in paragraphs 16 through 19
hereinabove, together with other false and defamatory statements,
inter alia falsely characterized West and Gabor as participants
in numerous unauthorized and illegal wiretaps. The statements,
and the pattern of making such statements, were outrageous and
beyond all bounds of decency and resulted in extreme and severe
emotional distress to West and Gabor.

63. The actions of the Defendants have implemented the
threats made by Gates at the time of his discharge and are
designed as a vendetta against persons who have taken steps
allegedly adverse to his position, including West and Gabor.

64. Defendants made the false statements with negligent or
reckless disregard of the falsity of the statements, with the
result of inflicting extreme embarrassment, humiliation, and
severe emotional distress upon West and Gabor.

65. As a result of the false and defamatory statements made
by Gates and Draise, Cincinnati Bell, West, and Gabor have been
named as defendants in the Federal Suit.

66. As a direct and proximate result of Defendants' extreme and outrageous conduct, West and Gabor have in fact suffered extreme public embarrassment, humiliation, shame, and severe emotional distress, as well as injury to their personal and business reputations. As such, West and Gabor are entitled to compensatory damages in an amount to be shown at trial, but which exceeds $1,000,000.

### COUNT X

### Punitive Damages

67. The Plaintiffs incorporate paragraphs 1 through 66 above as if fully set forth herein.

68. The Defendants' conduct, as set forth in Counts I through IX above and paragraphs 1 through 66 hereinabove, was undertaken in bad faith, willfully, wantonly, maliciously, spitefully and with knowledge of falsity and/or reckless disregard for truth or falsity.

69. As a direct and proximate result of the Defendants' willful, wanton, malicious and bad faith conduct, the Plaintiffs are entitled to recover punitive damages against the Defendants, jointly and severally, in an amount to be determined at trial, but which exceeds $1,000,000.

WHEREFORE, the Plaintiffs demand judgment against the Defendants, jointly and severally, as follows:

1. On behalf of Cincinnati Bell Inc. and Cincinnati Bell Telephone Company, actual and compensatory damages for personal injury and other injury in an amount to be established at trial, but which exceeds $1,000,000.

-18-

2.    On behalf of Cincinnati Bell Inc. and Cincinnati Bell Telephone Company, punitive damages in an amount to be established at trial, but which exceeds $1,000,000.

3.    On behalf of Cincinnati Bell Inc. and Cincinnati Bell Telephone Company, preliminary and permanent injunctive relief against the Defendants, enjoining and prohibiting all disparaging statements concerning Cincinnati Bell's services and business.

4.    On behalf of West and Gabor, actual and compensatory damages for personal injury and other injury to West and Gabor in an amount to be established at trial, but which exceeds $1,000,000.

5.    On behalf of West and Gabor, punitive damages in an amount to be established at trial, but which exceeds $1,000,000.

6.    On behalf of all Plaintiffs, an award of reasonable attorneys' fees and costs incurred herein.

7.    All other legal and equitable relief to which Plaintiffs may be entitled.

Respectfully submitted,

Susan Grogan Faller (F-099)
Trial Attorney for Plaintiffs
FROST & JACOBS
2500 Central Trust Center
201 East Fifth Street
Cincinnati, Ohio  45202
(513) 651-6800

OF COUNSEL:

David C. Olson (0-113)
FROST & JACOBS
2500 Central Trust Center
201 East Fifth Street
Cincinnati, Ohio  45202
(513) 651-6800
5283L/6739d

# Exhibit F

Judge Spiegel's April 26, 1990 Order

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

90 APR 26 PM

SHARON RENNICK, et al.,

Plaintiffs,

vs.

No. C-1-89-749

FROST & JACOBS, et al.,

ORDER DISMISSING COMPLAINT

Defendants.

The plaintiffs in the above captioned case have filed a complaint (doc. 1) against approximately 120 defendants alleging that the defendants have committed violations of the Racketeer Influenced and Corrupt Organizations Act, deprived the plaintiffs of their right to due process of law, obstructed justice, committed mail and wire fraud to intentionally harm the plaintiffs, conspired to harm and extort money from the plaintiffs, conspired to slander and defame the plaintiffs, and conspired to commit various other harmful and malicious acts against the plaintiffs. The plaintiffs are seeking one billion dollars in damages. The defendants include various law firms and attorneys, several manufacturing and retail businesses and their employees, the Cincinnati Bar Association, various state and federal judges, various employees of the federal courts, the Department of Justice, the Federal Bureau of Investigation, the City of Cincinnati and various city officials, the Legal Aid Society, the Ohio Civil Rights Commission, and others.

Numerous defendants have filed motions to dismiss the plaintiffs' complaint under Fed. R. Civ. P. 12(b)(6) for failure

to comply with the requirements of Fed. R. Civ. P. 8(a). "Rule 8(a)(2) simply requires 'a short plain statement of the claim showing that the pleader is entitled to relief.' All a complaint need do is afford the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976)(citations omitted). The pleadings of pro se litigants are held to a less stringent standard than the formal pleadings prepared by lawyers. Haines v. Kerner, 404 U.S. 519, 520-21 (1972). However, even pro se complaints are held to certain minimum standards. In order to satisfy the requirements of Rule 8(a)(2), a pro se complaint must at least outline the factual basis for the claims asserted and may not rely on purely conclusory allegations. Pavilonis v. King, 626 F.2d 1075, 1078 (1st Cir. 1980); United States ex rel. Dattola v. National Treasury Employees Union, 86 F.R.D. 496, 499 (W.D. Penn. 1980); Brown v. Califano, 75 F.R.D. 497, 488-89 (D.D.C. 1977). When considering a motion to dismiss, the Court is required to accept the well pleaded facts in the complaint as true, but the Court is not required to accept any legal conclusions that may be alleged. Chapman v. City of Detroit, 808 F.2d 459, 465 (6th Cir. 1986); Blackburn v. Fisk University, 443 F.2d 121, 124 (6th Cir. 1971). Rule 8(a)(2) requires dismissal of the complaint where the allegations contained therein are so confused or conclusory that the defendants are not provided with fair notice of the charges against them so that they may file a meaningful response to the complaint. Dattola, 86 F.R.D. at 499; Califano, 75 F.R.D. at 489.

2

The Rule also allows the defendants to determine whether the doctrine of res judicata is applicable, sharpens the issues to be litigated, and confines discovery and the presentation of evidence at trial within reasonable boundaries. Califano, 75 F.R.D. at 489. When a complaint makes allegations of such a conclusory nature so as to fail to satisfy the requirements of Rule 8(a)(2), the Court may dismiss the complaint sua sponte. Pavilonis, 626 F.2d at 1078 n.6; Dattola, 86 F.R.D. at 500 n. 11.

The defendants point out that most of the defendants named in the complaint's caption are never specifically referred to in the complaint's statement of claims. The complaint uses "defendants," "certain defendants," "others," "other aforementioned defendants," and other phrases that provide little guidance to the more than 120 defendants as to what allegations are being brought against what defendants. The defendants also point out that even when the complaint refers to specific defendants, its allegations are of a conclusory nature and never state what specific actions or inactions of the defendants have harmed the plaintiffs. Indeed, the complaint fails to set forth any specific incidents or occurrences underlying the plaintiffs' claim for relief. Instead, the complaint states in a conclusory fashion that the defendants have violated the plaintiffs' rights and certain federal laws without setting forth any facts whatsoever regarding the manner in which these alleged violations occurred.

Accordingly, the plaintiffs' complaint is dismissed as to all defendants in the above captioned case. The plaintiffs are granted

3

20 days to amend their complaint to comply with Fed. R. Civ. P. 8(a). In order to comply with Rule 8(a), the plaintiffs must outline the facts underlying their claims and must specifically identify which defendants have committed each alleged act underlying those claims.

We also note that several of the defendants have moved for sanctions against the plaintiffs under Fed. R. Civ. P. 11. We hereby deny these motions at this time since the plaintiffs have prepared their pleadings without the benefit of counsel and may be unfamiliar with the rules of this Court. The plaintiffs are cautioned, however, that even pro se pleadings are governed by the Federal Rules of Procedure. Rule 11 provides, in part, as follows:

> The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

If any future pleadings of the plaintiffs are found to violate this Rule, the Court may impose sanctions upon the plaintiffs which may include requiring the plaintiffs to pay the other parties' reasonable expenses in responding to the pleadings including reasonable attorney fees.

4

Accordingly, the plaintiffs' complaint is hereby dismissed as to all of the defendants in the above captioned case, and the defendants' motions for sanctions are hereby denied.

SO ORDERED.

S. Arthur Spiegel
United States District Judge

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JERRY CARR** | ) |
| | ) |
| **and** | ) |
| | ) |
| **SHARON M. CARR,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) **Civil Action Number 1:06CV01893 (JR)** |
| | ) |
| **v.** | ) |
| | ) |
| | ) |
| **GEORGE YUND, ET AL.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

### PROPOSED ORDER GRANTING DEFENDANTS GEORGE YUND AND RANDY FREKING'S MOTION TO DISMISS AND MOTION FOR ORDER PERMANENTLY ENJOINING PLAINTIFFS FROM FILING SUIT AGAINST DEFENDANTS YUND AND <u>FREKING PURSUANT TO 28 U.S.C. § 1651</u>

Defendants Yund and Freking filed a Motion to Dismiss pursuant to FRCP 12(b)(2) and 12(b)(6).  For the reasons set forth in Defendants' Motion to Dismiss and for good cause shown, said Motion is hereby GRANTED.

Defendants also moved the Court for an order pursuant to the All Writs Act, 28 U.S.C. § 1651 permanently enjoining Plaintiffs from filing any action against Yund or Freking.  For the reasons set forth in Defendants' Motion and for good cause shown, Jerry and Sharon Carr shall be permanently enjoined from filing any suit in a United States District Court against Defendants

Yund or Freking without obtaining leave from this Court.  Failure to obtain leave before filing an

action against Yund or Freking will be viewed as contempt of this Court.

SO ORDERED:


_____                          _____
Date                                                     Hon. James Robertson
                                                         United States District Judge