United States District Court
For The District of Columbia

Jerry L. Carr
Sharon Carr
        Plaintiffs

        vs

Frost, Brown & Todd Law Firm

Criminal & Civil R.I.C.O.
Case No. 06-1893 JR

Motion to Overturn
Judge Manos Sanction
and Return Yund & Freking
to Defendants

## Memorandum

Plaintiffs are responding to Judge Robertson
Order filed Jan. 12, 07
        Plaintiffs interpret this that the Court wants
Plaintiffs to show any Corrupt Acts that Yund and
Freking participated in against Plaintiffs. Second
Plaintiffs need to prove Judge Manos Sanction
28 USC 1651 is a Bogus Sanction. Third, Plaintiffs
to show why Yund and Freking are very important
Defendants and should not be Dismissed under Rule 19.
Fourth, Plaintiffs have Lost their Civil Rights and
Human Rights.

i

P1

1) Show any Corrupt acts by Attorneys Yund and FreKing.

A. Yund Lied at a State Unemployment hearing March 13, 1985.
Yund told Referee John Moraites that John Michael Howard
was subpoenaed to the Hearing page 18 & 19.

Mr. Howard on page 121 & 122 Denies ever being Subpoenaed.

Mr. Yund continues to Lie to all concerned about Ms. Rennick
cutting Mr. Jones. Ms. Rennick has never denied cutting Mr. Jones,
its Mr. Yund that has twisted the facts. Mr. Yund continues
to state it was without provocation. John Qualls, Supervisor
of Labor Relations on page 15 & 16 Stated "The Slashing
incident was a continuation of an incident that had started
back in June" Complaining two Employees harassing her
Jones and Wilson.

On page 4 of findings of fact Carevs Champion Int. Corp.
item #11 Mr. Yund continues to defame Ms. Rennick
allegeding she herself is prejudice.

Mr. Yund as in the cutting incident is again twisting
the facts. Instead of Champion Int. Corp. being Recist,
Mr. Yund wants you to believe Ms. Rennick was prejudice.
It was Champion doing a "Cover Up" of Racism at Champion
with a very Hostile environment with KKK members in
the plant.

* Plaintiffs would Like to Re- ~~Litigate~~ Re Litigate their
Champion suits because Plaintiffs could continue to show
with Un disputed evidence of false hoods and Affidavits.

P2

B) After Rennick was terminated, two days later Mr. Carr was terminated, on more false affidavits. Mr. Carr got his job back thru arbitration. Mr. Carr came back to a very Hostile work enviroment. Mr. Carr starting receiving threats inside the plant and on the outside of the plant. Some were "Death Threats". Other threats in the plant were of the nature they would whip "my ass" or I'll have a serious accident.

Early in 1986 Mr. Carr tried to secure a transfer to Florida to rid himself of the Hostility.

Mr. Carr on 11-29-86 was beaten so badly he was put in the Hospital for 5 days and a large portion of Mr. Carrs' right ear was Bitten off. Champion helped the three thugs try to get off, helped with their defense.

Three months later Mr. Carr went to trial against Champion Ms. Rennicks Trial was March 1988

Mr. Carrs' Attorney Mark Mezibov did not enter the K K K card in as evidence. "Wormie" Wilson and "WaWa" Jones Received Letters in their files because of their admitted use of "Nigger" and poorly thought out "Racial acts" by Mr. Jones. Mr. Jones hung a Black & White poka dotted towel at Ms. Rennicks work station

Randy Freking dilibertly ignored Judge Webers Court Order for Personnel files. The K K K card with Wormies phone number on the back and Randy withholding personnel files made sure no Racism was proven

P3

About 4 months before Rennicks Trial in March 1988, Mr. Carr became the victim of constant threats again in the plant outside the plant. Mr. Carrs' Electrician Helper wrote a Letter Nov. 4, 1937 about a close call of an industrial accident or on purpose.

Jan. 1, 1988, Jerome Israel the same Fork Lift Driver Kicked Mr. Carr.

Mr. Carr had to call O.S.H.A., someone had cut Mr. Carrs' Lockout off a Electrical Device Mr. Carr and Mr. Parrott were working on and energized the Device Hot 480 Volts Champion was fined $200.00.

In March 1988 Ms. Rennick had try her Own Civil Rights case in U.S. District Court for seven days without Legal Representation against Frost, Brown & Todd

False Affidavits were entered uncross-examined, witnesses did not show up and Rennicks witnesses were threatened and intiminated by Randy Freeking one week before Rennick had to try her own case. During Rennicks Trial George Yund had Ms. Rennick tried over again in U.S. District Court for Cutting Mr. Jones. Case was heard Nov. 13, 1984 infront of Judge Dolan. The Court ordered No Restitution. Mr. Yund tried Ms. Rennick infront of Judge Weber and Rennick without Legal Representation was found guilty and Ordered $15,000.00 Restitution this was in Rennicks Federal Civil Rights Suit she was suddenly the Defendant.

P4

In Late 1988 and into 1989 Mr. Carr and Ms. Rennick were contacted by Lonnie Gates and Robert Dreise about Wiretaps placed on Mr. Carr and Ms. Rennicks phones. Plaintiffs are standing by what is alleged in this R.I.C.O. Complaint. George Yund and Frost, Brown & Todd Law Firm used S.O.S. (Service Observation Shoe) to Wiretap Federal Judges, Law Firms, Lawyers, CEO's, Law Enforcement and the News.

In 1989, a Mr. Fritz Hawkins from Dayton, Ohio contacted Mr. Carr and Ms. Rennick claiming to do Wiretaps for Ohio Bell in Dayton, ordered by George Yund and supported Mr. Gates claims of people and Entitys being Wiretapped including all the aforementioned. Mr. Hawkins stated Federal Judge Carl Rubin was a party to the Corruption same as Gates Stated to Mr. Carr. Plaintiffs wrote to Dept. of Justice in April 1990 alledging Wiretaps and Corruption. Plaintiffs even met Special Investigator for the Wiretapping Investigation John Baber. Mr. Baber did nothing.

As usual Mr. Yund trys to get Plaintiffs to argue small matters in the Champion cases to keep you from getting to to Main issues. In 1989 and 1990 Mr. Carr started receiving Bogus Retail Sales Receipts. Frost, Brown & Todd Represented Federated Dept. Stores, Mr. Carr had serious engine problems with a new 1988 Toyota Refused Warranties. Frost, Brown & Todd

P5

Represented the Toyota Dealership. The Plaintiffs went to the Press and T.V. news. Like Fritz Hawkins the news refuse to do a story. Frost, Brown & Todd Represent the Press.

May 21, 1990, Plaintiffs filed a R.I.C.O. Suit in U.S. District Court in Columbus, Ohio to get away from a prejudice Court in Cincinnati, Ohio. The issues contained in the first R.I.C.O. Suit C-1-89-749 Judge Spiegel were never heard. Judge Spiegel Dismissed the case without seeing or hearing any evidence. So May 21, 1990, Plaintiffs Refiled because they undisputed evidence.

On July 3, 1990, George Yund really crossed the line with Corruption. Then you'll understand why George Yund is in Plaintiffs lives on a regular basis to keep Plaintiffs financially ruined.

Mr. Yund conspired with Champion Int. Corp, Elaine Holman, Butler County Forensic Psychologist Roger Fisher and Fairfield MD. Michael Miller to have Mr. Carr taken at Gunpoint off the street and put in a State Mental Institution (Rollmans). Refer to pages 13 thru 19 of Lawsuit 06-1893, then pages 12A thru 17A and Complaint pages 12, 13 & 14

C* Frost, Brown & Todd represented Tom Sweeney Nissan and Givaudan, Plaintiffs employers in 1999. Debra DeLong was a Paralegal for Frost & Jacobs in the 1980's and worked on Rennick's Champion suit.

6

p6

Andrea Hicks represented Sharon (Rennick) Carr against Tom Sweeney Nissan Inc. Ms. Hicks presented Privilege and Confidential information to Debra DeLong now working for Thompson, Hine & Florey. Ms. Hicks told Ms. DeLong that Ms. Carr was the former Ms. Rennick and had filed a R.I.C.O. Suit in 1990. Ms. DeLong Remembered Ms. Carr and her case against Champion quite well. Ms. Brenneman of Thompson, Hine & Florey presented this information to the Courts and suddenly both Ms. Carrs' cases were Dismissed.

P7

2.) Judge Manos Sanction is Bogus and Fraudulent Document.

A.) Again you must refer to Forensic Psychologist Roger Fishers Fax Transmittal Document. Roger Fisher is phoning Judge Manos because Fisher had just been sued in the Amended Complaint, C-2-90-360

B.) How did Fisher Know Manos was going to be assigned to the case, Fisher circled Graham & King already assigned. Why did Fisher contact George Yund, Mr. Yund was Represented by Michael Meundrell of Rendigs, Fry, Kiely & Dennis.

C.) Plaintiffs were never at any Trial or Hearing on July 10, 1991. This an out right Lie by Manos or whom ever Fabricated the Document to protect each person that conspired against Plaintiffs

d.) The Court expects the Plaintiffs to Live under such a Bogus Sanction for Life (permanent) without seeing the Court records, transcripts, documents, tapes or any other used against Plaintiffs on July 10, 1991. Plaintiffs were never asked by the Court or any Defendants to turn over any evidence or subjected to any Depositions or interrogitories. So How did Manos rule all issues and evidence was heard July 10, 1991 case Dismissed.

E.) In Judge Manos memorandum, he never addresses any issues the Plaintiffs were complaining about.

P8

Kidnapping, KKK threat, witnesses being threatened
before trial and Wiretapping. Judge Manos never
Responded to any of these allegations. Manos focused
on the Labor problems Carr & Rennick had, that wasn't
What Plaintiffs filed a R.I.C.O. suit for, Plaintiffs
believe George Yund wrote up the Sanction and put
Judge Manos name on it.

F.) In 2001, Mr. Carrs' Psychologist Faye Ross reviewed
Mr. Carrs' Medical Records and Listened to the tape
recordings of Fisher and Miller and concluded there
was an Unlawful Abduction. Ms. Ross tried but was
Refused Mr. Carrs' Medical Records by Butler County
Probate Court in 2001. Mr. Carr wrote to Cindy Carpenter
and Requested his records June 2001. Much of the
Records are very incriminating, now Mr. Carr Knows
Why they was Kept from him for 11 years. So much of
this R.I.C.O. suit is about new evidence including
Manos Sanction. Plaintiffs in 2001, sent to Chicago ILL.
to the National Archives and Requested and paid for
the Entire Records of case C-2-90-360 and Judge Manos
Sanction was not in the Documents. Matter of Fact
this Sanction never surfaced until 2002 when
Deb Brenneman entered it to get the Sweeney case
Dismissed

P9P9

3.) Under Rule 19 George Yund and Randy Freking should not be Dismissed from this action.

* Both played Large roles in the events since 1984 _Refer to number one, their Corrupt Acts._

Mr. Yund has admitted he has practiced in Wash. D.C. Courts.

Plaintiffs filed a 423 page complaint with the Dept. of Justice in 2003 against these Attorneys. Para Legal for the Justice Dept dismissed Plaintiffs Complaint, named Kevin Callihan.

P10

4) Plaintiffs have Lost all their protected Rights under the Constitution.

A) Plaintiffs cannot retain Counsel. Since July 3, 1990 Mr. Carr has contacted several hundred Lawyers and Law Firms to bring Justice to Mr. Carr, Equal Protection under the Law. Mr. Carr has never had a chance to make any of these individuals stand accountable for Mr. Carrs' Kidnap.

B.) Plaintiffs have virtually exhausted every avenue for Legal Assistance or Some one to investigate their complaints.

Listed below are places Plaintiffs went to for help.

1) Dept. of Justice March 30, 2005
2) Ohio Legal Rights August 8, 2003
3) Dept. of Justice Feb. 20, 2003
4) F.B.I. April 30, 2002
5) Attorney General May 21, 2002
6) Butler County Prosecutor June 28, 2002
7) Dept. of Justice July 23, 2002
8) Congressman Tom Raga
9) Attorney James Whitaker

C.) This is Plaintiffs third attempt at Bringing to Justice Corruption in Ohio. These issues and evidence has never been Reviewed.

13

Affidavits against Mr. Carr and all of the other
incidents, that Mr. Carr was going to start
defending himself against these actions.

On July 3, 1990, Mr. Carr as stated before went
to Dr. Fisher to talk about the credit card fraud.
Dr. Fisher was tape recorded in that session with Mr. Carr.
Mr. Carr and Dr. Fisher, on tape, talk about Mr. Carr's
garnishment and credit card problems. The appointment,
same as Dr. Miller, lasted about 20 minutes. Dr. Fisher
agreed with Mr. Carr, on tape, that someone was
trying to forge Mr. Carr's signature.

3)    Mr. Carr left Dr. Fishers office and was given
a ride by Ms. Rennick, to Mr. Carr's mothers house.
Upon arriving at Mr. Carr's mothers home, where Mr. Carr
was living, suddenly 8 police cars surrounded Ms. Rennick
and Mr. Carr with the officers, guns drawn, automatic
weapons and shotguns aimed at Ms. Rennick and
Mr. Carr. Mr. Carr was slammed to the ground by
the police, handcuffed and shackled with Leg Irons.
Mr. Carr and Ms. Rennick asked what Mr. Carr was
being charged with and where was he being taken. The
police refused to answer. Mr. Carr was put in the
back of a police car and was taken to Cincinnati, Ohio,
Rollmans State Mental Institution. At Rollmans,
Mr. Carr was again slammed down by two big
orderlies who worked for Rollmans. Mr. Carr was
then injected with a drug of some kind. Mr. Carr
immediately became helpless but trying to fight off

the effects of the drug. Mr. Carr had already ask
the Sheriff Deputy for the right to an attorney.
Mr. Carr was kept drugged against his protest and
continued for the next five days asking to have an attorney
and to know why he was being held at a State Mental
Institution. Mr. Carr was told he was being held on a
72 hour hold. Mr. Carr was held 5 days at Rollmans.
Mr. Carr was drugged daily against his protest
Mr. Carr was refused an attorney
Mr. Carr was refused any phone calls
Mr. Carr had blood work done by Rollmans against protest
Mr. Carr was not fed by Rollmans for 5 days
Mr. Carr was not showered for 5 days
Mr. Carr was led to a door on the third night at about
3 a.m. and was told he could escape by going out that
door. Mr. Carr was drugged but still knew if he went
through that door he would be shot by Cincinnati Police.
Several escapees were shot and killed by Cincinnati Police.
Mr. Carr was also given Electric Shock Treatments against
his protest. Mr. Carr kept trying to tell Rollmans
Staff that Champion Int. and their Law Firm, Frost
and Jacobs were trying to shut him up and that only
6 weeks early, May 21, 1990, Mr. Carr had sued Champion
Int. and George Yund of Frost & Jacobs and his firm, in
a R.I.C.O. ACT C-2-90-360. On the 5th day of a
72 hr. hold Mr. Carr was transferred to Probate Court
in Butler County, Ohio. Mr. Carr had still not had

15

evaluation. Judge Henry Brewer read the folder placed in front of him, then stood up and stated "I will not participate in this action," then left the Hearing Room. Mr. Carr was Probated within 5 minutes without a Judge to Dartmouth Mental Institution in Dayton, Ohio. A man sitting next to Mr. Carr in the Hearing Room was Mr. Carr's court appointed attorney. The attorney, Pat Garrettson, never even spoke to Mr. Carr. After the Hearing Ms. Rennick confronted Mr. Garrettson and asked him what he was going to do for Mr. Carr and he told Ms. Rennick theres nothing he could do for Mr. Carr. Mr. Carr was then transported to Dartmouth in Dayton, Ohio. Mr. Carr upon arrival was again drugged immediately, against his protest. Mr. Carr again, was not allowed an attorney, Mr. Carr was not allowed a phone call. A Dr. Prada introduced himself to Mr. Carr and stated he would be treating Mr. Carr. Right from the start, Dr. Prada started telling Mr. Carr that he was going to have to drop the R.I.C.O. Complaint or Mr. Carr would never get out of the Mental Institution. Ms. Rennick finally got to visit Mr. Carr and slipped him a tape recorder. Mr. Carr taped Dr. Prada telling Mr. Carr to drop the R.I.C.O. or he would never get out of the Mental Inst. Mr. Carr was confined to Darthmouth Mental Inst. in Dayton, Ohio. According to Darthmouth Medical Records Mr. Carr was injected daily with psychotropic medication,

16

Mr. Carr was also injected with Cogentin. This was all being done under protest by Mr. Carr, against his will. Mr. Carr started reflecting on what a Doctor Slavin, a Rollmans Psychiatrist, ~~told~~ had told Mr. Carr on the evening of July 3, 1990, at Rollmans in his office. Doctor Slavin explained to Mr. Carr that Mr. Carr was in a very dangerous situation and that Mr. Carr should cooperate fully or their could be and accident in a facility like this, Rollmans Mental Inst.

Dartmouth Mental Inst. and Doctor German Prada M.D., released Mr. Carr after 30 days of confinement. Mr. Carr immediately headed to the authorities. Mr. Carr made all same rounds, the F.B.I., the Justice Dept., prosecutors as Mr. Carr did prior to filing the R.I.C.O. suit May 21, 1990. The Authorities refused to take Mr. Carr's complaint of kidnapping at gunpoint to Dismiss a R.I.C.O. Suit. Mr. Carr exhausted all avenues to bring George Yund, Roger Fisher, Michael Miller and Champion Int. Corp. to justice. Mr. Carr was Black-Listed everywhere he went to file a complaint. Mr. Carr was Journeyman Electrician and a Journeyman Millwright and could not get a job. Mr. Carr tried to get his Probate Records from Butler County and the Probate Court refused to release Mr. Carr's Records. Mr. Carr exhausted himself trying to find an attorney to represent Mr. Carr.

17

Then Mr. Carr fully understood, it was just like Wiretappers Gates, Draise and Hawkins told Mr. Carr it was Organized Crime, including Federal Judges, Law Firms, the F.B.I., the Dept. of Justice, the State Attorney General, Congressmen, Senators and State Government. Mr. Lampley stated in Federal Court in fon't of Judge Herman Weber (Rennick vs Champion Int.) page 695, Randy Freeking told Allen Lampley that he, Randy Freeking, attorney for Frost & Jacobs, was associated with people in High Places that Controlled the Federal Courts.

Finally in 2001, Mr. Carr was given his Probate Records from 1990. When Mr. Carr Reviewed the documents he immediately knew why he was refused his records. The whole Probate Record shows how a Corporation and their Law Firm, Frost & Jacobs, conspired to have Mr. Carr grabbed at Gunpoint by the Authorities and put in a Mental Inst. to Discredit him and lable him Mentally Ill. The medical records show Doctor Michael Miller using Mr. Carr's name on two Medical Release forms. Dr. Miller Released medical information to Tom Knox Hamilton Police Chief, Sheriffs Dept., Butler County, Lena Saylor and Elaine Holman of Champion Int., Hal Shepherd Hamilton City Mgr and Roger Fisker, Ph.D. Forensic Psychologist with the Butler County Courts. Mr. Carr never authorized any of these Releases. Mr. Carr also see's a Fax Transmittal Document. The Cover Page shows

18

Doctor Roger Fisker, Center for Forensic Psychiatry, in his handwriting; sending to Ms. Holman of Champion Int. Corp. on July 12, 1990, 2 pages. George Yunds' Name and phone number 651-6824 and Frost & Jacobs and the second page shows the Cover sheet of Mr. Carr's R.I.C.O. ACT Law Suit C-2-90-360. On that cover sheet, Dr. Fisker in his handwriting has written Judge Manos Cleveland, 216-522-4290 Karen Smith and call Columbus 614-469-6945 and Circled the Case number and the Criminal & Civil R.I.C.O ACT. This is an Amended Complaint filed by Ms. Rennick shortly after Mr. Carr was abducted at gun point. This shows the aforementioned parties were in contact with each other, conspiring to Dismiss the R.I.C.O. suit alleging Mr. Carr is Mentally ILL. An attorney cannot contact a case Judge much less a psychologist thats being charged with Kidnapping, now Federal Judge Manos is directly involved in the confinement of Mr. Carr. Now Mr. Carr fines out in 2002 this 28 USC § 1651 Sanction by Judge Manos appears. This again is intended shut Mr. Carr up. Sanction by Manos has taken Mr. Carr's Citizenship, his Civil Rights and his Human Rights away without any Legal Representation, Court Hearing, Nothing. This is No Longer United States of America. Mr. Carr fully understands that his Life is in jeopardy upon filing this action. Mr. Carr is 63 now and feels George Yund and Manos have taken his Life anyway

12

since July 3, 1990.

Because of all the aforementioned reasons, Mr. Carr is Demanding C-2.90.360 R.i.C.O. ACT be made whole and an active case again. Mr. Carr Request that all transcripts, Notes, depositions etc., be made available. There was Nothing done on this action. Mr. Carr as in 1990, Request a Special Prosecutor to Investigate Racketeering in Ohio.

In 2001, Doctor Fisher finally had his License Revoked permanently and Doctor Prada's was also permanently barred from practicing medicine but the authorities still refuse to take Mr. Carr's complaint. Mr. Carr is not allowed access to Courts or any level of state or federal authorities. Mr. Carr truely thought it is against the law to Abduct someone at gunpoint put them in a Mental Inst. against their will by falsifying documents to Dismiss a Racketeering suit. Mr. Carr believes Frost & Jacobs (Frost, Brown & Todd Law Firm) and Judge Manos proved his case of Criminal Racketeering in Ohio

In and around 1987 to 1990 Cleveland, Ohio was also being investigated for Wiretaps and Corruption.

In and around 1987 to 1990 "The Keating Five", investigation was also going in Cincinnati, Ohio and John Baber Special Investigator was investigating Cincinnati Bell and Wiretappee for Ohio Bell in Dayton, Ohio, Fritz Hawkins, was trying to Blow the Whistle. Cincinnati could NOT stand for Mr. Carr

12A

that Mr. Carr join the Employees Assistance
Program, designed to help employees with
Alcohol, Drug or Financial Problems. Mr. Carr
felt his job was safe under this program.
On May 21, 1990 Mr. Carr and Ms. Rennick
filed a R.I.C.O. ACT (criminal) c-2-90-360.
The full R.I.C.O. suit c-2-90-360 will be
attached to this new complaint.

   Less than 6 weeks Later, Mr. Carr,
through the Employees Assistance Program
Director Elaine Holman, was made to go see
for appointment Dr. Michael Miller of Fairfield,
This was July 2, 1990. Mr. Carr being suspious
took a pocket tape recorder and recorded
the entire session, about 20min. Mr. Carr
went to Dr. Miller to discuss the boogis bills
and garnishment. Dr. Miller started talking
how he and a Dr. Fisher were going to have
Mr. Carr removed from Champion Int. payroll
and put on a Psychiatric Disability. Mr. Carr
immediately refused and Dr. Miller continued
to talk on how that R.I.C.O. suit must be
Dismissed. Mr. Carr and Dr. Miller did not
agree on anything except those weren't my
signatures on those phony bills. Mr. Carr
was told by Dr. Miller to go to Dr. Fisher
the next day on July 3, 1990 the appointment

14

13 A

was already made by Champion Int. Corp.
On July 3, 1990 Mr. Carr kept his appoint-
-ment with Dr. Roger Fisher of Hamilton, Ohio.
Mr. Carr again took his pocket tape recorder
and taped the entire session, about 15 min.
Dr. Fisher and Mr. Carr on tape, discuss Mr. Carr's
phony bills and how the signatures are not even
close to Mr. Carr's signature. This was about all
that was discussed. Mr. Carr left Dr. Fishers
office and received a ride by Ms. Rennick
to Mr. Carr's mothers house where he was
residing. As soon as Ms. Rennick came to a
stop in front of Mr. Carr's mother house, 8 police
cars raced in and surrounded Ms. Rennick
and Mr. Carr. There were on or about 12 police
and Sheriff deputies with Guns Drawn. Some
had Shotguns aimed at Ms. Rennick and Mr. Carr,
some had Hand Guns. Mr. Carr was pulled out
of the car and slammed to the ground.
Mr. Carr was then Shackled at the ankles and
Handcuffed behind his back. Ms. Rennick
kept asking what Mr. Carr was being charged
with, the police refused to answer Ms. Rennick
and then was threatened by the Police that
would be taken also. Mr. Carr was thrown
into the back of a Sheriff's car and taken away.
Ms. Rennick was following behind thinking

15

$2^0$

14 A

we were going to the Butler County Jail for some mistaken charge that maybe Frost & Jacobs was trying to hang on Mr. Carr.

On that July 3, 1990 day, Mr. Carr's Life forever changed. Mr. Carr was taken to Cincinnati, Ohio and admitted to Rollmans State Mental Institution. Sheriff deputy already had paper work completed to give to the staff, at admittance. Mr. Carr was immediately grabbed by two big Orderlies and slammed to the floor and given an injection of some kind of drug rendering Mr. Carr incapacitated. Mr. Carr was dragged down a hallway to room where about 7 other men were laying on beds. Mr. Carr was then thrown into a bed. Mr. Carr was held against his will for 5 days at Rollmans State Mental Inst. on later information (documents) a 72 hour hold.

During those 5 days at Rollmans; Mr. Carr was Denied Legal Representation Mr. Carr was Denied a Phone call Mr. Carr was injected daily against his will with Haldol, Ativan and Cogentin. Mr. Carr had Blood taken from him against his will. Mr. Carr was Denied a shower Mr. Carr was Denied food until outside minister gave food

16

2.1

15A

On the third night, Mr. Carr was led down a hallway to a small flight of stairs and a door. Mr. Carr was then told by the Orderly to go through the door and Mr. Carr could escape. Mr. Carr refused to go through the door and later documents show, Mr. Carr was on High Escape Alert. Mr. Carr would have been shot. Mr. Carr also received Electric Shock Treatments against his will.

On the 4th day Mr. Carr was taken to an office with three men in the office. Neil Waugh, Dr. Slaven and an unknown third. Neil Waugh did most of the talking (screaming) to Mr. Carr on how this situation has to be defused and this R.I.C.O. suit has to be dropped. At that point Mr. Carr realized he had been put in a State Mental Inst. for filing a R.I.C.O. suit against some very high profile persons and enterprizes. Mr. Waugh told Mr. Carr if he did not drop the suit, he could be in a Mental Inst. for years to come.

On the 5th day, Mr. Carr was injected early in the morning with some drugs and taken to Hamilton, Ohio, for a Probate Hearing. Presiding Judge Henry Brewer read the folder in front of him and stood up and stated, "I will not participate in this," then walked

22

16 A

Mr. Carr had some man sitting next to him
named Pat Garretson attorney in Hamilton,
Ohio. Mr. Garretson, through documents showed
later was suppose be Mr. Carr's court appointed
attorney. Mr. Garretson never spoke to Mr. Carr
the court, nothing, he was just there to show Mr.
Carr had an attorney. After Judge Brewer
walked out Mr. Carr was Probated anyway to
another Mental Inst. in Dayton, Ohio.
Mr. Carr fully realized the Power and Corruption
by Frost & Jacobs at this time and also realizing
Mr. Carr could be Shut Up Permanently. What
was being done to Mr. Carr was Unlawful but the
Butler County Courts were more than willing
to participate. Mr. Carr was in total Disbelief
that this was the United States of America.

Mr. Carr was held a total of 35 days at
Dartmouth Mental Inst. in Dayton, Ohio, now
closed down. Mr. Carr was medicated daily against
his will. After Mr. Carr was Released, he and Ms. Rennick
went to all the Local State and Federal Authories but
no one will take the Plaintiffs complaint or a charge.

Mr. Carr and Ms. Rennick tried getting on with Life.
Black Listed for about 2 yrs Mr. Carr and Ms. Rennick
finally landed employment. Mr. Carr hired as an
electrician with a company named Givaudan Roure at
$50,000.00 fifty thousand a year and Ms. Rennick

17A

with Chrysler at $40,000.00 a yr. From 1992 to 1999
Plaintiffs were married and bought a $300,000.00
Home in Mason, Ohio. Mr. and Mrs. Carr managed to
save $90,000.00 in 401K and had $42,000.00 in company
pension. In 1995, Mr. Carr came down with Cancer.
With Radiation treatments, Mr. Carr fought the Cancer
for over 2 yrs and was terminated in 1999 while on
sick leave, Frost, Brown & Todd represented Givaudan
Roure. Two days later Mrs. Carr was terminated
from her employment she was on State Workers Comp.
Now the Carr's had to start withdrawing their
retirement money from 401K before Mr. Carr was
old enough, so there's an IRS penalty. Mr. & Mrs. Carr
were without incomes again as Frost, Brown & Todd did
in the 1980's and Bankrupt the Carr's. The Carr's
had to withdraw the whole $140,000.00 to try and
save their Home, pay bills and food. The Carr's still
lost their Home and moved into a $3500.00 Trailer for
over 2 yrs. Mr. & Mrs. Carr were now aware that George
Yund were going to permanently keep the Carr's financially
Ruined so the Carr's could not Legally pursue the
Unlawful Detainment of Mr. Carr to Dismiss case
C-2-90-360.

To further show the Carr's Loss of Rights,
Mr. Carr was Rear-ended in an auto accident. This was
June 5th 1997, the other Driver was an un-insured
and un-Licensed driver that Lied to the police and a
Tow stating she had Insurance when in fact she was

Complaint

24

Defendant                                                                    12

Michael Miller - Psychiatrist M.D., Fairfield, Ohio

Mr. Miller met with Mr. Carr on July 2, 1990. Mr. Carr being referred to Doctor Miller by Mr. Carrs' Employer Champion Int. Corp. Mr. Carr met with Dr. Miller for about 20 min. and Mr. Carr recorded the whole meeting.

Mr. Carr went to Dr. Miller about Credit Card Fraud

Dr. Miller immediately starts telling Mr. Carr how <u>were</u> going to Remove you from the payroll (champion) and put you on a Psychiatric Disability and the lawsuit must be Dismissed. C-2-90-360

Doctor Miller used Fraud and Deceit with two Medical Release Forms. Mr. Miller asked Mr. Carr to sign two blank Medical release forms, one for Doctor McBrady and the other for Doctor Barrish. Doctor Miller instead wrote in the Hamilton Police, Butler County sheriffs Dept. City Manager, Champion Elaine Holman and Roger Fisker

At the end of the meeting Dr. Miller made an appointment for Mr. Carr on July 3, 1990 with Roger Fisker Forensic Psychologist with Butler County.

Mr. Carr was not allowed access to any Probate Evidence until June 2001. Cover UP.

Mr. Miller is Also Immune from Prosecution because he too is Linked with Frost & Jacobs in Mr. Carrs' Kidnapping at Gunpoint.

Racketeering, Kidnapping, Obstruction of Justice Falsifying Documents

Complaint

25

13

Defendant

Roger Fisher - Forensic Psychologist Butler County Court Feb 28th, 2003, Mr. Fishers License was permanently revoked.

July 3, 1990, Mr. Fisher met with Jerry Carr, first time ever, at Mr. Fishers office. The meeting Last about 20 min. Mr. Carr tape recorded the whole meeting. This was not an Evaluation. Mr. Carr was there to talk about bogus credit cards and garnishments and thats what was talked about.

Mr. Fisher maliciously Lied in an affidavit to the Butler County Courts and Sheriffs Dept. to have Mr. Carr Arrested at Gunpoint and taken to Rollmans State Mental Inst. in Cincinnati Ohio

In Mr. Fishers Affidavit he purposely Lied to have Mr. Carr Deemed Mentally ILL and distroy his Credibility, Mr. Carr Less than 6 weeks earlier had filed a Racketeering Lawsuit C-2-90-360 against Champion Int. and Frost & Jacobs Law Firm. Champion Int. Employees Assistance Program Director Elaine Holman made the appointments to Doctors Miller and Roger Fisher on Mr. Carrs' behalf

According to papers provided to Mr. Carr finally in 2001 from Probate Court Mr. was Entitled to an Attorney, never got one. Mr. Carr was allowed a phone call never was allowed one, Mr. Carr was also allowed a second evaluation, Mr. Fisher wrote himself in as second opinion evaluation.

Mr. Fisher upon his Recomendation had Mr. Carr fired from his Job at Champion Int. Corp. (Removed from payroll)

Racketeering, Kidnapping, Obstruction of Justice, False Affidavit

Complaint

14

On July 16, 1990, Roger Fisher in his own HandWriting Conspired with Frost & Jacobs, George Yund attorney from Frost & Jacobs, Legal Representatives of Champion Int. Corp, Champion Int. Corp EAP Director Elaine Holman and Judge John Manos, to confine Mr. Carr to a Mental Institute to declare Mr. Carr Mentally Ill and have the case transferred to Judge Manos from Judge Grahm. Then Judge Manos signature is now on a Bogus Sanction being passed around. There was no Trial or Hearing on July 10, 1991. If there was a Trial or Hearing on July 10, 1991, who represented Roger Fisher? Wheres Roger Fishers Transcripts of questions he answered. How come Mr. Carr and Ms. Rennick, the Plaintiffs?

Mr. Fisher was sued under the R.I.C.O. Act in an Amended Complaint to C-2-90-360.

Roger Fisher was sending a Fax Transmittal on Butler County Forensic form to the aforementioned, when he wrote these names he was Contacting in his own Handwriting. Showing again Frost, Brown & Todd (Frost & Jacobs) do control the Courts and the Judges. Mr. Fisher is hiding behind the Power and Connections of Frost & Brown & Todd to escape charges and investigations. Frost, Brown & Todd and George Yund are protecting Roger Fisher because he wrote their names on the Fax Transmittal Document.

27

## Conclusion

Plaintiffs are victims of a Corrupt Law Firm and Corrupt Attorneys. Frost, Brown & Todd Law Firm has an agenda, "to Control the Federal Courts" refer to Allen Lampley testimony of Randy Freking, Mr. Freking is "associated with people in High Places that Control the Federal Courts".

Is everyone Lying except Frost, Brown & Todd, Yund and Freking. Lonnie Gates, Robt. Draise, Fritz Hawkins, Sharon Carr, Jerry Carr all tried to expose Corruption. Even Attorney James Whitaker wanted $200,000.00 to go to the Authorities. Mr. Whitaker Knew Yund had Mr. Carr picked up at Gunpoint.

Plaintiffs are outraged, this is third time Plaintiffs have had to try and Prosecute a Racketeering case. It's not the Plaintiffs Responsibility to Prosecute Corruption, that's why we have the D.O.J, the F.B.I and Local and State Authorities but they all Refuse to Look any evidence. This is not Equal Protection under the Law.

Plaintiffs Request Yund & Freking ~~being~~ be Re-instated as Defendants and Let the case proceed.

Roger Fisher and Dr. Prada both Lost their Liscense

29

## Certificate of Service

Plaintiffs do hereby Certify that a true and accurate copy was sent Certified Mail to:
U.S. District Court
For the District of Columbia
U.S. Courthouse
333 Constitution Ave. N.W.
Washington, D.C. 20001


Jerry L. Carr
1261 Southern Hills Blvd
Hamilton, Ohio 45013
cell ph 513-312-6698

Sharon Carr

Exhibit List

Exhibits

15) April 11, 1990 Return Letter from the Dept. of Justice acknowledging Plaintiffs compleining of Wireteps. Plaintiffs ~~wento~~ went to the Cincinnati F.B.I., Refused to take complaint.

16) Wiretapping Special Investigator John Babers' Handwritten Statement

17) ~~Phil~~ Michael Millers Letter to Elaine Holman, Director Employees Assist. Program : No Threats were made

18) Roger Fisher Letter to Frank Hawk Human Resources.
18) ~~Letter By Michael Miller~~ MEDICAL Release Forms - FRAUDULENT No Threats were made   Mr. Carr has the tapes

19) Tape Recording of Michael Miller

20) Tape Recording of Roger Fisher

21) Rollmans State Mental Inst. Medical Papers

22) Psychologist Faye Ross hand Written Statement of Unlawful Detention

23) Settlement proposals sent to George Yund 6-25-90, one week before Mr. Yund Conspired to have Mr. Carr put eway in a Mental Institution

24) ~~An~~ Nine Documents confirming Plaintiffs seeking Justice and protection

* 25) Most Important Exhibit saved for Last to Remind the Court Pyschologist Roger Fisher Lost his Liscensed. In his hand writing Frost & Jacobs George Yund 651-6824 = Page 2 FAX TRANSMITTAL

Exhibits List

Exhibits

1. Plaintiffs item No 1.) - A. March 13, 1985 Unemployment Hearing

2. Ohio Civil Rights Commission Report from 5/8/85 supporting Ms. Rennick that she was not prejudice. On page 6 " Staff found that statements of the above persons effectively Refuted Respondents allegation Regarding charging part's association with Blacks. Ms. Rennick's psychologist Robert McBrady gave a favorable evaluation of her racial Attitude.

3. The Ku, Klux, Klan card put on Mr. Carr's tool box in the Trim-Pak area of Champion Int. Corp. On the back side of the card is Mr. Louis "Wormie" Wilsons phone number. As stated in the R.I.C.O. Suit Mr. Wilson and Mr. Jones were K.K.K. members.

4) A Letter showing Mr. Carr was trying to get a transfer to Champions Florida Plant. March 3, 1986, Mr. Carr was being subjected to Hostility in ever depertment.

5) Bloody picture and medical documents. Mr. Carr was supposed to meet Mr. Steve Garrett at the Columbia Inn. And discuss Mr. Carr's Transfer to Florida over A Beer, Mr. Garrett was one of Management helping anyone who wanted a transfer.

Exhibits List

Exhibits

6) Randy Frekings hand written refusal of Judge Webers Court Order. Attached are the Letters Mr. Freking was Obstructing.

7) Letter from Mr. Carrs former Attorney Mark Mezibov still trying to work out a settlement. Mr. Yurud Refused

8) Letter from Roger Perrott about Fork Truck

9) Letters from Chief Union Stewart Don Flick

10) Transcript from Rennick vs Champion. p.695,696,697 Allen stating Randy Freking said He (Freking) was associated with People in "High places" that Control the Federal Courts.

11) George Yurud trying Rennick in Court a second time for cutting Jones (Double Jeopardy) and tried to Extort $15,000.00

12) Mr. Carrs' supervisor Tim Burton (African-American) wrote Mr. Carr Three Letters. The first Letter, George Yurud trying to get Mr. Burton to sign False Affidavits against Mr. Carr. The second Letter Mr. Burton witness to another Foreman (Supervisor) James Philley was going to Kick Mr. Carrs' "ASS.

13) Newspaper from Cincinnati Enquirer about Gates and Draise doing Hundreds of Wiretaps.

14) Mail Gram by Western Union showing Mr. Hawkins by his Van with Judge Rubins name. Four pages Total

Roger Fisher wrote Judge Manos Cleveland 216-527-5490 Karen Smith

## Additional exhibits

1A) Psychologist Roger Fisher License Revoked Permanently

2A) Letter to Mr. Carr removing him from Champion Payroll pursuant to Dr. Fishers Recommendation

3A) Pictures of Plaintiff Picketing

4A) Notorized Letter from Mr. Charles Moore (Chuck) stating African-Americans were referred to as Porch-Monkeys and Niggers. Mr. Moore was White married to an African-American Lady. Mr. Moore was Fired on Martin Luther Kings Day. Mr. Moore also refers to Sharon Carr being stalked and herassed.

5A) Dr. German Preda License Revoked

APPEALS DOCKET NO. 636209

BOARD OF REVIEW

OHIO BUREAU OF EMPLOYMENT SERVICES

TRANSCRIPT OF TESTIMONY


IN RE CLAIM OF:          JERRY L. CARR
                         1261 SOUTHERN HILLS BOULEVARD
                         HAMILTON, OHIO  45013


                         SS:  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


HEARING DATE:            MARCH 13, 1985

PLACE:                   HAMILTON, OHIO

APPEARANCES:

                         CLAIMANT APPEARED IN PERSON AND WAS
                         REPRESENTED BY WESLEY ABRAMS, UNITED
                         PAPERWORKERS OF AMERICA, AFL/CIO,
                         INTERNATIONAL REPRESENTATIVE, WITH
                         ONE POTENTIAL WITNESS, SHARON
                         RENNICK.

                         CHAMPION INTERNATIONAL CORPORATION
                         WAS REPRESENTED BY FROST & JACOBS,
                         ATTORNEYS-AT-LAW, IN THE PERSON OF
                         GEORGE YUND, ESQ., WITH LEWIS T.
                         WILSON AND JOHN R. QUALLS AS
                         WITNESSES.

                         A SUBPOENAED WITNESS, JOHN MICHAEL
                         HOWARD, DID NOT RESPOND TO THE
                         SUBPOENA OR APPEAR ON BEHALF OF THE
                         EMPLOYER.


REFEREE:                 JOHN S. MORAITES

MC GINNIS—LOVE ASSOCIATES, INC.
REGISTERED PROFESSIONAL REPORTERS
COLUMBUS OHIO 43085
(614) 431-1344

APPEALS DOCKET NO. 636209

BOARD OF REVIEW

OHIO BUREAU OF EMPLOYMENT SERVICES

TRANSCRIPT OF TESTIMONY

IN RE CLAIM OF:          JERRY L. CARR
                         1261 SOUTHERN HILLS BOULEVARD
                         HAMILTON, OHIO   45013

                         SS:   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

HEARING DATE:            FEBRUARY 20, 1985

PLACE:                   HAMILTON, OHIO

APPEARANCES:             CLAIMANT APPEARED IN PERSON.

                         CHAMPION INTERNATIONAL CORP. WAS
                         REPRESENTED BY THE LAW FIRM OF
                         FROST & JACOBS IN THE PERSON OF
                         GEORGE YUND, ESQ., WITH JOHN R.
                         QUALLS, JACK WINTERHALTER, EARL
                         HILLMAN AND JOHN ALDER AS POTENTIAL
                         WITNESSES.

SHARON LOOK ON PAGES
15 & 16

REFEREE:                 JOHN S. MORAITES

1

2                                    APPEALS DOCKET NO. 636209

3                        BOARD OF REVIEW

4             OHIO BUREAU OF EMPLOYMENT SERVICES

5                    TRANSCRIPT OF TESTIMONY

6

7    IN RE CLAIM OF:        JERRY L. CARR
                            1261 SOUTHERN HILLS BOULEVARD
8                           HAMILTON, OHIO  45013

9

10                          SS:  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

11

12   HEARING DATE:          MARCH 13, 1985

13   PLACE:                 HAMILTON, OHIO

14   APPEARANCES:           CLAIMANT APPEARED IN PERSON AND WAS
                            REPRESENTED BY WESLEY ABRAMS, UNITED
15                          PAPERWORKERS OF AMERICA, AFL/CIO,
                            INTERNATIONAL REPRESENTATIVE, WITH
16                          ONE POTENTIAL WITNESS, SHARON
                            RENNICK.
17
                            CHAMPION INTERNATIONAL CORPORATION
18                          WAS REPRESENTED BY FROST & JACOBS,
                            ATTORNEYS-AT-LAW, IN THE PERSON OF
19                          GEORGE YUND, ESQ., WITH LEWIS T.
                            WILSON AND JOHN R. QUALLS AS
20                          WITNESSES.

21                          A SUBPOENAED WITNESS, JOHN MICHAEL
                            HOWARD, DID NOT RESPOND TO THE
22                          SUBPOENA OR APPEAR ON BEHALF OF THE
                            EMPLOYER.

23

24   REFEREE:               JOHN S. HURAITES

25

18

1    RECROSS-EXAMINATION OF LEWIS T. WILSON:

2    BY MR. ABRAMS:

3    Q.   WHO TOOK YOUR STATEMENT, MR. WILSON?

4    BY MR. WILSON:

5    A.   LORD, I DON'T KNOW, OVER THERE IN THE WHITE

6         HOUSE.

7    Q.   YOU DON'T KNOW WHO TOOK IT?

8    A.   NO.  MIGHT HAVE BEEN YOU.

9    Q.   WAIT JUST A MINUTE.  YOU SAID -- I BELIEVE YOU

10        ANSWERED ALREADY THAT YOU DON'T KNOW WHO TOOK

11        YOUR STATEMENT.

12             MR. ABRAMS:  I HAVE NOTHING FURTHER.

13             THE REFEREE:  ALL RIGHT.  YOU MAY CALL

14   YOUR NEXT WITNESS.

15             YOU MAY STEP OUTSIDE IF THERE'S NOTHING

16   FURTHER.

17             MR. WILSON:  CAN I GO BACK TO WORK?

18             THE REFEREE:  IT'S UP TO YOUR COUNSEL.  I

19   HAVE NO FURTHER NEED FOR YOU.

20             MR. YUND:  THE OTHER WITNESS SUBPOENAED

21   DID NOT -- OR FAILED TO APPEAR IN ACCORDANCE WITH THE

22   SUBPOENA.

23             THE REFEREE:  WELL, WHAT IS YOUR PLEASURE?

24             MR. YUND:  WELL, I SUPPOSE NOW I HAVE THE

25   OPTION TO ENFORCE THE SUBPOENA THROUGH A CONTEMPT

1    CITATION IN THE COURT OF COMMON PLEAS IN BUTLER

2    COUNTY.  ALLOW ME A MOMENT TO CONSULT WITH MY CLIENT,

3    UNLESS YOU HAVE SOME OBSERVATION TO MAKE ON THAT.

4            THE REFEREE:  NO, I HAVE NO -- YOU WANT --

5    SHALL WE GO OFF THE RECORD WHILE YOU CAN TALK?

6            MR. YUND:  YES, SIR.

7            THE REFEREE:  SAVE THE TAPE?  ANY OBJECTION?

8            MR. ABRAMS:  NO OBJECTION.

9            THE REFEREE:  ALL RIGHT.

10           (OFF THE RECORD.)

11           THE REFEREE:  ALL RIGHT, WE'RE BACK ON THE

12   RECORD.  HAVING GIVEN COUNSEL AN OPPORTUNITY TO DISCUSS

13   THE MATTER WITH HIS CLIENT, NOTHING PERTAINING TO

14   -- DIRECTLY TO THIS CASE TRANSPIRED OFF THE RECORD.

15           MR. YUND, WHAT IS YOUR PLEASURE?

16           MR. YUND:  I WOULD LIKE TO MOVE FOR THE

17   RECORD ONE MORE TIME FOR THE ADMISSION OF COMPANY

18   EXHIBIT 3, A SIGNED STATEMENT OF JOHN MICHAEL HOWARD,

19   THAT MR. QUALLS TESTIFIED WAS TAKEN AND WAS

20   RETAINED IN COMPANY FILES --

21           THE REFEREE:  WELL, WE'VE ALREADY GOT THAT.

22           MR. YUND:  YES, SIR, BUT I'M -- THERE WAS

23   SOME QUESTION LAST TIME AS TO WHETHER OR NOT IT WAS

24   RELIABLE AND PROBATIVE EVIDENCE, AND THAT'S WHAT I'M

25   STATING TO YOU NOW.

<u>INDEX</u>

| <u>WITNESSES</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| <u>EMPLOYER'S</u> | | | | |
| | | | | |
| LEWIS T. WILSON | | | | |
| (BY THE REFEREE) | 2 | | | |
| (BY MR. YUND) | 4 | | 17 | |
| (BY MR. ABRAMS) | | 8 | | 17 |
| | | | | |
| JOHN R. QUALLS | | | | |
| (BY THE REFEREE) | 21 | | | |
| (BY MR. ABRAMS) | | 22 | | |
| | | | | |
| <u>CLAIMANT'S</u> | | | | |
| | | | | |
| JERRY L. CARR | | | | |
| (BY MR. ABRAMS) | 27 | | 37 | |
| (BY MR. YUND) | | 29 | | 38 |
| | | | | |
| <u>REBUTTAL</u> | | | | |
| | | | | |
| JOHN R. QUALLS | | | | |
| (BY MR. YUND) | 39 | | 40 | |
| (BY MR. ABRAMS) | | 39 | | 40 |

<u>EXHIBITS</u>

| <u>EXHIBITS</u> | <u>IDENTIFIED</u> | <u>ADMITTED</u> | <u>ATTACHED</u> |
|---|---|---|---|
| <u>EMPLOYER'S</u> | | | |
| | | | |
| EXHIBIT 8 | 36 | 36 | 50 |

1

1          THE REFEREE:  THIS IS A HEARING IN PROGRESS

2   IN RE CLAIM OF JERRY L. CARR, SOCIAL SECURITY ACCOUNT

3   NO. 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.  THE DOCKET NUMBER IS 636209, AND

4   THE HEARING IS BEING HELD AT HAMILTON, OHIO, ON

5   MARCH 13, 1985.  THE HEARING ORIGINALLY STARTED IN

6   HAMILTON ON FEBRUARY 20, 1985, AND WAS CONTINUED IN

7   PROGRESS BECAUSE OF THE NEED TO HAVE SOME ADDITIONAL

8   WITNESSES, AND BECAUSE WE HAD NOT COMPLETED THE

9   TESTIMONY AT THE FIRST HEARING.

10          PRESENT HERE IS THE CLAIMANT, AND HE IS

11   REPRESENTED BY MR. WESLEY ABRAMS, THE INTERNATIONAL

12   REPRESENTATIVE OF THE UNITED PAPERWORKERS, AFL/CIO.

13          I BELIEVE YOU INDICATED YOU MAY HAVE A

14   WITNESS.  WHAT IS THE LADY'S NAME?

15          MR. ABRAMS:  SHARON RENNICK.

16          THE REFEREE:  RENNICK?

17          MR. ABRAMS:  YES.

18          THE REFEREE:  ALL RIGHT.  AND CHAMPION

19   INTERNATIONAL CORPORATION IS AGAIN REPRESENTED BY

20   ATTORNEY GEORGE YUND, WITH JOHN R. QUALLS, THE

21   COMPANY REPRESENTATIVE, AND TWO POTENTIAL WITNESSES;

22   LEW WILSON AND JOHN MICHAEL HOWARD.

23          MR. -- I BELIEVE WE HAD COMPLETED THE

24   TESTIMONY OF MR. QUALLS AND MR. YUND ON DIRECT AT THE

25   FIRST MEETING, AND WE'LL START WITH MR. WILSON AS

2

1    THE EMPLOYER'S FIRST REBUTTAL WITNESS.

2                MR. WILSON, IF YOU'LL RAISE YOUR RIGHT

3    HAND.

4         LEWIS T. WILSON WAS DULY SWORN AND TESTIFIED

5    AS FOLLOWS:

6         DIRECT EXAMINATION OF LEWIS T. WILSON:

7    BY THE REFEREE:

8    Q.   ALL RIGHT, SIR.  WOULD YOU STATE YOUR NAME FOR

9         THE RECORD, PLEASE?

10    BY MR. WILSON:

11    A.   LEWIS WILSON.

12    Q.   L-O-U-I-S?

13    A.   L-E-W-I-S.

14    Q.   OKAY.  AND IS THAT WITH ONE L, WILSON?

15    A.   YEAH.

16    Q.   ALL RIGHT.  AND ARE YOU AN EMPLOYEE OF CHAMPION

17         INTERNATIONAL CORPORATION?

18    A.   YES.

19    Q.   WHAT DEPARTMENT DO YOU WORK IN, SIR?

20    A.   DEPARTMENT 864, TRIM PACK DEPARTMENT.

21    Q.   NOW DID CLAIMANT WORK IN THAT DEPARTMENT?

22    A.   WHO'S THAT?

23    Q.   THE CLAIMANT IS MR. CARR.

24    A.   MR. CARR?  NO.

25    Q.   ALL RIGHT.

1    A.    NOT AS I KNOW OF.

2    Q.    YOU'RE ACQUAINTED WITH MR. CARR, ARE YOU NOT?

3    A.    YES.

4    Q.    OKAY.  DID YOU HAVE OCCASION TO SEE HIM IN THE

5          LATTER PART OF OCTOBER, 1984, IN YOUR DEPARTMENT?

6    A.    YES.

7    Q.    AND WHAT WAS THE CIRCUMSTANCES OF YOUR SEEING

8          HIM?

9    A.    YOU WANT ME TO TELL YOU WHAT HAPPENED?

10   Q.    YEAH.

11   A.    I WAS WALKING UP THE AISLE AND HE WAS STANDING

12         THERE NEXT TO THE RAIL.  HE POINTED TO ME ACROSS

13         FROM THE SCALE, MADE A GESTURE OF CUTTING MY

14         THROAT, AND SAYS -- POINTED HIS FINGER AT ME

15         AND SAYS, "I'M GONNA GET YOU AND FOUR MORE."

16         HE SAYS, "YOU'RE NOT FUCKIN' WITH A LITTLE GIRL

17         NOW, YOU'RE FUCKIN' WITH A MAN."  ABOUT ALL THERE

18         WAS TO IT.  I WENT AND TALKED TO DAVE STEWART,

19         TOLD HIM ABOUT IT, TALKED TO THE UNION STEWARD,

20         CHARLIE WARREN, GOT BACK TO WHERE I WORK AND I

21         GOT TO THINKING ABOUT IT, AND I GOT SCARED, SO

22         I CALLED PLANT PROTECTION AND TOLD THEM ABOUT IT.

23         AS FAR AS HIM GETTING FIRED, I DIDN'T WANT HIM

24         FIRED.  I CALLED THE UNION AND TOLD THEM, "I

25         DON'T WANT THE MAN FIRED, I JUST WANT SOMEBODY

4

TO TALK TO HIM."  HE WAS MAD; ANYBODY GETS

MAD SOMETIME.  I DIDN'T WANT THE MAN FIRED.

I CAN SAY THAT.

Q.  WELL, DO YOU KNOW  WHY HE WOULD HAVE ADDRESSED

YOU IN THIS MANNER?

A.  I -- I CAN'T PRESUME NOTHING.  I MEAN, --

Q.  HE DIDN'T SAY NOTHING TO YOU OTHER THAN MADE

A GESTURE?

A.  THAT'S WHAT HE SAID TO ME.

Q.  UH-HUH.  WOULD YOU DEMONSTRATE THE GESTURE THAT

HE MADE TO YOU?  IS THAT BEFORE HE SAID ANYTHING?

A.  YEAH.

MR. YUND:  COULD WE LET THE RECORD REFLECT

THAT THE WITNESS MADE A GESTURE OF DRAWING HIS INDEX

FINGER OF HIS RIGHT HAND ACROSS HIS THROAT?

THE REFEREE:  THANK YOU.  ALL RIGHT.

ANY ADDITIONAL QUESTIONS OF THIS WITNESS,

MR. YUND?

DIRECT EXAMINATION OF LEWIS T. WILSON:

BY MR. YUND:

Q.  MR. WILSON, I'M HANDING YOU A COPY, AND IF THE

REFEREE WOULD GIVE ME THE ORIGINAL, I COULD SHOW

HIM AN ORIGINAL.

THE REFEREE:  I THOUGHT THIS WAS A COPY WE

HAD.

MR. YUND:  I'M SORRY, THE ORIGINAL EXHIBIT

5

WHICH IS ITSELF A COPY.  AND I'M SPEAKING OF EXHIBIT
2 OFFERED BY THE COMPANY.  AND IT IS A 2-PAGE STATE-
MENT ALREADY IN THE RECORD IN THIS CASE.

BY MR. YUND:

Q.    IS THAT YOUR SIGNATURE ON THE SECOND PAGE?

A.    YES.

Q.    OKAY.  WOULD YOU REVIEW THAT STATEMENT AND SEE
      WHETHER OR NOT THERE IS ANYTHING IN IT THAT IS
      UNTRUE?

A.    THAT'S ABOUT IT.

Q.    OKAY.  MR. WILSON, WHEN YOU CALLED PLANT
      PROTECTION TO REPORT THE INCIDENT, DID PLANT
      PROTECTION ASK YOUR PERMISSION TO RECORD?

A.    YES.

Q.    AND DID YOU GIVE YOUR PERMISSION TO PLANT
      PROTECTION TO RECORD --

A.    YEAH, BROCKMAN.

Q.    -- WHAT HAPPENED?

A.    YEAH.

Q.    BROCKMAN WAS THE NAME OF THE PLANT PROTECTION
      OFFICER?

A.    YEAH.

Q.    OKAY.  AND YOU DIDN'T TELL MR. BROCKMAN THEN,
      DID YOU, THAT YOU DIDN'T WANT MR. CARR FIRED?

A.    NOT THEN, BUT I WENT TO -- OVER IN THE OFFICE,

6

1       THEN I CALLED THE UNION AFTER I -- WELL, HE

2       WASN'T FIRED THEN.  IT WAS, WHAT, THREE OR FOUR

3       DAYS OR A WEEK; I DON'T KNOW HOW LONG LATER,

4       SOMEBODY COME AND TOLD ME THEY FIRED HIM.  I

5       SAID, "WELL, THEY SHOULDN'T HAVE FIRED HIM."

6       THAT'S THE WAY I FEEL ABOUT IT.  I DIDN'T WANT

7       HIM TO GET FIRED.  IF I'D KNOWN THEY WAS GONNA

8       DO THAT, I'D NEVER SAID NOTHING.

9    Q.   OKAY.

10   A.   ANYBODY CAN GET MAD.

11   Q.   YOU DIDN'T TELL OFFICER BROCKMAN AT THE TIME YOU

12       CALLED HIM AND HE RECORDED YOUR STATEMENT THAT

13       YOU JUST WANTED SOMEONE TO TALK TO MR. CARR,

14       AND THAT'S ALL --

15   A.   NOT AT THAT TIME, NO.  NO, I WAS SCARED.  THERE

16       WAS AN INCIDENT THE NIGHT BEFORE, AND EVERYBODY

17       WAS IN AN UPROAR OVER THAT --

18           MR. ABRAMS:  OBJECT.

19           MR. WILSON:  AND IT SCARED ME.

20           THE REFEREE:  WERE YOU WORKING AT THE TIME,

21    SIR?

22           MR. WILSON:  HUH?

23           THE REFEREE:  WERE YOU AT YOUR JOB, OR WHERE

24    DID THIS HAPPEN?

25           MR. WILSON:  YES.  I -- THE JOB I WORK AT,

7

1    I GO ALL OVER THE DEPARTMENT.

2         THE REFEREE:  ALL RIGHT.

3    BY MR. YUND:

4    Q.   MR. WILSON, YOU SAID THAT THERE WAS AN INCIDENT

5         THE NIGHT BEFORE.  WAS THAT WHAT YOU WERE SCARED

6         OF?

7         MR. ABRAMS:  I OBJECT, MR. REFEREE.  WHAT-

8    EVER HAPPENED THE NIGHT BEFORE IS IRRELEVANT AS TO

9    WHAT OCCURRED WHEN MR. CARR WAS TERMINATED.

10        MR. YUND:  THE WITNESS BROUGHT IT UP,

11   MR. REFEREE.  I THINK IT IS RELEVANT, AND HE RELATED

12   IT TO THE FACT OF WHY HE WAS SCARED, WHICH HE ALREADY

13   TESTIFIED TO IN THE QUESTIONING BY YOURSELF.

14        THE REFEREE:  YOU MAY ANSWER.  I WILL

15   RESERVE JUDGMENT UNTIL I HEAR WHAT IT'S ABOUT, AND

16   IF IT'S EXCLUDABLE, I WILL NOT BASE MY DECISION ON IT.

17   BY MR. YUND:

18   Q.   WAS THE INCIDENT THE NIGHT BEFORE HAD -- THAT

19        HAD SOMETHING TO DO WITH YOUR BEING SCARED?

20   A.   WELL, THERE WAS SOMEONE CUT THE NIGHT BEFORE.

21   Q.   DID THAT HAVE SOMETHING TO DO WITH YOUR BEING

22        SCARED?

23   A.   SURE, IT DOES.  IT BEARS ON ANYBODY'S MIND I

24        THINK.  IT DID MINE.

25   Q.   WHAT WAS THE INCIDENT OF THE NIGHT BEFORE THAT

8

1    YOU HAD HEARD ABOUT?

2    A.    THAT SOME GIRL HAD CUT A MAN ON THE ARM THE

3          NIGHT BEFORE.

4          THE REFEREE:    WELL, WHAT DID THIS HAVE TO

5    DO WITH MR. CARR?

6          MR. WILSON:    HE MADE A GESTURE OF DOING

7    THIS, I FIGURED HE WAS GONNA CUT MY THROAT, SO,

8    YOU KNOW, IT JUST RUNS IN YOUR --

9          THE REFEREE:    OKAY.

10         MR. WILSON:    -- JUST SCARES YOU.

11         THE REFEREE:    BUT HE DIDN'T LAY A HAND ON

12   YOU?

13         MR. WILSON:    NO.  NO.

14         THE REFEREE:    OKAY.

15         MR. YUND:    NOTHING FURTHER OF THIS WITNESS.

16         THE REFEREE:    CROSS-EXAMINATION?

17    CROSS-EXAMINATION OF LEWIS T. WILSON:

18   BY MR. ABRAMS:

19   Q.    HOW LONG, MR. WILSON, HAVE YOU WORKED FOR

20         CHAMPION INTERNATIONAL?

21   A.    THIRTY-THREE YEARS.  BE 33 IN APRIL.

22   Q.    WHAT -- AND WHAT DEPARTMENT DO YOU WORK IN?

23   A.    I WORK IN 364 NOW.  I'VE WORKED IN TWO OTHER

24         DEPARTMENTS.

25   Q.    OKAY.  364, 365 TRIM PACK?

1    A.    YEAH, FOR THE LAST 16, 17 YEARS.

2    Q.    APPROXIMATELY HOW MANY EMPLOYEES WORK IN THAT

3          AREA?

4    A.    HOW MANY PEOPLE?

5    Q.    YEAH.

6    A.    TWO HUNDRED AND FIFTY.

7    Q.    IN YOUR EXPERIENCE AT THE MILL IN THE 18 OR 19

8          YEARS AT THE TRIM PACK DEPARTMENT, IS IT A COMMON

9          THING FOR ONE EMPLOYEE TO MAKE A GESTURE OF ONE

10         TYPE OR ANOTHER TO ANOTHER EMPLOYEE?

11   A.    YEAH, BUT --

12               MR. YUND:  OBJECT.  WE'RE NOT TALKING ABOUT

13   A GESTURE OF ONE TYPE OR ANOTHER.  I THINK THE

14   QUESTION, TO BE RELEVANT, HAS TO RELATE TO THE GESTURE

15   AT ISSUE IN THIS CASE.

16               THE REFEREE:  WELL, --

17               MR. ABRAMS:  I THINK MR. --

18               THE REFEREE:  -- YOU WANT TO MAKE IT A

19   SPECIFIC QUESTION IS IT COMMON TO SEE SOMEONE DO THIS?

20   MAKING THE GESTURE THAT YOU MADE?

21               MR. WILSON:  THAT GESTURE, NO.

22               THE REFEREE:  OKAY.

23               MR. CARR:  IT'S NOT BEEN PROVEN.  I OBJECT.

24               THE REFEREE:  WOULD YOU JUST BE QUIET, SIR,

25   UNTIL IT'S YOUR TURN TO SPEAK?  YOU'RE REPRESENTED.

1    a good record and he didn't want me to get into

2    trouble; is that true?

3         A.    That's true.

4         Q.    So he was telling you in effect to cool it,

5    wasn't he?

6         A.    Yes, he was.  He didn't want nothing to get

7    started between me and Jerry Carr on working hours, I

8    guess.

9         Q.    Michael, let me ask you this.  Had you been

10   discharged and reinstated earlier?

11        A.    That's correct.

12        Q.    What were you discharged for?

13        A.    For failure to list a prior back injury that

14   I had had in the service.

15        Q.    Isn't it fair to say that Mr. Warren was

16   concerned that something might develop out of this, that

17   if it would get out of hand, he was really telling you

18   to cool it and keep it under control?

19        A.    That's true.

20        Q.    How far away was Jim Cornett when this was

21   going on with Jerry and you?

22        A.    He was within about, I don't know, five to

23   ten yards of me.

24        Q.    Were you subpoenaed to the Unemployment

25   hearing, Michael?

122

1    A.    No, I wasn't.

2    Q.    You didn't show up there, did you?

3    A.    No.

4    Q.    If a subpoena were issued for you, you never

5    found out about it or you didn't get it?

6    A.    I never received none, no.    Charley Warren

7    called me up the day before the hearing and told me

8    that -- well, he asked me if I could be there and I told

9    him I'd already had plans.    It was for the very next

10   day and I didn't have any advance warning.    And he

11   said, well, we may have to subpoena you.    But I never

12   did receive a subpoena.

13   Q.    Okay, let me go through this with you one

14   more time.    As I understand it, Michael, wherever you

15   were working you said Jerry went by, glanced over your

16   way and made this gesture with his hand, right?

17   A.    Yes.

18   Q.    No. 1.    And you waved at him and smiled,

19   right?

20   A.    Yeah, with one hand (demonstrating).

21   Q.    Thinking that he was goofing off?    That this

22   was just goofing off, right?

23   A.    As far as I was concerned, yeah.    I didn't

24   know what was coming off.    I didn't know the background

25   of what somebody had said to him because, see, this

F 7-83

Appeals Docket No.    636209

STATE OF OHIO
UNEMPLOYMENT COMPENSATION
BOARD OF REVIEW
145 South Front Street  P.O. Box 1618
Columbus, Ohio  43216

[ In re claim of:                    ]    [ Employer:                              ]
  JERRY L. CARR                            CHAMPION INTERNATIONAL CORP.
  1261 Southern Hills Blvd.                601 N. "B" Street
  Hamilton, Ohio  45013                    Hamilton, Ohio   45013

[                                    ]    [                                        ]
  S.S. No.  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                         UCO  Account No.  056290

<u>DECISION</u>

By a decision on reconsideration, mailed January 22, 1985, the Administrator held claimant was discharged by Champion International Corp. for just cause in connection with work; suspended benefit rights for the full period of unemployment next ensuing after said separation and until such time as he becomes reemployed in employment subject to an unemployment compensation law; has worked six weeks and has earned wages equal to $510.60, or more; is otherwise eligible and disallowed a claim for weekly benefits for week ending November 17, 1984.

On February 5, 1985, the claimant filed a timely appeal.

On February 20, 1985 a hearing was scheduled in Hamilton, Ohio.

All interested parties were duly notified of the date, time and place of hearing.

Appearances:          Claimant appeared in person.

                      Champion International Corp. was
                      represented by the law firm of Frost
                      & Jacobs in the person of George Yund, Esq.
                      with John R. Qualls, Jack Winterhalter,
                      Earl Hillman and John Alder, as potential
                      witnesses.

On March 13, 1985 a further hearing was scheduled in progress at Hamilton, Ohio.

All interested parties were duly notified of the date, time and place of hearing.

Appearances:          Claimant appeared in person and was
                      represented by Wesley Abrams, United
                      Paperworkers of America, AFL-CIO,
                      International Representative, with
                      one potential witness, Sharon Rennick.

                      Champion International Corp. was represented
                      by Frost & Jacobs, Attorneys at Law, in the
                      person of George Yund, Esq., with Lewis
                      T. Wilson and John R. Qualls, as witnesses.

                      A subpoenaed witness, John Michael Howard,
                      did not respond to the subpoena or appear on
                      behalf of the employer.

Form Ref-BR-5  (5-81)

Jerry L. Carr - 636209

As set forth hereinabove, it must be concluded that the claimant was discharged by Champion International Corp. for just cause in connection with work and that the Administrator properly imposed a disqualification for benefit rights in accordance with the provisions of Section 4141.29 (D) (2) (a) (G), Revised Code of Ohio.

DECISION:

The Administrator's decision on reconsideration, mailed January 22, 1985, is hereby affirmed.

APPEAL RIGHTS

An application to institute a further appeal before the Board of Review may be filed by any interested party within fourteen (14) calendar days following the date of mailing of this decision.

Date mailed: March 18, 1985
js
L. O.  308-0

John S. Moraites, Referee

-2-

THE REFEREE:  THIS IS A HEARING IN RE

APPEALS DOCKET NO. 636209, CLAIM OF JERRY L. CARR,

SOCIAL SECURITY ACCOUNT NO. 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, BEING HEARD

ON FEBRUARY 20, 1985, AT HAMILTON, OHIO, BEFORE

JOHN MORAITES, A REFEREE OF THE OHIO BOARD OF REVIEW,

ON AN APPEAL FILED BY THE CLAIMANT ON FEBRUARY 5,

1985, TO AN ADMINISTRATIVE DECISION ON RECONSIDERA-

TION MAILED JANUARY 22, 1985, WHICH HELD THAT HE WAS

DISCHARGED BY CHAMPION INTERNATIONAL CORPORATION FOR

JUST CAUSE IN CONNECTION WITH WORK; IMPOSED A

STATUTORY DISQUALIFICATION FOR BENEFIT RIGHTS AND

DISALLOWED A CLAIM FOR WEEKLY BENEFITS FOR THE WEEK

ENDING NOVEMBER 17, 1984.

NOTICES OF THIS HEARING WERE DULY MAILED

TO ALL INTERESTED PARTIES.  APPEARING HERE FOR THE

HEARING IS THE CLAIMANT IN PERSON.  CHAMPION

INTERNATIONAL CORPORATION WAS REPRESENTED BY FROST &

JACOBS IN THE PERSON OF GEORGE YUND, ATTORNEY-AT-LAW,

WITH FOUR POTENTIAL WITNESSES:  JOHN R. QUALLS, JACK

WINTERHALTER, EARL HILLMAN AND JOHN ALDER.

BEFORE BEGINNING THE HEARING, I EXPLAINED

THE PROCEDURES TO BE FOLLOWED AND THE RIGHTS OF THE

PARTIES.  THOSE RIGHTS ARE ALSO CONTAINED IN THE

WRITTEN NOTICES SENT TO THE PARTIES TO ATTEND THIS

HEARING.

2

1        I WILL FURTHER EXPLAIN THAT I HAVE BEFORE

2    ME THE ADMINISTRATOR'S FILE WHICH HE CERTIFIED TO THE

3    BOARD OF REVIEW AS BEING HIS TRUE AND COMPLETE FILE.

4        WITH REFERENCE TO THE APPLICATION FOR

5    DETERMINATION OF BENEFIT RIGHTS FILED BY THE CLAIMANT

6    ON NOVEMBER 15, 1984, AND THAT BY VIRTUE OF THE

7    PROVISIONS OF THE OHIO REVISED CODE, THE ADMINISTRATOR'S

8    FILE SO CERTIFIED DOES CONSTITUTE A PART OF THE

9    RECORD BEFORE ME ON THIS APPEAL.

10       THERE HAS BEEN A SEPARATION OF WITNESSES.

11   BEFORE WE BEGIN, I WANT TO BE SURE THAT THE CLAIMANT

12   UNDERSTANDS HIS RIGHTS.

13       YOU DO UNDERSTAND YOUR RIGHTS, MR. CARR,

14   AND ARE THERE ANY QUESTIONS?

15       MR. CARR:  WHAT ARE MY RIGHTS?

16       THE REFEREE:  YOU HAVE THE RIGHT TO CROSS-

17   EXAMINE THE WITNESSES, THE RIGHT TO BE REPRESENTED,

18   THE RIGHT TO MAKE CLOSING ARGUMENT.

19       MR. CARR:  I DON'T SEE ANY WITNESSES HERE.

20   THE TWO PEOPLE THAT HAS CHARGES AGAINST ME --

21       THE REFEREE:  I DIDN'T ASK --

22       MR. CARR:  -- THEY'RE NOT EVEN HERE.  THEY

23   NEVER HAVE BEEN --

24       THE REFEREE:  SIR, I DIDN'T ASK YOU THAT.

25       MR. CARR:  OKAY.

         THE REFEREE:  THEY HAVE WITNESSES HERE, AND

3

1    YOU HAVE A RIGHT TO CROSS-EXAMINE ANY WITNESSES THEY

2    PUT ON.

3                    DO YOU HAVE ANY OTHER QUESTIONS --

4                    MR. CARR:  NO.

5                    THE REFEREE:  -- ABOUT YOUR RIGHTS BEFORE

6    WE BEGIN?  ARE YOU READY TO BEGIN, SIR?

7                    MR. CARR:  YES, SIR.

8                    THE REFEREE:  IS THE EMPLOYER READY TO

9    BEGIN?

10                    MR. YUND:  YES, SIR.

11                    THE REFEREE:  ALL RIGHT.

12                    MR. QUALLS, WILL YOU RAISE YOUR RIGHT HAND?

13        JOHN R. QUALLS WAS DULY SWORN AND TESTIFIED AS

14    FOLLOWS:

15        DIRECT EXAMINATION OF JOHN R. QUALLS:

16    BY THE REFEREE:

17    Q.    THANK YOU.  WOULD YOU IDENTIFY YOURSELF FOR THE

18          RECORD AND SPELL YOUR LAST NAME?
      BY MR. QUALLS:
19    A.    MY NAME IS JOHN QUALLS, Q-U-A-L-L-S.

20    Q.    WHAT'S YOUR TITLE?

21    A.    SUPERVISOR OF LABOR RELATIONS AT THE HAMILTON

22          MILL OF CHAMPION INTERNATIONAL.

23    Q.    ALL RIGHT.  WAS CLAIMANT AN EMPLOYEE OF YOUR

24          COMPANY FROM MARCH 30, 1966 TO OCTOBER 30, 1984?

25    A.    HE -- I'M NOT SURE WHAT THE BEGINNING DATE OF

4

HIS EMPLOYMENT WAS.

Q. HE'D BEEN THERE A LONG TIME THOUGH?

A. RIGHT. HE'D BEEN THERE A SIGNIFICANT PERIOD OF TIME, YES, SIR.

Q. OKAY. WHAT WAS HIS JOB AT THE TIME OF SEPARATION?

A. HE WAS AN ELECTRICIAN.

Q. AND DO YOU KNOW WHAT HIS HOURLY RATE WAS?

A. NO, SIR, I'D HAVE TO LOOK AT A COPY OF THE LABOR --

Q. OKAY. NOW AT THE TIME OF HIS EMPLOYMENT, IS THERE A COLLECTIVE BARGAINING AGENT REPRESENTING THE EMPLOYEES AT CHAMPION INTERNATIONAL CORPORATION?

A. YES.

Q. WHO IS THAT COLLECTIVE BARGAINING AGENT?

A. LOCAL 1967 OF THE UNITED PAPER WORKERS INTERNATIONAL UNION.

Q. NOW THIS AGREEMENT, AS FAR AS YOU KNOW, DOES CONTAIN THE USUAL GRIEVANCE PROCEDURES AND BINDING ARBITRATION?

A. YES, SIR.

Q. AND HAVE YOU ADOPTED CERTAIN WORK RULES PURSUANT TO THIS AGREEMENT WHICH YOU ENFORCE AS TO HOURLY RATE EMPLOYEES?

A. WORK RULES HAVE BEEN ADOPTED. THEY ARE NOT

5

1    PART OF THE AGREEMENT.

2    Q.   WELL, THE AGREEMENT AUTHORIZES --

3    A.   THEY ARE NOT NEGOTIATED.

4    Q.   -- THE ADOPTION OF THOSE WORK RULES, --

5    A.   YES.

6    Q.   -- DO THEY NOT?  AND THE UNION CAN CHALLENGE

7         THOSE RULES IF THEY'RE NOT ACCEPTABLE, CAN THEY

8         NOT?

9    A.   YES.

10   Q.   AND THOSE RULES HAVE BEEN IN EFFECT FOR SOME

11        TIME?

12   A.   YES.

13   Q.   WAS HE DISCHARGED FOR VIOLATION OF ANY OF

14        THESE RULES?

15   A.   YES, SIR.

16   Q.   WHAT RULES SPECIFICALLY?

17   A.   THE RULE, I BELIEVE, IS 2.25, WHICH CONCERNS,

18        AMONG OTHER THINGS, THREATENING OTHER PERSONS.

19        WOULD YOU LIKE ME TO READ THE RULE?

20   Q.   NO.

21             MR. YUND:  MAY WE OFFER --

22             THE REFEREE:  IS THAT A COPY OF THE RULES?

23             MR. YUND:  WE WOULD LIKE TO OFFER THIS

24   AS EMPLOYER EXHIBIT 1.

25             THE REFEREE:  ALL RIGHT.

6

1          MR. CARR, I'LL SHOW YOU WHAT'S BEEN

2     HANDED TO ME AND --

3          MR. CARR:  I HAVE A COPY.

4          THE REFEREE:  YOU HAVE A COPY OF THOSE

5     RULES?  ALL RIGHT.  THAT WILL BE RECEIVED AS

6     EMPLOYER'S EXHIBIT NO. 1.

7               - - -

8          EMPLOYER'S EXHIBIT NO. 1

9          WAS RECEIVED IN EVIDENCE.

10              - - -

11    BY THE REFEREE:

12    Q.   NOW I BELIEVE THE FILE INDICATES THE CLAIMANT

13         WAS NOT ONLY A MEMBER OF THE PAPER WORKERS

14         UNION, BUT HE WAS ALSO THE UNION STEWARD, IS

15         THAT NOT CORRECT?

16    BY MR. QUALLS:

17    A.   I BELIEVE HE HAD ACTED AS A STEWARD AT SOME

18         TIME.  I'M NOT SURE WHETHER HE WAS A STEWARD

19         AT THE TIME OF HIS DISCHARGE.

20    Q.   OKAY.  AND WHO DID HE THREATEN, IF THAT'S WHAT

21         HE WAS DISCHARGED FOR?

22    A.   TWO EMPLOYEES.  ONE NAMED LEWIS WILSON, THE

23         OTHER NAMED JOHN HOWARD.  HE ALSO MADE A

24         STATEMENT THAT THERE WERE THREE OTHER EMPLOYEES

25         THAT HE WAS GOING TO, QUOTE, "GET," BUT WHO

1    THOSE THREE WERE WAS NEVER SPECIFIED.

2    Q.   DID YOU HEAR OR SEE ANY OF THESE REMARKS?

3    A.   NO, SIR.

4    Q.   DID HE FILE A GRIEVANCE OVER SEPARATION?

5    A.   YES, SIR.

6    Q.   HOW FAR HAS THAT PROCEEDED?

7    A.   THAT'S BEEN A FIELD ARBITRATION BY THE UNION.

8    Q.   IT IS PENDING ARBITRATION?

9    A.   YES, SIR.

10         THE REFEREE:   MR. YUND?

11         MR. YUND:   YES, SIR.

12    DIRECT EXAMINATION OF JOHN R. QUALLS:

13    BY MR. YUND:

14    Q.   MR. QUALLS, WERE YOU INVOLVED IN THE DECISION

15         TO DISCHARGE JERRY CARR?

16    BY MR. QUALLS:

17    A.   I WAS INVOLVED IN THE DECISION, YES.

18    Q.   WHY WAS JERRY CARR DISCHARGED?

19    A.   HE WAS DISCHARGED BECAUSE HE HAD MADE THREATS

20         AGAINST THESE TWO EMPLOYEES IN A VERY VOLATILE

21         SITUATION THAT EXISTED AT THAT TIME IN THE MILL.

22    Q.   OKAY.  LET'S -- LET'S TALK ABOUT THAT SITUATION

23         A MINUTE.  HOW WERE THOSE THREATS BROUGHT TO

24         YOUR ATTENTION?

25    A.   THEY WERE BROUGHT TO MY ATTENTION BY EARL HILLMAN

1    AND DAVE STEWART.

2    Q.    WHO ARE THEY?

3    A.    THEY ARE THE GENERAL SUPERVISOR AND ASSISTANT

4    GENERAL SUPERVISOR RESPECTIVELY OF THE TRIM

5    PACK DEPARTMENT.

6    Q.    OKAY.    AND WAS ANY RECORD MADE OF THOSE THREATS?

7    A.    STATEMENTS -- STATEMENTS WERE TAKEN FROM THE

8    PERSONS WHO WERE THREATENED; ALSO, ONE OF THE

9    PERSONS WHO WAS THREATENED CALLED OUR PLANT

10    PROTECTION DEPARTMENT TO MAKE A RECORD OF THIS

11    THREAT, AND THAT TELEPHONE CALL WAS ROUTINELY

12    RECORDED.

13    MR. YUND:  I'D LIKE TO OFFER THIS AS

14    EMPLOYER EXHIBIT 1.

15    MR. CARR:    I HAVE GOT IT SOMEPLACE.

16    MR. YUND:  AND FURNISH -- OKAY.

17    THE REFEREE:  ALL RIGHT.  LET THE RECORD

18    REFLECT THAT --

19    MR. YUND:  I'M SORRY, EMPLOYER EXHIBIT 2.

20    THE REFEREE:  -- EXHIBIT 2, THE CLAIMANT

21    ACKNOWLEDGES HAVING A COPY OF SAME.  CONTINUE.

22    BY MR. YUND:

23    Q.    MR. QUALLS, I'M SHOWING YOU A COPY OF WHAT'S

24    BEEN MARKED FOR IDENTIFICATION AS EXHIBIT 2, AND

25    ASK IF YOU CAN IDENTIFY THAT, PLEASE?

9

BY MR. QUALLS:

A.    THIS IS A COPY OF THE STATEMENT OF LEWIS WILSON,

ONE OF THE EMPLOYEES WHO WAS THREATENED.

Q.    AND THIS WAS TAKEN BY WHOM?

A.    BY EARL HILLMAN.

Q.    ALL RIGHT.  WHY WAS THIS STATEMENT TAKEN?

A.    THIS STATEMENT WAS TAKEN AFTER EARL AND MR. STEWART

DISCUSSED IT WITH US, AND WE RECOMMENDED THAT

THEY OBTAIN ALL THE FACTS THEY COULD IN WRITING.

Q.    IS IT CUSTOMARY AT CHAMPION INTERNATIONAL FOR

LABOR RELATIONS TO SEEK WRITTEN STATEMENTS OF

ALLEGATIONS OF PERSONS WHO ARE ALLEGING THAT

OTHERS IN THE MILL HAD VIOLATED PLANT RULES?

A.    YES.

Q.    AND A COPY OF THIS STATEMENT IS RETAINED BY

YOUR DEPARTMENT?

A.    YES.

Q.    IN THE ORDINARY COURSE OF BUSINESS?

A.    THAT'S CORRECT.

        MR. YUND:  I'D LIKE TO OFFER THIS AS

EMPLOYER EXHIBIT 3.

        THE REFEREE:  ALL RIGHT.  DO YOU HAVE A

COPY OF EMPLOYER'S EXHIBIT NO. 3 ALSO?  STATEMENT

OF JOHN HOWARD?

        MR. CARR:  YES, SIR.

10

BY MR. YUND:

Q.    MR. QUALLS, I'M HANDING YOU A COPY OF AN -- OF
      THE DOCUMENT MARKED FOR IDENTIFICATION AS
      EXHIBIT 3, AND ASK IF YOU CAN IDENTIFY THAT,
      PLEASE?

A.    YES.  THIS IS A COPY OF A TWO-PAGE STATEMENT,
      EMPLOYER'S EXHIBIT 2 IS ALSO A TWO-PAGE STATE-
      MENT.  EMPLOYER'S EXHIBIT 3 IS A STATEMENT BY
      JOHN HOWARD REGARDING THE THREAT MADE BY
      MR. CARR.

Q.    AND THIS WAS TAKEN BY WHOM?

A.    THIS WAS TAKEN BY EARL HILLMAN ALSO.  IT'S
      WITNESSED BY CHARLES WARREN, WHO AT THAT TIME
      WAS THE CHIEF STEWARD IN THE TRIM PACK DEPART-
      MENT.

Q.    AND WAS THIS STATEMENT PRESENTED TO LABOR
      RELATIONS?

A.    YES, IT WAS.

Q.    APPROXIMATELY WHEN WAS THIS?  WAS THIS LAST
      WEEK SHORTLY AFTER THE INCIDENT?

A.    OH, NO, IT WAS VERY SHORTLY AFTER THE INCIDENT.

Q.    OKAY.  AND WAS IT ALSO KEPT IN -- A COPY OF THIS
      KEPT IN LABOR RELATIONS FILES IN THE ORDINARY
      COURSE OF YOUR BUSINESS?

A.    YES, IT WAS.

11

Q.   WAS IT TAKEN FOR THE SAME REASON THAT EXHIBIT 2
     WAS TAKEN?

A.   YES, IT WAS.

Q.   ALL RIGHT.  NOW YOU MENTIONED THAT A TAPE
     RECORDING WAS MADE BY PLANT PROTECTION OF THE
     STATEMENT OF ONE OF THE PERSONS WHO ALLEGED THAT
     JERRY CARR HAD MADE A THREAT AGAINST THEM.  DO
     YOU HAVE CUSTODY OF THAT TAPE?

A.   YES.

Q.   OKAY.

          MR. YUND:  MR. REFEREE, WE'VE BROUGHT A
TAPE RECORDER AND THAT TAPE WITH US.

          THE REFEREE:  WHY WASN'T IT POSSIBLE TO
BRING THE WITNESS HIMSELF IN?

          MR YUND:  THE WITNESS IS -- THE WITNESS IS
AN HOURLY CHAMPION EMPLOYEE, AND IT'S -- IT'S BASED
ON THESE STATEMENTS AND THE STATEMENT AS RECORDED BY
THE PLANT PROTECTION THAT THE COMPANY MADE ITS
DECISION.

          THE REFEREE:  WELL, I'M NOT GOING TO PERMIT
THE RECORDING --

          MR. YUND:  OKAY.

          THE REFEREE:  -- IN EVIDENCE, BECAUSE IT
DEPRIVES THE CLAIMANT OF THE RIGHT OF CROSS-
EXAMINATION.

1    MR. YUND:  ALL RIGHT.

2    BY MR. YUND:

3    Q.    NOW WHEN MR. HILLMAN AND MR. STEWART BROUGHT

4          THE ALLEGATIONS OF THESE THREATS TO YOUR

5          ATTENTION, WHAT, IF ANYTHING, DID YOU DO AT

6          THAT POINT?

7    BY MR. QUALLS:

8    A.    AT THAT POINT, I ADVISED THEM TO COLLECT ALL

9          THE INFORMATION THEY COULD, AS I SAID EARLIER,

10         IN WRITTEN FORM.  I ALSO TELEPHONED JOHN ALDER,

11         WHO'S THE GENERAL SUPERINTENDENT OF MAINTENANCE

12         AT THE MILL, AND WHICH IS THE -- THE OVERALL

13         DEPARTMENT IN WHICH MR. CARR WORKED.  I TOLD

14         MR. ALDER THE INFORMATION THAT WE HAD RECEIVED,

15         AND I TOLD HIM THAT WE THOUGHT HE SHOULD GET

16         MR. CARR IN AND TALK TO HIM ABOUT WHAT HAD

17         HAPPENED AND SEE WHAT HIS SIDE OF THE STORY WAS.

18   Q.    DID MR. ALDER REPORT BACK TO YOU?

19   A.    YES, HE DID.

20   Q.    AND WHAT DID HE REPORT?

21   A.    HE REPORTED THAT MR. CARR HAD DENIED MAKING ANY

22         THREATS, BUT HE WOULD NOT SAY WHERE HE WAS AT

23         THE TIME THESE THREATS HAD BEEN MADE.

24   Q.    DID YOU QUESTION THE CLAIMANT YOURSELF AT ALL?

25   A.    NO, I DID NOT.

15

Q.    OKAY.  OKAY.  DID YOU AT THE TIME THE -- THE

ALLEGED THREATS WERE BROUGHT TO YOUR ATTENTION,

DID YOU HAVE ANY REASON TO BELIEVE THAT SUCH

THREATS WERE SERIOUS AS OPPOSED TO BEING IN THE

NATURE OF HORSEPLAY OR KIDDING OR SOME JUST

OFF-THE-CUFF REMARKS BETWEEN THESE EMPLOYEES?

A.    YES, WE DID.

Q.    PLEASE EXPLAIN THAT -- THOSE REASONS.

A.    WELL, THE DAY BEFORE THIS INCIDENT THERE HAD

BEEN A SERIOUS ATTACK ON ANOTHER EMPLOYEE IN THE

TRIM PACK DEPARTMENT.

        THE REFEREE:  DOES THE CLAIMANT WORK IN THE

TRIM PACK DEPARTMENT?

        MR. QUALLS:  HE'S NOT ASSIGNED TO THAT

DEPARTMENT, SIR, NO.

BY MR. YUND:

Q.    DID HE ADMIT BEING IN THE TRIM PACK DEPARTMENT?

BY MR. QUALLS:

A.    AT THE TIME WE'RE TALKING ABOUT WHEN THE

INVESTIGATION WAS BEING CONDUCTED, NO, SIR, HE

DID NOT.

        THE REFEREE:  UH-HUH.  WHAT DEPARTMENT DID

THE CLAIMANT WORK IN?

        MR. QUALLS:  HE WORKED IN THE MAINTENANCE

DEPARTMENT, AND --

14

1      THE REFEREE:  THIS INCIDENT OCCURRED IN THE

2  TRIM PACK DEPARTMENT?

3      MR. QUALLS:  YES, SIR.  AND AS I UNDERSTAND

4  IT THE -- THE NATURE OF HIS JOB MIGHT HAVE REQUIRED

5  HIM TO BE AT DIFFERENT PLACES AS FAR AS HIS PHYSICAL

6  LOCATION.

7      THE REFEREE:  ARE THESE TWO COMPLAINANTS

8  IN SUPERVISORY POSITIONS OR JUST FELLOW EMPLOYEES?

9      MR. QUALLS:  THEY ARE HOURLY EMPLOYEES.

10      THE REFEREE:  HOURLY EMPLOYEES.

11      MR. QUALLS:  YES, SIR.

12      THE REFEREE:  ALL RIGHT.

13  BY MR. YUND:

14  Q.    OKAY.  YOU WILL PLEASE CONTINUE WITH THE -- THE

15        REASONS WHY YOU HAD TO BELIEVE THAT SUCH THREATS

16        WERE SERIOUS OR THERE WAS SOME MOTIVE FOR SUCH

17        THREATS AS OPPOSED TO BEING HORSEPLAY OR SOME-

18        THING?

19  BY MR. QUALLS:

20  A.    AS I WAS SAYING, THERE -- THERE HAD BEEN THIS

21        INCIDENT THE DAY BEFORE, AN HOURLY EMPLOYEE IN

22        THAT DEPARTMENT WAS SLASHED WITH A RAZOR BLADE.

23  Q.    THAT DEPARTMENT BEING TRIM PACK DEPARTMENT?

24  A.    BEING TRIM PACK, THAT'S RIGHT.  BY A LADY NAMED

25        SHARON RENNICK.

Q.   OKAY, AND WHAT WAS THE EMPLOYEE'S NAME WHO WAS

SLASHED?

A.   HIS NAME WAS WILLIAM JONES.

THE REFEREE:  WELL, WHAT'S THIS GOT TO DO

WITH THE CLAIMANT?

MR. YUND:  I BELIEVE THAT IF YOU'LL LET

HIM CONTINUE, IT WILL ALL BECOME CRYSTAL CLEAR.

THE REFEREE:  WELL, HE DOESN'T HAVE ANY

FIRSTHAND KNOWLEDGE OF WHAT HAPPENED, DOES HE?

MR. YUND:  YES, HE HAS FIRST --

THE REFEREE:  EVERYTHING HE'S TELLING ME

IS HEARSAY.

MR. YUND:  HE HAS FIRSTHAND KNOWLEDGE OF

THE REASON FOR THE DISCHARGE.

THE REFEREE:  WELL, HE'S GIVEN ME THE BASIC

REASON, THAT HE BELIEVED THE STATEMENTS OF THE TWO

EMPLOYEES, THAT THEY WERE THREATENED, AND THIS IS A

VIOLATION OF THE WORK RULES.

MR. YUND:  YES, SIR.  THERE'S ADDITIONAL

REASON WHY THOSE STATEMENTS WERE BELIEVABLE, IF

YOU'LL INDULGE US FOR JUST ONE MINUTE MORE, YOU'LL

FIND OUT WHAT THAT IS.

MR. QUALLS:  THE SLASHING INCIDENT WAS A

CONTINUATION OF AN INCIDENT THAT HAD STARTED BACK IN

JUNE.  MISS RENNICK HAD COMPLAINED THAT TWO EMPLOYEES,

16

1    A MR. WILSON, THE EMPLOYEE -- ONE OF THE EMPLOYEES

2    WHO WAS THREATENED, AND MR. JONES, THE EMPLOYEE WHO

3    WAS SLASHED, FOR HARASSING HER BECAUSE OF HER RELATION-

4    SHIP WITH AN EMPLOYEE NAMED JOHN HOWARD, WHO WAS THE

5    OTHER EMPLOYEE WHO WAS THREATENED.  MR. CARR HAD

6    INDICATED A PERSONAL INTEREST IN WHAT WAS GOING ON

7    AT THAT TIME, AND THIS HAD BEEN THE SUBJECT OF -- OF

8    SOME DISCUSSION.

9            THE REFEREE:  ARE YOU SAYING THIS WAS HIS

10   GIRL FRIEND?  IS THAT WHAT YOU'RE TRYING TO TELL ME?

11           MR. QUALLS:  I HAVE NO PERSONAL KNOWLEDGE

12   OF THAT, SIR.  ALL I CAN SAY IS THAT HE DID INDICATE

13   A PERSONAL INTEREST IN WHAT WAS GOING ON.

14           THE REFEREE:  IN THE GIRL -- IN THE WOMAN?

15           MR. CARR:  DO I HAVE A RIGHT --

16           MR. QUALLS:  IN THE SITUATION.

17           THE REFEREE:  YOU HAVE A RIGHT TO QUESTION --

18           MR. CARR:  -- TO OBJECT?

19           THE REFEREE:  YEAH, YOU CAN OBJECT.

20           MR. CARR:  I OBJECT.  GO AHEAD.

21           THE REFEREE:  OBJECT TO WHAT?

22           MR. CARR:  HIM SUPPOSING I HAD A PERSONAL

23   RELATIONSHIP WITH THIS WOMAN AT THIS TIME.

24           THE REFEREE:  WELL, IF THAT'S WHAT YOUR

25   OBJECTION IS, IT WILL BE OVERRULED.  HOWEVER, IF

YOU'RE OBJECTING TO THE HEARSAY NATURE OF THE

TESTIMONY, IT WILL BE SUSTAINED.

       MR. CARR:  I OBJECT TO THAT.

       THE REFEREE:  ALL RIGHT.

BY MR. YUND:

Q.   CONTINUE, MR. QUALLS, PLEASE.

BY MR. QUALLS:

A.   DUE TO THE FACT THAT THESE THREATS CAME ON THE

    DAY AFTER THE SLASHING AND THAT THEY WERE

    DIRECTED AT TWO OF THE THREE PEOPLE THAT WERE

    INVOLVED IN -- IN THIS INCIDENT, THEY SEEMED

    VERY CREDIBLE.  WE HAVE AN OBLIGATION TO LOOK OUT

    FOR THE WELFARE, THE SAFETY OF ALL THE EMPLOYEES

    AT THE MILL, AND UNDER THE CIRCUMSTANCES,

    CONSIDERING WHAT HAD JUST HAPPENED, THE FACT

    THAT THESE SERIOUS THREATS WERE MADE BY MR. CARR

    AND THE WAKE OF THE SLASHING INCIDENT, WE FELT

    THEY WERE DESERVING OF VERY SERIOUS CONCERN.

       THE REFEREE:  ALL RIGHT.  ANYTHING FURTHER?

       MR. YUND:  YES, SIR.

BY MR. YUND:

Q.   DID YOU -- MR. QUALLS, DID YOU TAKE ANY STEPS

    OTHER THAN HAVE MR. ALDER DISCUSS WITH MR. CARR

    THAT DAY, DID YOU TAKE ANY STEPS TO INVESTIGATE

    MR. CARR'S SIDE OF THE STORY?

In my judgment, however, this provocation can hardly serve to justify the Grievant's violant response. Thus even allowing for the Grievant's perception of uneven enforcement of the safety shoes rule, inbedded in the concept of provocation is the notion that in order to excuse or mitigate inappropriate conduct in response to it, the reactive conduct must be in proportion to the provocation offered. Here it is clear that the severe knife wound inflicted on Jones by the Grievant was entirely out of proportion to the provocation offered, such that such provocation as arguably exists simply does not serve to excuse or mitigate the Grievant's conduct. Moreover, in light of the Grievant's conceded lack of remorse and indeed, unwillingness to even so much as apologize for her behavior, it is entirely feasible that the Grievant would react similarly in the future. But the Company is obliged by contract and by law to furnish a safe work place. Retention of the Grievant would jeopardize the fulfillment of that duty. While the Union has done a yeoman's job in seeking to save the Grievant's job, in all the circumstances present here, the Grievant was properly discharged.

IX. AWARD:

For the reasons more fully set forth above, the grievance is denied. The Grievant was discharged for just cause.

DATED: OCTOBER 23, 1985

FRANK A. KEENAN
LABOR ARBITRATOR



RICHARD F. CELESTE
Governor

# OHIO CIVIL RIGHTS COMMISSION

**CENTRAL OFFICE**
220 Parsons Avenue
Columbus, Ohio 43215
1-414-466-2785

**SOUTHWEST REGIONAL OFFICE**
Masonry Office Building – 2nd Floor
707 Race Street
Cincinnati, Ohio 45202
1-313-852-3344

SHARON RENNICK
5151 Capital Hill Dr.
Fairfield, Ohio 45014
Butler County

CHAMPION INTERNATIONAL CORPORATION
601 North B St.
Hamilton, Ohio 45013
Butler County

### (07)2062784(13893)101684, 057850162

The Ohio Civil Rights Commission makes the following determination concerning subject matter.

Respondent is an employer as defined by Ohio Revised Code, Section 4112.01(A)(2), and Section 701(B) of the Civil Rights Act of 1964 as amended. Timeliness and all other jurisdictional requirements have been met.

Charging Party is a Caucasian female and has standing to file a charge of discrimination under Section 4112.02 and Section 4112.05(B) of the Ohio Revised Code.

By affidavit filed with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission on October 16, 1984, Charging Party alleged that the Respondent engaged in discriminatory practices because of race on June 27, 1984.

Charging Party alleged that on June 27, 1984, she was harassed by co-workers and management appeared to condone the harassment and took no action to correct the situation. Charging Party alleges that the alleged harassment was in the form of threats, a flag hanging incident with racial overtones and physical intimidation by a Supervisor. Management was aware of the situation but nothing was done to correct the situation.

I registered & downgrade of I small Hope of Property

*Exhibit 2*

FORM GEN 1001

SHARON RENNICK VS. CHAMPION INTERNATIONAL CORPORATION
Page #2
(07)2062784(13893)101684, 057850162

Respondent denied the allegations of race discrimination. Respondent's statement of position was provided by Attorney, George E. Yund. Respondent asserts that Rennick did not seek to be free from harassment for associating with a Black, but rather that she did not want anyone to believe or indicate to others that she would associate with persons thought by others to be Black. Respondent asserts that Charging Party's concerns were investigated and the appropriate action was taken.

Investigation by the Ohio Civil Rights Commission substantiates the following:

Witness testimony substantiates that a Caucasian co-worker did make a racially disparaging remark to Charging Party about Michael Howard, a co-worker with whom Charging Party associated with while at work. Evidence also substantiates that another co-worker hung a brown and white polka-dotted flag in the vicinity of Charging Party's work area.

Witness testimony refutes Respondent's assertion regarding Charging Party not really wanting to be identified with Blacks.

Respondent and Charging Party concur that Management was made aware of the incidents. Witness testimony did not support Charging Party's allegation regarding a Foreman shaking her.

Documentation and witness testimony substantiates that Respondent has an anti-harassment policy and that the two men involved in the alleged harassment were warned to stay away from Charging Party except for work-related concerns.

Evidence substantiates that Respondent instructed and brought about the cessation of the alleged harassment.

Witness testimony does support Charging Party's allegations regarding the race related harassment, however, testimony also supports Respondent's assertion that action was initiated to remedy the situation.

Based on the aforementioned, evidence does not show that Respondent condoned the harassment or failed to act upon Charging Party's complaints.

As a result of the foregoing, the Ohio Civil Rights Commission has determined that it is not probable that unlawful discriminatory practices have been or are being engaged in by the Respondent in violation of Section 4112 of the Ohio Revised Code, and hereby dismisses subject matter.

FORM GEN 1001

SHARON RENNICK VS. CHAMPION INTERNATIONAL CORPORATION
Page #3
(07)2062784(13893)101684, 057850162

The parties to this charge are advised of their right to request reconsideration of the Commission's determination pursuant to Section 4112-3-04 of the Commission's Rules. Such a request must be in writing, must state specifically the grounds upon which it is based, and must be submitted to the Commission's Central Office in Columbus, Ohio, within ten (10) days of date of this notice.

FOR THE COMMISSION

Ray O. Paul
SOUTHWEST REGIONAL DIRECTOR

Respondent's Representative:

George E. Yund, Attorney
Frost & Jacobs
2500 Central Trust Center
201 E. 5th Street
Cincinnati, Ohio 45202

ROP/ES/lp

NO PROBABLE CAUSE-DISMISS-CODE #44

SHARON RENNICK VS. CHAMPION INTERNATIONAL CORPORATION
Page #4
(07)2062781(13893)101664, 057850162

## SUMMARY OF EVIDENCE

Charging Party filed a charge of discrimination based upon race association with the Ohio Civil Rights Commission on October 16, 1984. (ATTACHMENT A)

Contact sheet is ATTACHMENT B.

Charging Party confirmed that Respondent employed +15 persons; Title VII requirements were met. (ATTACHMENT C) Respondent's legal name was confirmed by the Secretary of State. (ATTACHMENT D)

On June 27, 1984, Charging Party was kidding around with John Michael Howard, a co-worker. Staff has not met Howard, but the latter purportedly appears to be Caucasian. Lewis "Wormy" Wilson acknowledged that he asked Charging Party if she knew Howard was a "nigger". (ATTACHMENT E) Wilson told Staff that he was in his 50's from the South, and he thought he was doing Charging Party a favor by telling her the above. (ATTACHMENT F)

Charging Party stated that she became very upset and grew even more upset when William "WaWa" Jones hung up a brown and white polka-dotted flag by her work station. Jones acknowledged that he hung up the rag or flag. (ATTACHMENT G) Jones allegedly did not recall the colors of the rag, he denied any intent of racial bias. Wilson stated that the flag was brown and white.

Charging Party stated that she was upset because she took the remarks and flag to be racially derogatory and meddlesome.

Charging Party stated that when she complained to Joe Stephens, supervisor, he already had knowledge of Howard's rumored racial origin.

Charging Party stated that Stephens shook her and said that she should know for her own good.

Stephens denied the allegation that he shook Charging Party; he stated that he told her that Howard's race was not a matter of concern. (ATTACHMENT H)

Juanita Croucher, Caucasian co-worker, had gone with Charging Party to see Stephens. Croucher supported Stephens's contention that he did not shake Charging Party. (ATTACHMENT I)

Charging Party alleged that Carrie McKinney, Black co-worker, had indicated to Charging Party that she is the incident with Stephens. After a concerted effort, Staff contacted McKinney. McKinney stated that she did see Charging Party and Stephens

FORM GEN 1001

SHARON RENNICK VS. CHAMPION INTERNATIONAL CORPORATION
Page #5

(07)2062784(13893)101684, 057850162

In the office, but did not view the latter shake Charging Party.
(ATTACHMENT J)  McKinney had been recently dismissed and then rein-
stated as an employee.  McKinney denied that anyone from the com-
pany had questioned her about the circumstances involving Charging
Party's complaint.

Jerry Carr stated that he was told by Croucher that Stephens shook
Charging Party.  (ATTACHMENT K)  Carr is also a Charging Party in
action filed against Respondent.

Respondent Action

Respondent possessed an anti-harassment policy which was posted in
1983.  (ATTACHMENT L)

John Qualls, Labor Relations Supervisor, stated that he talked with
Charging Party on June 27, 1984.  (ATTACHMENT M)

Qualls stated that he investigated the matter, and on June 28, 1984,
Jones and Wilson were instructed to stay away from Charging Party.
(ATTACHMENT M)

Stephens stated that he told Jones and Wilson to stay away from
Charging Party unless they had work-related business with her.
Both Jones and Wilson agreed that they both then left Charging Party
alone.  (ATTACHMENTS E & G)

Stephens stated to Staff that he told Wilson that he would send
Wilson home if a future incident occurred.  Wilson denied that
he was told the above.  Wilson stated that he did not interpret
the instruction to contain a verbal warning - rather he viewed
it as advice.  (ATTACHMENT N)  Wilson stated that a Union repre-
sentative had to be present when a verbal warning was given.

Charging Party initially alleged that co-workers harassed her
by "messing up her work", and calling her "nigger lover."
Charging Party did not identify subject co-workers, nor did she
allege that Respondent had knowledge of the above.

Respondent's Allegation

Respondent stated in a position statement ". . . . Rennick did not
seek to be free from harassment for associating with a Black, but
rather that she did not want anyone to believe or indicate to
others that she would associate with persons thought by others to
be Black."  (ATTACHMENT O)

In his statement, Qualls allegedly asked Charging Party why the
incidents upset her so much, and she said, "Well, you know Whites
and Blacks don't mix."  Early in the conversation she used the
term "Blacks", but she soon changed that to "niggers."  (ATTACHMENT M)

SHARON RENNICK VS. CHAMPION INTERNATIONAL CORPORATION
Page #6                                    (07)2062784(13893)101684, 057850162

Staff asked Stephens if he recalled seeing Charging Party talking
with Black female co-workers. Stephens replied: No, I've got 50
people to supervise . . . . Stephens added that he knew Charging
Party talked with Juanita (Croucher).

Staff talked with two Black female co-workers, with whom Charging
Party alleged she was friendly.

Sharon Sutton, Black, stated that she and Charging Party had been
out for drinks after work a few times. Sutton stated that Charging
Party never showed any difference. "She always treated me like a
friend, not a Black friend." (ATTACHMENT P)

Vivian King, Black, stated that she had known Charging Party for
about three years: To me, Sharon has a very nice attitude."
(ATTACHMENT Q) King also indicated that she and Charging Party
had gone out for activities after work. King confirmed that
Charging Party picked up King's check while the latter was on
disability leave, until Respondent informed them that the checks
would be mailed to King.

Ernest Lowery, Black male, observed that Charging Party had
talked with both Blacks and Caucasians but had – toward the end –
kept to herself. (ATTACHMENT R)

Staff found that the statements of the above persons effectively
refuted Respondent's allegation regarding Charging Party's
association with Blacks.

Charging Party's psychologist, Robert McBrady, presented a
favorable evaluation of his patient's racial attitudes. McBrady
also described in definitive terms the trauma that he observed in
Charging Party which he attributed to the incidents named in
this charge. (ATTACHMENT S)

Conclusion

There was evidence to show that Respondent instructed, and
brought about the cessation of the harassment by Wilson and Jones.

The evidence provided by independent persons who witnessed first-
hand the meeting with Stephens and Charging Party failed to
support the latter's allegation that Stephens shook her.

Subsequent to filing her charge, Charging Party was fired, as
was Jerry Carr, another Charging Party.

Staff found it reasonable to believe that if Respondent had
taken more affirmative and credible action regarding Charging
Party's internal complaint (for example, formally disciplined
Wilson and Jones) – and informed Charging Party of subject action –
the unfortunate incident, which preceded her dismissal, may have
been averted.

SHARON RENNICK VS. CHAMPION INTERNATIONAL CORPORATION
Page #6                                    (07)2062784(13893)101684, 057850162

Staff asked Stephens if he recalled seeing Charging Party talking
with Black female co-workers. Stephens replied: No, I've got 50
people to supervise . . . . Stephens added that he knew Charging
Party talked with Juanita (Croucher).

Staff talked with two Black female co-workers, with whom Charging
Party alleged she was friendly.

Sharon Sutton, Black, stated that she and Charging Party had been
out for drinks after work a few times. Sutton stated that Charging
Party never showed any difference.  "She always treated me like a
friend, not a Black friend."  (ATTACHMENT P)

Vivian King, Black, stated that she had known Charging Party for
about three years:  To me, Sharon has a very nice attitude."
(ATTACHMENT Q)  King also indicated that she and Charging Party
had gone out for activities after work.  King confirmed that
Charging Party picked up King's check while the latter was on
disability leave, until Respondent informed them that the checks
would be mailed to King.

Ernest Lowery, Black male, observed that Charging Party had
talked with both Blacks and Caucasians but had - toward the end -
kept to herself.  (ATTACHMENT R)

Staff found that the statements of the above persons effectively
refuted Respondent's allegation regarding Charging Party's
association with Blacks.

Charging Party's psychologist, Robert McBrady, presented a
favorable evaluation of his patient's racial attitudes.  McBrady
also described in definitive terms the trauma that he observed in
Charging Party which he attributed to the incidents named in
this charge.  (ATTACHMENT S)




Conclusion

There was evidence to show that Respondent instructed, and
brought about the cessation of the harassment by Wilson and Jones.

The evidence provided by independent persons who witnessed first-
hand the meeting with Stephens and Charging Party failed to
support the latter's allegation that Stephens shook her.

Subsequent to filing her charge, Charging Party was fired, as
was Jerry Carr, another Charging Party.



Staff found it reasonable to believe that if Respondent had
taken more affirmative and visible action regarding Charging
Party's internal complaint (for example, formally disciplined
Wilson and Jones) - and informed Charging Party of subject action -
the unfortunate incidents which preceded her dismissal may have
been averted.

SHARON RENNICK VS. CHAMPION INTERNATIONAL CORPORATION
Page #7
(07)2062784(13893)101684, 057850162

Nonetheless, Respondent's failure to assume a more affirmative role cannot be construed as unlawful discrimination. As a result. Staff recommends dismissal of subject charge, based upon No Probable Cause. Staff advised Charging Party of the recommendation via conversation and mail. (ATTACHMENT

## Staff Note

This recommendation was made upon the advice of Helen Ninos (Attorney-General's Office). Ninos opined that Respondent could not be held liable for its failure to take more vigorous disciplinary action, for it was not required to do so.

Charging Party alleged that Stephens sexually harassed her prior to the June 27 incident. Stephens denied the allegation. Charging Party also alleged that Jones (to a lesser event) and particularly Wilson, expressed sexual interest in her. Wilson vigorously denied the allegation.

## INDEX OF ATTACHMENTS

A.      Charge. 212
B.      Contact Sheet
C.      Legal Name
D.      EEO-1
E.      Wilson Statement
F.      Staff notes re: Wilson
G.      Jones statement
H.      Stephen's statement
I.      Croucher Affidavit
J.      Staff notes re: McKinney
K.      Carr Affidavit
L.      Respondent Policy
M.      Qualls Statement
N.      Staff Notes re: Wilson
O.      Respondent's Position Statement

SHARON RENNICK   VS. CHAMPION INTERNATIONAL CORPORATION
Page #8
(07)2062784(13893)101684, 057850162

10-16-84                    10-16-85
Date Charge Received  /  Statute Date

I. Prechtl, Typist                              5/8/85
                                                Date
Edwina Smith, Supervisor.                       5/8/85
                                                Date
Ray O. Paul, SW Regional Director               5/8/85
                                                Date

5-8-85              204 days
Mailing Date  /  Total Processing Time

SHARON RENNICK VS. CHAMPION INTERNATIONAL CORPORATION
Page #7
(07)2062784(13893)101684, 057850162

Nonetheless, Respondent's failure to assume a more affirmative role cannot be construed as unlawful discrimination. As a result, Staff recommends dismissal of subject charge, based upon No Probable Cause. Staff advised Charging Party of the recommendation via conversation and mail. (ATTACHMENT

## Staff Note

This recommendation was made upon the advice of Helen Ninos (Attorney-General's Office). Ninos opined that Respondent could not be held liable for its failure to take more vigorous dis- ciplinary action, for it was not required to do so.

Charging Party alleged that Stephens sexually harassed her prior to the June 27 incident. Stephens denied the allegation. Charging Party also alleged that Jones (to a lesser event) and particularly Wilson, expressed sexual interest in her. Wilson vigorously denied the allegation.

## INDEX OF ATTACHMENTS

A.     Charge, 212
B.     Contact Sheet
C.     Legal Name
D.     EEO-1
E.     Wilson Statement
F.     Staff notes re:  Wilson
G.     Jones statement
H.     Stephens's statement
I.     Croucher Affidavit
J.     Staff notes re:  McKinney
K.     Carr Affidavit
L.     Respondent Policy
M.     Qualls Statement
N.     Staff Notes re:  Wilson
O.     Respondent's Position Statement
P.     Staff notes re:  Sutton
Q.     Staff notes re:  King
       Staff notes re:  Lowery
       McBrady Statement
R.     Letter to Charging Party

EXHIBIT #3



# You have been paid a
# Friendly Visit
## by the Ku Klux Klan

- **Should we pay you**
  **A REAL VISIT ?**

*This was not allowed to be used in Mr. Carr's case or Mrs. Carr's case. Mr. Carr was given this by the Champion Employees.*



375 Muscogee Road
P.O. Box 87
Cantonment, Florida 32533-0087
904 968-2121

**Champion**
Champion International Corporation

March 3, 1986

Jerry L. Carr
1261 Southern Hills Blvd.
Hamilton, Ohio  45013

Dear Jerry:

Several weeks ago you expressed an interest and asked to be considered for a position at the Pensacola Mill.  Your Request for Consideration and your qualifications have been reviewed here and we are sorry to inform you that there are others who appear to be better qualified for the positions available.

Many things can happen between now and startup, however For this reason we are keeping the Profiles of all those who expressed an interest.  Should the situation change or if selections cannot be made from Champions who do visit Pensacola, we may want to consider you further at a later date.

Thank you very much for your interest.

Sincerely,

Bud Newkirk
Staffing Manager

cc:  Tom Eberwein

Exhibit 4



**Champion**
Champion International Corporation

To:
Jim Johns
Chief Steward Dept. 442

From:
Lee Gentry

Date:
August 22, 1986

.Subject:
Second Step Grievance
Meeting and Disposition of
Grievance No. 442-86-16

Re:  Jerry Carr

A meeting was held Tuesday, August 19, 1986 at 3:15 p.m. in my
office to consider the grievance.  Meeting participants were:

| Representing the Company | Representing the Union |
|---|---|
| L. Gentry | J. Johns |
| P. Conover | J. Carr |

The grievance reads:  "Applied for Pensacola Fla. craftsman job.  Was
not even considered for job.  I feel that the company is trying to
retaliate against me for grievances that I have filed and for the
lawsuite that I have against the company"

My investigation reveals that during the interview of employees for
transferring to Pensacola, Florida, the Hamilton Mill only facili-
tated in providing facilities for the interviewing of employees.
Qualifications and selections were the responsibility of management
from Pensacola, Florida.

There having been no violation of the labor agreement, this grievance
is considered resolved.

*Jack Phillips*
*for*
Lee Gentry  *8-23-86*

LG:nj

xc:  J. Winterhalter
     J. Alder
     P. Conover
     F. Hawk
     Union (2)
     File

*Exhibit 4D*





**ASSAULT**

049828

| | | | |
|---|---|---|---|
| S A T | | 4. COMPLAINANT NAME LAST Carr FIRST Jerry MIDDLE L | S.C.F. 8 | 6. BLOCK 2 | 7. DISTR. 11 |

11-29-86  0115  8. ADDRESS OF COMPLAINANT 1261 Southern Hills Blvd.  CITY Hamilton, OHIO  45013

10. DAY/DATE REPORTED  SAT 11-29-86  TIME 0240  11. SEX M  RACE W  D.O.B. 11-9-42  HOME PHONE 868-1200  BUS. PHONE-OTHER 868-5548  12. COMPL. SOC. SEC. NO. 288 36 6157

13. LOCATION OF INCIDENT  Clark Station on Hamilton Cleves 631 Ham. Cleves.  FLOOR  ROOM  APT. NO.

14. VICTIM'S NAME  Same

15. ADDRESS OF VICTIM  Same

16. VICTIM'S SOC. SEC. NO.

17. PERSON REPORTING CRIME TO POLICE (IF VICTIM, WRITE "VICTIM")  Victim

18. VICTIM'S SOC. SEC. NO.

18. PARENT OR GUARDIAN OF VICTIM IF JUVENILE

19. NAME OF PERSON WHO DISCOVERED BODY (HOMICIDE)

20. WITNESSES: NAME

Exhibit B

22. NAME OF FIRST OFFICER AT SCENE  S. Scrimizzi  BADGE NO. 164

23. HOW OFFENDER APPROACHED - ENTRY - DIRECTION  Frontal

24. VICTIM'S OCCUPATION  Electrician

25. CRIME LAB. NOTIFIED  YES  [X] NO

26. EXACT LOCATION OF VICTIM ON PREMISES

27. WEAPON, INSTRUMENT OR MEANS OF ATTACK  Hands, Feet, Teeth

28. HOW MEANS OF ATTACK USED  Struck, Kicked, Bit

29. IF VICTIM HOSPITALIZED STATE WHERE  Fort Hamilton E.R.

30. NATURE OF INJURIES AND LOCATION ON BODY  Bruised Eyes, Ribs, Legs, Laceration of Right Ear

31. EXACT WORDS USED BY OFFENDER  See Narrative

32. OFFENDER'S VEH.  YEAR  MAKE  BODY STYLE  COLOR White  LICENSE NO. 191-LSC  STATE OH  YEAR 87  OTHER IDENTIFYING INFORMATION

33. NO. SUSPECTS  3  USED BY  1  STOLEN  SEX M  RACE W  AGE 25  NAME - ADDRESS (LIST ALL SUSPECTS ON REVERSE SIDE) 5'10 170lbs. Brn. Med. Length Hair, Mustache

34. ARREST MADE  YES  [X] NO

35. PHOTOGRAPHED BY  TIME

36. CORONER NOTIFIED  TIME

37. NARRATIVE: (GIVE DESCRIPTION BELOW ON HOW CRIME WAS COMMITTED.)

Victim stated he was attempting to park his car at the Clark Station and enter Columbia INN. The above suspect had words with the Victim over a parking place and approached Victim stating "I've got a problem with you". The two began to fight at which point 2 other subjects with the above suspect held the Victim while the suspect bit the top part of the Victims right ear off, then all 3 subjects kicked the Victim several times. Victim obtained Suspect Veh. License Number and will prosecute.

38. CASE CLOSED BY OFFICER

39. STATUS (CHECK ONE)  CLEARED  UNFOUNDED  CLEARED EXCEPT

40. IS FURTHER POLICE ACTION REQUIRED?  [X] YES  NO

41. IF CASE IS CLEARED, HOW CLEARED?  ARREST & PROSECUTE  COMPLAINANT DIRECTED TO PROSECUTOR  COMPLAINANT REFUSED TO PROSECUTE  OTHER EXCEPTIONAL

42. LEADS NO.  NCIC NO. 43. OCA NO.  44. SENT DATE  TIME  45. CANCELLED BY OFFICER - IBM NO.  DATE  TIME

6. REPORTING OFFICER  RANK  IBM NO.  D. Decimini P.O. 164

47. SUPERVISING OFFICER  IBM NO.  DGang Sgt 318

48. REPORT REVIEW OFFICER  IBM NO.  DATE  TIME

P-74

RECORDS

(OVER)

FORT HAMILTON-HUGHES MEMORIAL HOSPITAL

HAMILTON, OHIO  45013

*Exhibit 5*

**PATIENT:** CARR, JERRY L.

**UNIT #** 335399     **ROOM #** 514W

**DATE:** 11-29-86

**DOCTOR:** H. PAN

**PREOPERATIVE DIAGNOSIS:** Avulsion defect of the helical aspect of the pinna of the right external ear and puncture wound about the radial volar aspect of the thenar eminence subjacent to the MP joint of left hand secondary to human bites.

**POSTOPERATIVE DIAGNOSIS:** Same.

**OPERATION:** Debridement of the human bite wounds of the right external ear and left hand and coverage of the avulsion wound defect of the helical aspect of the pinna of the right external ear with right retroauricular full thickness skin graft with primary closure of the donor defect.

**ANESTHESIA:** General per endotracheal intubation.

**FINDINGS AT OPERATION:** The patient is a 44 year old Caucasian male who in the wee hours of this morning was admitted via the emergency room after being assaulted by three men who had not only kicked and beaten him, but one of them bit off his right ear and left hand. He sustained a puncture wound about the radial volar aspect of the thenar eminence subjacent to the MP joint of the thumb of his dominant left hand and most remarkably, however, is the avulsion defect of the superior helical aspect of the pinna of his right external ear.

Operative findings revealed the avulsion defect with loss of helical cartilage and skin extending from the superior aspect of the external ear down to the mid portion approximating 3 cm in length and 1 cm in greatest width. No evidence of autohematoma or other injuries noted in the vicinity. The external auditory meatus was intact as was the tympanic membrane. The puncture wound of about 1 cm in greatest diameter located about the radial volar aspect of the thenar eminence subjacent to the MP joint of the thumb of his dominant left hand extends into the subcutaneous plane without violating the underlying thenar musculature.

**SURGICAL TECHNIQUE:** With the patient in the supine position under general anesthesia per endotracheal intubation the patient's right external ear and hemi-face scrubbed and prepped with Betadine and thereafter draped into a sterile field. After debridement of the contused skin wound edges and the edges of the torn helical/antihelical cartilage, the avulsion wound defect was then copiously irrigated with antibiotic Kanamycin-saline solution. Meticulous wound hemostasis was then established with the use of bipolar electrocautery. A full thickness skin graft of the dimension to match the recipient site of the avulsion defect was harvested from the inferior retroauricular area. The retroauricular donor site was then closed primarily in layers with 5-0 chromic subcutaneous interrupted sutures and 6-0 Prolene skin sutures. The retroauricular full thickness skin graft was then utilized for coverage of the avulsion helical wound defect and sutured into the skin wound edges with 6-0

**OPERATIVE REPORT**

# FROST & JACOBS

2500 CENTRAL TRUST CENTER • 201 EAST FIFTH STREET • CINCINNATI, OHIO 45202-4182 • (513) 651-6800 • TELECOPIER (513) 651-6981 • TELEX 21-4396 F&J CIN • CABLE "FROSTJAC"

DENNIS J. BARRON
WILLIAM L. COWAN
JOSEPH J. CONNAUGHTON
J LELAND BREWSTER II
JAMES S. WACHS
BARRY J. LEVEY
DANIEL P. DOOLEY
JOHN K. ROSE
RONALD B. HEINLEN
DONALD McG. ROSE
JAMES R ADAMS
WILLIAM D. BASKETT III
JOHN S. STITH
PIERCE E. CUNNINGHAM
EDMUND J. ADAMS
ALBERT E. HEEKIN III
LAWRENCE H. KYTE, JR.
F. STEPHEN PHILLIPS
THOMAS F. MEHNERT
JAMES K. L. LAWRENCE
ROBERT A. DIMLING
JERENA SMITH
CARL E. WESTMANN
GERALD L. BALDWIN
GARY L. HERFEL

JOHN G. PARNELL
RICHARD J. ERICKSON
FREDERICK J. McGAVRAN
G. DAVID VAN EPPS
NEIL GANULIN
JOHN H APPEL
MICHAEL F. HAVERKAMP
RICHARD A. GETTY
JOSEPH J DENNER
SAMUEL McW. SCOGGINS
SUSAN GROGAN FALLER
JEFFERY R. RUSH
THOMAS A. SWOPE
DENNIS J. MURPHY
TODD H. BAILEY
LARRY H. McMILLIN
MARK H. LONGENECKER, JR.
GEORGE E. YUND
PAUL A. OSE
DAVID G. HORN
WILLIAM H. HAWKINS II
DONALD L. CRAIN
MYRON L. DALE
E. RICHARD OBERSCHMIDT
MARTIN E. MOONEY

DAVID C. OLSON
JOHN M. PASSIDOMO*
EDWARD K. CHEFFY
HOPE M. FRYE
FREDERICK C. KRAMER*
KATHLEEN W. CARR
WALTER B. HAGGERTY
DAVID T. CROALL
MICHAEL L CIOFFI
GARY A. GARFIELD
CHARLES E. SCHROER
STEPHEN C. SCHATTEMAN
DOUGLAS E. HART
RICHARD M. GOEHLER
RANDOLPH H. FREKING
BETH A. MYERS
ANTHONY W. HOBSON
DEBORAH B. ADAMS
JOHN E. BARNES
JOSEPH W. PLYE
MARK N. KLUSMEER
PATRICIA D. LAUB
MARK B. KANTER
FERN E. GOLDMAN
PATRICIA A. SUTTMANN

DENISE H. McCLELLAND
RICHARD M. MARCHEWKA*
MICHAEL T. BUTTON
DONNA K. LEONARD
STEPHEN E. THOMPSON
GREGORY C. SHIELDS*
JAMES L. KARL II*
CALVIN D. BUFORD
WILLIAM C. STRANGFELD
WILLIAM W. FORD III
GRANT B. COWAN
DANIEL J. PICARD
REBEKAH E. BELL
GREGORY A. KEYSER
MARTHA H. GOOD
P. ROBERT RADEL*
LAWRENCE A. GLASSMANN
LAURA L. KEGG
GEORGE P. SCHOBER
SUSAN W. KAMP
ROBERT A. LeVINE
LISA D. MULLER
CLAUDIA L. SCHAEFER
VINCENT E. MAUER*
JOHN H. WENDELN

RAYMOND D. NEUSCH
DOUGLAS D. THOMSON
PHYLLIS E. BROWN
DAVID W. HILLS*

PATENT, TRADEMARK AND
COPYRIGHT ATTORNEYS
ALBERT E. STRASSER
GIBSON R. YUNGBLUT
JAMES H. HAYES
DAVE S. SCHMIT
JAMES D. LILES
RONALD J. SNYDER
ROGER A. GILCREST
JAMES P. DAVIDSON

SENIOR PARTNERS
CHARLES G. PUCHTA
HENRY W. HOBSON, JR.
JOSEPH V. HOFFMAN

COUNSEL
H. J. SIEBENTHALER
WILLIAM M. SEAMAN
JOHN W. MELVILLE
R. O. KLAUSMEYER
JAMES G. HEADLEY
ALAN R. VOGELER
STANLEY H. FOSTER
ELIZABETH K. LANIER
BRUCE F. LOWE
WALTER W. JACKSON*
JOHN R. LEATHERS*
THOMAS E. TAYLOR
RICK E. BAUGHER
THOMAS L. WILLIAMS

* NOT ADMITTED IN OHIO

WRITER'S DIRECT DIAL NUMBER

(513) 651-6714

February 5, 1988

Ms. Sharon Rennick
90 Branch Hill Court
Harrison, OH  45030

          Re:  Sharon Rennick vs. Champion International
               Corporation, et al; United States District Court
               Case No. C-1-84-1487

Dear Ms. Rennick:

          Pursuant to Judge Weber's Order of Procedure, the
documents that we intend to use as exhibits at trial in the
above-referenced matter are available for your review in our
offices.  Please call us to arrange a convenient time for your
inspection, if you desire.  A description of the exhibits will
be attached as an Appendix to the Proposed Final Pre-Trial Order
that we file with the Court on Monday.

          With respect to your exhibits, please forward copies of
them to us as soon as possible.  If any exhibits are not capable
of being copied conveniently, please advise us and we will
arrange to inspect them at a convenient time and place.  Please
let me know of any expenses incurred in providing the copies to
us.

          Thank you for your cooperation.  Please call me if you
have any questions.

                              Sincerely,

                              Randy Freking by rt

                              Randolph H. Freking

RHF:rt

0653H

*Frost & Jacobs disregarded Judge Weber's Court Order. They control the Courts*



July 31, 1987

<u>MEMO TO FILE</u>

On Friday, July 31, 1987, a meeting was held in Frank Hawk's office with Lewis Wilson. Also present at that meeting was Kellous Peters, Trim Pack General Supervisor. The meeting began at 1:30 p.m. and was completed at 1:45 p.m.

During this meeting Mr. Peters and I reviewed with Lew Wilson the importance of compliance with the mill rules and regulations concerning the types of language used and gestures made (sic, Rule 2.25). Mr. Wilson said he understood and would comply with Company policy. He advised us that the Judge in the Jerry Carr case had given him a good chewing out over the use of the word "nigger."

Upon conclusion of this line of conversation, Mr. Wilson said it was his intention to stay away from Mr. Carr and that there would be nothing between them unless Jerry did something to him which would require him to defend himself.

Misters Hawk and Peters reminded Mr. Wilson that the Company would continue to do all it could do to insure the safety of all its employees.

Upon conclusion of the meeting Mr. Wilson reiterated his understanding and need to comply with mill rules and regulations and his commitment to doing so.


Frank Hawk, Manager
Personnel


Kellous Peters
General Supervisor
Trim Pack

nrw

xc:
L. Wilson Personnel File
Reader's file
Jerry Carr Trial File

CONFIDENTIAL

SUBJECT TO PROTECTIVE ORDER
RENNICK VS CHAMPION INTERNATIONAL CORP.
U.S. DISTRICT COURT CASE No. C-1-84-1437



August 4, 1987

MEMO TO FILE

On Tuesday, August 4, 1987, a meeting was held between
Kellous Peters, Bill Jones, and Frank Hawk.  The meeting commenced
at approximately 6:40 a.m.

During this meeting, Messrs. Peters and Hawk reviewed the importance
of compliance with Hamilton Mill Rules (sic. 2.25) and the
unacceptability of profanity, racial comments, or poorly thought out
actions.  It was pointed out that this type of conduct led to a
lengthy period of dispute, and will not be tolerated in the future.

Mr. Jones, when asked if he understood, responded that he did and
confirmed that he would act accordingly in the future.

The meeting concluded at 7:05 a.m.


_____          _____
Frank Hawk, Manager                      Kellous Peters, Gen. Supervisor
Personnel                                Trim Pack


FH:omi

xc:
D. Banks
Personnel Folder - W. Jones
K. Peters
F. Hawk

CONFIDENTIAL

SUBJECT
RENNICK VS CH
U.S. DISTRICT

FURER, MOSKOWITZ & MEZIBOV

ATTORNEYS AT LAW

SUITE 714, 36 E. FOURTH STREET

CINCINNATI, OHIO 45202

(513) 721-3111

JOEL S. MOSKOWITZ
*MARC D. MEZIBOV
JEFFREY A. TESSEL
BETH SILVERMAN

SAMUEL H. FURER
(1916 - 1986)

*ALSO ADMITTED TO PRACTICE
IN NEW JERSEY

December 31, 1987

Mr. Jerry Carr
1261 Southern Hills Boulevard
Hamilton, Ohio  45013

Exhibit 7

            RE:  Carr v. Champion

Dear Jerry:

This will confirm our conversation of December 31, 1987 concerning the status of your case with Champion.  As you know, in that conversation I suggested to you that you propose to Champion the following terms for a complete resolution of this on-going dispute.

1.    You will withdraw your appeal and dismiss your complaint against Champion;

2.    Champion will dismiss its application for attorney fees in the above matter;

3.    Champion will effect your transfer to another plant and you will retain all rights of seniority and benefits to which you are entitled at your present location.

Frankly, I think this would be the best resolution for both parties. The alternative is to allow this matter to continue to escalate which in the long run will have a greater impact on you than it will on Champion.  If you wish for me to convey this proposal on your behalf, I would appreciate confirmation from you in writing.

                        Very truly yours,

                        FURER, MOSKOWITZ & MEZIBOV

                        Marc D. Mezibov

MDM/amf

Exhibit 8

On November 4, 1987 at about 5:00 pm, Jerry Carr and I received two calls at the same time. One to the skid buggy, trimmers, the other to #10 cutter crane. I took the call at skid buggy and Jerry took the crane. Thinking them both minor calls and wouldn't take long the repair.

Upon arriving at the skid buggy at looked to see where the fork lift truck was, so I would have a clear work area. The driver was sitting in the smoker area, so I started to work.

I had checked three out of the four safety switches on the buggy and Jerry arrived. We were in the process of jumping the switch when Jerome Dernol came up on the truck and started moving skids. He failed to blow his horn and came close enough to us we stopped what we were doing and got up, out of the way.

I really didn't pay that much attention to it the first time. But he then made a pass so close to us that I dropped my tools and jumped to the backside of the skid buggy to keep from being hit.

The way I see it, he didn't make an attempt to drive the at all, until Jerry Carr showed up. The first close pass I figured as misjudgement in driving the second time wasn't.

Roger D. Orcutt

Exhibit

To whom it may concern)

On June 1 1988 Jerry Carr) was suspended for instigating a fight, Jerry said what fight to John alders). John said Jerry instigated a fight on may 9 & 10 th on Jerrys 11-7 shift. Jerry said again what fight, John would not tell him. Jerry asked if any threats or blows were thrown, and he said no. John said no. Jerry said do you have any witness, John said no. John said you are being suspended pending further investigation. In my opion there was no evidence for a displinary action, and I firmy believe on what has and is happening Jerry is being harrassed.

Donald L Flick

January 1, 1988                    Exhibit 9 103                    (1)

Several weeks ago I was called into a
meeting in the industrial relations office.
Present were Jerry Carr, Will Sawyer & myself.
Will, said he wanted to know all about the
problem Jerry was having in trim Pack. Jerry
started by telling Will about Jerome Isreal
kicking him while he was working on a
trimmer. Jerry told about Jerome tried
to run over himself and Roger, Parrett with Jitney.
Jerry told of all the problems he had with
people in trim pack. Will said he would
investigate Jerrys allegations and get back
with him. approximately a week later I
was again summoned to a meeting, this time
with Will Sawyer & Roger Parrett. Will asked
Roger to tell him in his own words what
people were doing to Jerry.

Roger told Will the same story as did Jerry, about Jerome kicking Jerry while he was working on a trimmer, about Wa wa Jones' striking the electrician's work cart, about Jerome trying to hit both of them with a jitney while they were working on a skid buggey. Roger talked about how Jerome would show up on a job that they were called on in trim pack. Roger said they (the personell in trim pack) were harrassing Jerry. Will then asked Roger what recommendations he would make, Roger replied he wanted no one to lose their job, but maybe the person causing the problem could be transfered to another shift. This was the end of this meeting and Will said he would investigate this matter further and make recommendations.

January 1, 1988

Several weeks later I was told by Thomas Thompson to be at the main office building in Frank Hawks office at 1 30/Pm. When I arrived, Frank Hawk, Winterhalter, and Carr and Holman were there. Frank started out by saying Will Sawyer Investigated the problems with Jerry and Trim Pack personell and as a conclusion of his recommendations, they decided Jerry should enter the Employee ass. program. Jerry could hardly believe what he had just heard and said no. Jerry said I almost get run over, get kicked and you want me to goto the E.A.P. With this the meeting Ended.

Donald L. Slick
Chief Steward
Local 1967

EXHIBIT 10,183    695
THReateNed WitNesses

1    contract?

2            A.    Yes.

3            Q.    And if they were to break the contract they

4    should be written reprimanded?

5            A.    Yes.

6            Q.    Because you received written reprimands for just

7    being late?

8            A.    Yes.

9            Q.    So that over at Champion Paper it is well known

10    that they don't treat people equally?

11            A.    No, they don't.

12            MS. RENNICK:    That's all the questions I have.

13            MR. FREKING:    With the Court's indulgence, I

14    just have a few.

15                    RE-RECROSS-EXAMINATION

16    BY MR. FREKING:  This is George Yunds Co.Counsel

17            Q.    Mr. Lampley, the meeting I had with you and the

18    other witnesses last week, who else was in the meeting when I

19    told you that I controlled the Federal Courts?

20            A.    You said you had people in higher places that

21    could control the Federal Courts.

22            Q.    I have places, I have people?

23            A.    You have people, you are associated with people

24    in the higher places that can control the Federal Courts.  You

25    were making a mimic of Sharon along with another individual

696

1    because she was defending her own self.

2         Q.    I was by myself, wasn't I?

3         A.    You was standing.  You had just come in the door

4    and you explained why you was late and everything.  I was

5    there, Ernest Lowrey was there, Sharon Sutton, Joy, Jerome

6    Isreal and Michael Butler.  You made that statement.

7         Q.    I made that statement in the presence of Michael

8    Butler, Jerome Israel, Sharon Sutton?

9         A.    Yes.

10        Q.    Ernest Lowrey?

11        A.    Yes.

12        Q.    Who else, sir?

13        A.    Joy and this guy named Radar, whatever his name.

14   They just called him Radar.  I don't know what his name is.

15        Q.    Radar.  Rick Whiting?

16             MS. RENNICK:  Vernon Reed.

17             MR. FREKING:  That's Vernon Reed.

18             MS. RENNICK:  Right, that's Radar.

19             MR. FREKING:  Thank you.

20        Q.    Sir, when I met with you, isn't it true that I

21   said at that meeting last week that I had a right under the

22   federal rules and under any rules governing the conduct of

23   attorneys to meet with witnesses before the case started to

24   insure they are going to tell the truth?

25        A.    No, you didn't tell me that.  All you stated to

1   me was that, you know, you was sorry that you had me wait this

2   long.  We didn't get into any type of thing such as that.  And

3   that you pulled out my deposition and you said, "I see you've

4   got a signed deposition here," and you read so much and then

5   you started reading to yourself.  And then you said, "Well, I

6   was just hoping that you would, when you go in the courtroom,

7   you just tell the truth."  And I said, "Well, I got a signed

8   deposition there.  That was about all my intentions."  And then

9   you hammered on that about three or four more times and I said

10  well --

11          Q.    You told the truth in your deposition, didn't

12  you?

13          A.    Yes.

14          Q.    And after we apparently pulled out your

15  deposition I made the comment that I hope you tell the truth

16  today?

17          A.    You said that.

18          Q.    Have you told the truth today?

19          A.    Yes, I have told the truth.

20          Q.    And I told you that I had the right to meet with

21  you before trial under any rules governing attorneys and any

22  kind of ethical guidelines that I was aware of?

23          A.    You didn't mention that to me.  You might have

24  mentioned it to someone else.  You did not mention that to me.

25          Q.    I didn't make the comment to you that an

## AFFIDAVIT AND ORDER OF GARNISHMENT OF PROPERTY
## OTHER THAN PERSONAL EARNINGS AND ANSWER OF GARNISHEE

CHAMPION INTERNATIONAL CORP.

_____
JUDGEMENT CREDITOR

VS

SHARON RENNICK
90 BRANCH HILL CT.
HARRISON, OHIO 45030

_____
JUDGMENT DEBTOR, name & address

~~HAMILTON~~ BUTLER COUNTY COURT OF COMMON PLEAS
ROOM 329, HAMILTON COUNTY COURT HOUSE
1000 MAIN STREET
CINCINNATI, OHIO 45202-1286

Case No. *Exhibit 1/A*
(This number must be used on all references)

STATE OF OHIO, HAMILTON COUNTY, ss:

The undersigned being first duly cautioned and sworn, or affirmed, according to law, says that I am __ATTORNEY__ for the Judgment Creditor herein who heretofore recovered, or certified, a judgment in the Hamilton County Common Pleas Court against the Judgment Debtor named above; that I have good reason to believe and do believe that the garnishee named in Section A below has property, OTHER THAN PERSONAL EARNINGS owing by him to said Judgment Debtor that is not exempt under the laws of Ohio and of the United States, such property being described as follows: _____

MONIES DEPOSITED IN ANY AND ALL ACCOUNTS OF
JUDGMENT DEBTOR

Sworn to and subscribed before me on

_June 16, 1988_
Date

George E. Yund

Ruth D. Trusdale   RUTH L. TRUSDALE
Notary Public   Notary Public, State of ...

## SECTION A: COURT ORDER AND NOTICE OF GARNISHMENT OF
## PROPERTY OTHER THAN PERSONAL EARNINGS

TO GARNISHEE(S): SECOND NATL. BANK OF HAMILTON
HIGH STREET & JOURNAL SQUARE, HAMILTON, OHIO 45012

The Judgment Creditor in the above case has filed an affidavit, satisfactory to the undersigned, in the Hamilton County Common Pleas Court stating that you have money, property, or credits, OTHER THAN PERSONAL EARNINGS, in your hands or under your control that belong to the JUDGMENT DEBTOR in the case, and that some of the money, property, or credits may not be exempt from execution or garnishment under the laws of the State of Ohio or the laws of the United States.

You are therefore ordered to complete section B. on the reverse of this form, and return the completed original of this form, together with any amount shown due on it to the Clerk of Courts within five (5) business days after receipt. Deliver one completed copy of this form to the indicated Judgment Debtor. Keep the other copy for your files.

## QUESTIONS SHOULD BE REFERRED TO YOUR ATTORNEY.

The total probable amount now due on this judgment, including interest and court costs is $ _15,000_ you also are ordered to hold safely anything of value that belongs to the indicated Judgment Debtor that has to be paid to the court, as determined under section (b) of this form, but that is of such nature that it cannot be so delivered, until further order of the court.

Witness my hand and the seal of this court this _____ day of _____, 19 _____

S. E. Elliott
Judge of the Hamilton County Court of Common Pleas

## COMPLETE AND RETURN ONE FORM TO ROOM 329, HAMILTON COUNTY COURT HOUSE, CINTI, OH 45202-1286
## IMMEDIATELY DELIVER ONE COMPLETED COPY TO EACH JUDGMENT DEBTOR.

Attorney for Judgment Creditor is GEORGE E. YUND, 2500 CENTRAL TRUST CENTER
Address 201 E. FIFTH STREET, CINTI, OHIO 45202   Telephone: 513-651-6800

To the Sheriff of Hamilton County, Ohio:

Notify the within named garnishee(s) to appear or answer in accordance with the foregoing order. Make legal service and return of this writ BEFORE

Given under my hand this _____ day of _____, 19 ___
ROBERT D. JENNINGS,
Clerk of Hamilton County Common Pleas Court   By: _____
Deputy Clerk

Exhibit 11 B

STATE OF OHIO

VS.

SHARON RENNICK

TRANSCRIPT OF TESTIMONY

STATE OF OHIO                         *        Case No. 84-CR-A-3726

       Plaintiff                   *        In the Municipal Court of

vs.                                  *        the City of Hamilton, Ohio

SHARON RENNICK                       *

       Defendant                   *        TRANSCRIPT OF TESTIMONY


* * * * * * * * * * * *

JUDGE JAMES H. DOLAN, Presiding


APPEARANCES:

   For the State of Ohio:                  Gerald Pater
   For the Defendant, Sharon Rennick:      Domineck Mastuesusio


CHARGE:

   Felonious Assault, Viol of Sec. 2903.11(A-1) RC


November 13, 1984                              10:00 A.M.

MR. PATER:    Sharon Rennick. This is on the second page of your docket, Your Honor, Case No. 84-CR-A-3726, State of Ohio versus Sharon Rennick, charged with Felonious Assault contrary to 2903.11(A-1) of the Revised Code. Miss Rennick is represented by Domineck Mastuesusio. Uh, at the Defense request, Your Honor, we are amending to Assault, contrary to 2903.13 of the Revised Code.

MR. MASTUESUSIO:    That is correct, Your Honor, we're entering a plea of no contest to it.

MR. PATER:    This is a result of an incident, Your Honor, that occurred on the 29th of October of 1984, where the Defendant knowingly caused physical harm to William Jones by cutting him on the arm with a razor requiring some twenty-three stitches to close.

MR. MASTUESUSIO:    There's nothing on her record.

COURT:    Miss Rennick, uh, you realize that a no contest plea means that you are not con-testing or denying the statement just made, read by the Prosecutor?

MISS RENNICK:    Yes.

COURT:    You realize that. In other words what you're, what I'm saying is with a no contest plea we do not have a formal trial, and I'll accept as being the evidence the State would present the statement the prosecution just made, that would be the evidence the State would present. Do you understand that?

MISS RENNICK:    Yes.

COURT:    Yes. You have to say yes or no because it's being taped and we don't get the nod

of the head. So in other words, uh, then you've discussed ths matter with your Attorney.

MISS RENNICK:    No, yes Sir.

COURT:    And the no contest plea made by the Attorney was made with your consent?

MISS RENNICK:    Yes.

COURT:    O.K. The Court will accept it. Do you have anything you wish to offer at this time, Sir?

MR. MASTUESUSIO:    Nothing by way of --

COURT:    Nothing on the facts.

MR. MASTUESUSIO:    the facts.

COURT:    O.K. Then in that case the Court is going to find that you are guilty of Assault. Do you have anything that you wish to say as to why at this time I should not pass sentence?

MR. MASTUESUSIO:    Not really, Your Honor, I do have a few words by mitigation.

COURT:    O.K.

MR. MASTUESUSIO:    The Court, of course the Court may want to consider pre-sentencing investigation but Sharon's twenty-eight, she has one child, she's divorced; The incident took place at the Champion Paper Company where she has been employed for four years. Apparently there has been a, a history of, uh, there's a complaint filed with the Company going back many months, there was a lot of pressure on her, uh, and there's an Attorney involved which she is asking for a transfer from (inaudible) company where she is located, uh, there's a lot of

hard feeling and hostility between herself
and some of the other employees, most of
the employees in the factory are male, uh,
there were comments being made to her and,
uh, I think she lashed out in anger, uh,
because of the pressure and the problems
involved but, uh, she is represented by an
Attorney by the name of, uh, Ivan Tomarkin

MISS RENNICK:    Tomarkin.

MR. MASTUESUSIO:    Ivan Tomarkin, uh, on a, on a Federal
matter regarding the, uh, uh, sexual dis-
crimination. So it's, it's a long standing
uh, problem that goes back eight to ten
months and that's what participated this
particular incident. She has no previous
criminal contact at all, Your Honor.

COURT:    Nothing at all on her record, Mr. Pater:

MR. PATER:    No, Your Honor, no prior, uh, as stated.

COURT:    Are there medical bills involved in this?

MR. JONES:    No, except, uh, just Champion, you know,
uh --

COURT:    Champion took care of all the bills?

VOICE:    Yes.

COURT:    In other words nothing out of his pocket.

MR. JONES:    No.

COURT:    O.K. Alright, then if nothing out of the
pocket then there won't be restitution.
The Court's going to access a penalty of
seventy five dollars and cost, and ten
days in jail. I'm going to refer this
matter to the Probation Department, if
you have no previous record and you pay
your fines and costs the Court will suspend

the jail sentence. I want to caution you, this is not the proper way to handle things. If you have an Attorney you let the Attorney handle the matter.

MR. MASTUESUSIO: She's been advised of that. Thank you very much, Your Honor.

## _C_E_R_T_I_F_I_C_A_T_I_O_N_

I, Jewel Thompson, hereby certify that I transcribed from tape the testimony in the trial of this case, and that the foregoing Transcript of such testimony and evidence constitutes all of the evidence and testimony received in said cause, and that the foregoing is a true and correct copy of said action.


                                    _Jewel Thompson_
                                    Jewel Thompson

Exhibit # 38

To Whom it may Concern

12/83

On the evening of February 9th 1989 I was asked to stay over after working it 7 shift to meet with Frank Hawk, in Industrial relations to sign statement concerning Jerry Carr. I told Mr. Hawk I couldn't sign these papers because they were false statements against Jerry Carr and myself. Refusing to do so, Mr. Hawk called George Wind of Frost & Jacobs law firm by phone Mr. Wind tried to convince me to sign these papers but again I refused because they were false statements. I feel this is a typical example of how the Company has done Jerry in the past. I being Jerry's supervisor have told management of some intentional actions by some trim/pack employees but management ignores my input and always finds Jerry in the wrong. I did tell Mr. Wind if he made some changes in these statements. I would sign. I believe Jerry could be hurt by these employees judging by some of the incidents taken in trim/pack area. I feel that the Company has not taken appropriate action against these trim/pack employees. I also feel that the Company was not truthful concerning the report on the Wilson lawyer investigation which led to Jerry getting an undeserving three day lay-off.

Timothy W. Burton    March 20 1989

EXHIBIT #5

To John Alder                                          5-15-89

ON May 9th 11-7 Shift I, (Tim Burton) Came
On Shift About 1040 PM. I TALKED TO 3-11 Shift
Foreman Jim Philley Saying he had #9 P.M. Down
AND WAS WAITING ON A Brg housing For The 2Nd
PRESS WET FELT STRETCH Roll F/S in The Basm.
He Walked Away Saying he was Still Looking For
A Housing. About 30 min. Later I Was Asked
To put A Call in For Electricians To put A
Electrical Switch in by hand. Doing This, I went
To The Job Site. When I ARRIVED Jim Philley
WAS on Location. (#9 PM BASMT.) Jerry Carr
ARRIVED To put Switch in when he and Jim Philley
had words About Working Procedures. During That
Conversation, Jim Philley Flipped Jerry The Finger.
Jerry Asked Why Do you people Feel You CAN Say
or Do Anything To me While I'm (Jerry) in here workin
with That, Philley Said We CAN go outside. (making
The Assumption That I (Jim Philley) will Fight You
or Kick Your Ass.) After putting The Switch in, Jerry
Called Hamilton Police Dept. Telling Them That A
Supervisor Just Threaten To Take him outside and
Whip his Ass. Jim Philley Also Talked To Police Dept
Jerry Again Talked To Police Dept And Then hung
up. After That Jim Asked Jerry if They Could Talk.
Jim Said he Was A little hot And Said he Shouldn't
have Said What he Said. Jerry Told Jim he didn't
Know how To Talk To people. Then Jerry Left The
office.                        5-15-89  Timothy W. Burton

To Whom it may Concern

Jerry Carr has worked for me (Tim Burton) for over a year in the Electrical Department. I find Jerry to intelligent Articulate, AND a very Capable Electrician. Within the Past year, Jerry has incountered some very Dangerous situations specificly in Trumbuck. Arum Jerry has been staird at, someone threw an Electrical switch in while he AND his partner were working on Equipment AND Just recently was almost hit by a Jitney.

Jerry has complaind To The Company To No avail saying his life was in Danger. Consequently Jerry was been handed a letter stating that if he complains about Another incident in Trumbuck he will be disaplend. This Statement itself is insult to injury.

Tim Burton

# 2 claim hundreds of wiretaps

## Grand jury hears former Bell workers

BY BEN L. KAUFMAN
The Cincinnati Enquirer

Two former Cincinnati Bell employees said they told a federal grand jury Wednesday that they tapped hundreds of business and private telephones as part of their jobs.

The pair, Robert Draise and Leonard Gates, said those whose phones were tapped included business executives, lawyers, law-enforcement officials and a local religious group.

Cincinnati Bell spokeswoman Cyndy Canton said the company taps about a dozen phones annually under court orders. She said the company had installed seven taps so far this year.

### Pair alleges orders

Draise, of Elkwood Drive, Pleasant Run, said he told the grand jury that he had installed taps from 1972 until 1979. Gates, of Glenrose Lane, Mount Carmel, said he installed them from 1972 until 1984.

Some were done on orders from Cincinnati police and the FBI, the pair said they told grand jurors, and others were done on orders from superiors at the telephone company.

Draise and Gates — who said they were free to talk about what they told the grand jury — described their testimony in interviews Wednesday afternoon.

They said they received subpoenas to testify after the *Mount Washington Press* published an article in which the pair described the wiretaps.

Assistant U.S. Attorney Kathleen Brinkman, who subpoenaed and questioned Draise and Gates, said she would neither confirm nor deny anything about the men's grand jury appearance.

If Gates and Draise did tap the phones, most or all of their installations were illegal, according to past and present law enforcement officials, because only a federal judge can approve electronic eavesdropping.

Getting that approval requires a significant effort within the Justice Department, and it's attempted infrequently, officials familiar with the process said.

### Executives' denials

Bell spokeswoman Canton could not say whether Gates or Draise installed legal taps, because she had not examined company records. But she did say that the company never asked employees to do anything illegal.

She said that Cincinnati Bell had asked supervisors and executives whom Draise and Gates had said were part of a wiretapping operation, and all had denied they played any part.

Draise, a telephone repairman, resigned from

## Taps

CONTINUED FROM PAGE D-1

was a hostile and insubordinate supervisor. Gates said the company was retaliating against him because he had supported two female installers' charges of sexual harassment and discrimination.

Gates sued Cincinnati Bell over his firing, and U.S. Magistrate Robert A. Steinberg heard the case earlier this year. His decision is pending.

Late Wednesday, FBI spokesman David Lichtenfeld said the bureau had asked Cincinnati Bell to install court-ordered taps during the period Draise and Gates were working. Lichtenfeld said he was sure agents never used unapproved taps.

In interviews and documents filed as part of his suit against Cincinnati Bell, Gates said he spent

so much ti... company ord... doubled his ... overtime pay...

He also s... by superviso... install taps.

Draise an... stalled many ... who would ... tion gleaned... tions or data...

"We don'... the motives ... Gates said.

"I know ... illegal," Dra... did had to b...

Most ta... voice-activat... typical targ... phone less ... Gates said.

left of the ...

*Exhibit #13*

Case 1:06-cv-01893-JR    Document ...    Filed 04/18/2007    Page 111 of 184



```
MAILGRAM SERVICE CENTER
MIDDLETOWN, VA. 22645
08AM
```

**Western Union Mailgram**

```
4-000562S281002 10/08/87 ICS IPMBNGZ CSP CINB
1 5134346060 MGM TDBN DAYTON OH 10-08 0425A EST
```

*EXH. 14 A*

```
FRITZ HAWKINS
6190 FLEMINGTON RD
DAYTON OH 45459
```

THIS IS A CONFIRMATION COPY OF THE FOLLOWING MESSAGE:

```
 5134346060 PDM TDBN DAYTON OH 114 10-08 0425A EST
PMS PRESIDENT RONALD REAGAN RPT DLY MGM
WHITE HOUSE DC 20500
MR. PRESIDENT
```
CIVIL CASE #C-3-79-206 EMPLOYMENT DISCRIMINATION
FRITZ HAWKINS PLAINTIFF VS. OHIO BELL TELEPHONE COMPANY DEFENDENT IN
THE U.S. DISTRICT COURT WESTERN OHIO DIVISION, JUDGES WALTER H. RICE,
CARL RUBIN AND U.S. MAGISTRATE ROBERT STEINBERG.

THE DISTRICT COURT DISMISSED THE CASE WHILE ARROGANTLY AND WILLFULLY
IRRESPONSIBLY ROBBING ME OF CONSTITUTIONALLY GUARANTEED RIGHTS. DUE
PROCESS. NOW ORIGINALLY INVOLVED IN CASE NUMBER C-3-79-206 JUDGE CARL
RUBIN AND U.S. MAGISTRATE ROBERT STEINBERG ARE WITH U.S. APPEALS
COURT FOR THE SIXTH CIRCUIT WHEN CASE NUMBER 84-3575 WAS DECIDED. THE
COURT'S DECISION WAS PREDICTABLE. IT WAS UNPUBLISHED AND NOT
RECOMMENDED FOR PUBLICATION. LEGAL CRIME JUSTICE DEPARTMENT
RESPONSIBILITY. IRON CURTAIN TYPE JUSTICE IN U.S. COURTS. STOP IT NOW
MR. PRESIDENT. HELP.
    FRITZ HAWKINS
    6190 FLEMINGTON RD
    DAYTON OH 45459

04:26 EST

MGMCOMP_
```

*THIS CONSTITUTES*
*THE THIRD TELE-*
*GRAM TO THIS*
*PRESIDENT_*
*PREDICTABLY*



*Exhibit 14*
*b*

Because so much has been hidden from the citizens of the tri-state area about WIRE TAPS and the involvement of the Cincinnati Bell Telephone Company and Government and Police agencies, we feel that an investigation must be conducted by an outside agency, such as the United States Senate or House of Representatives.

We have been told by Cincinnati Bell Telephone that they don't want to make public the names and phone numbers they have given to Police and Government Agencies because they want to protect their customers privacy!

We have been told by the Cincinnati Police, at first they didn't do it, then that they only did it now and then and long ago. Now they want the records and depositions sealed from the public so that police methods and practices won't be exposed, and so that Police Officers who took the 5th Amendment to avoid incriminating themselves, won't have to answer to the public.

We've been told by the U.S. Justice Department and other Federal agencies that they didn't do it. But they also want depositions and records sealed to keep secret methods and practices and lists of citizens, about whom the federal government has sought information from the Phone Company over the last 20 years, and to protect "on going" investigations, even though some of the information goes back 20 years.

The citizens of this area feel that we have been lied to by all parties. That their statements and denials are serving only their own purposes and not the public. We feel that the only way to find the truth is by an investigation by an outside source, who is trully answerable to the public.

If you also feel this way, please sign the petition presented, or mail a copy of this letter to your Senator or Congressman, under your signiture.

U.S. Senator Howard M. Metzenbaum
Federal Office Building
Cincinnati, Ohio, 45201 (684-3894)

U.S. Senator John H. Glenn
Federal Office Building
Cincinnati, Ohio, 45201 (684-3265)

U.S. Senator Mitch McConnell
Federal Office Building
Covington, Ky, 41011 (261-6304)

U.S. Congressman Bill Gradison
Federal Office Building
Cincinnati, Ohio, 45201 (684-2456)

U.S. Congressman Thomas A. Luken
Gwynne Building - 602 Main Street
Cincinnati, Ohio, 45201 (684-2723)

U.S. Congressman Donald E. Lukens
646 High Street
Hamilton, Ohio, 45011 (895-5656)

Fritz Hawkins                                    September 29, 1980
6190 Flemington Road
Dayton, Ohio 45459

                                          *Exhibit 14*
                                               *C*

President Jimmy Carter
White House
Washington, D.C. 20500

          Mr. President,

     On June 25, 1980, I sent you a Western Union Mailogram, informing you and other elected officials of my unconscionable, oppressive treatment by the Bell System. I went to the Soviet Union in order to see if the Soviet Press would do what none of the American Media would, that is, publicize this A.T.&T. lynching. I <u>did not share</u> <u>with Tass</u>.

     Mr. President, I know why the National Association of Colored People would refuse to support me against the excesses of the Bell System. Reason, A.T.&T. Co.'s President, W. M. Ellinghaus and the N.A.A.C.P. Executive Director, Ben Hooks entered into an agreement on or about January 23, 1979. (See New York Times) that amounted to collusion at its best and bribery at its worst. You see, Mr. President, I've been a life member of the Organization for forty years (40) yet Ben Hooks threw me to the wolves for a price. How many more has he done likewise? With A.T.&T. Co., controlling the N.A.A.C.P. the Black man for the first time since 1909 has no place to go.

     City Government here in Dayton with its Black Mayor refused to help me. A Black Legislator here also refused to help me. I feel that I know why these people have refused to help me, Bell System influenced with its enormous resources.

     Mr. President, why have you refused even a Presidential inquiry into this conspiracy that had the knowledge or support of ████████ A.T.&T. Co. Executive Vice President, Charley Hugel and Ohio Bell President, W. E. McDonald?

     I can only hope that the person I worked so hard for during the N.A.A.C.P.'s 1976 convention in Memphis, Tennessee's reason for failing to enforce the law of the land (in this instance) is not based on a reluctance to questioning big business.

     I've always supported you and I still do.

Fritz Hawkins
6190 Flemington Road
Dayton  Ohio 45459

*Exhibit #14*
*D*

Chief Justice William Rehnquist
United States Supreme Court
Washington  D C  20015

Dear Honorable Judge Rehnquist:

I have been robbed in the United States District Court of the
Southern District of Ohio Western Division of Constitutionally
Guaranteed Rights in Civil Case No  3-79-206  Fritz Hawkins
Plaintiff vs. Ohio Bell Telephone Company  The case was
appealed to the United States Appeals Court for the Sixth
Circuit Case No  84-3575  See Enclosed Documents

As you examine or have examined the enclosed documents  you will
conclude that the two Courts constitute a serious threat to
Constitutional and Human Rights

A highly vocal Media  particularly the Dayton Newspapers refused
to carry anything at all in their News coverage concerning
Civil Case No  3-79-206 or No  84-3575  inspite of the fact
the pictured Van in this package has been on the streets for
approximately one year   It was parked in front of the Dept
of Justice in our National Capitol on Aug  27th and 28th from
9.30 A.M. til 3 P.M. and again on Sept  3rd and 4th  yet the
Media  Washington's Media  refused to pick the story up   The
Media has been silenced  Mr  Chief Justice

My question  Mr  Chief Justice  "Are you going to permit
these Justices that have been appointed for life to continue
their abusive use of power"?

Will you please  Chief Justice Rehnquist  have these cases
reviewed in order to see the corrupt manner in which they
have been handled?

May I please hear from your Office?  I'd gladly return to
our National Capitol to be interviewed

                              Respectfully submitted by a
                              retired Senior Citizen


                              Fritz Hawkins

*SENT    10/20/87 - AS YET  No RESPONSE*

**U.S. Department of Justice**

DMS:KAS:ndg

_____

Washington, D.C. 20530

APR 11 1990

Ms. Sharon Rennick
90 Branch Hill Court
Harrison, Ohio  45030

Dear Ms. Rennick:

Your letter to the Department of Justice stating that you have knowledge of illegal wiretaps has been referred to me.

If you have information concerning conduct which would lead you to believe that a violation of federal law may have occurred, we suggest that you contact the local office of the Federal Bureau of Investigation. That office will be in the best position to determine how to proceed concerning your charges. You should find the telephone number listed inside the front cover of your telephone directory.

Thank you for writing.

Sincerely,

David M. Simonson, Chief
Legal Support Services Unit
Office of Enforcement Operations
Criminal Division

Exhibit 15

EXHiBit #16

March 17, 1989

On this date I have heard the story explained by Sharon M. Rennick in connection with her statement that there is information I should be concerned about in connection with my investigation into illegal wiretapping. If the information provided is pertinent to the case it will be used

John R. Belvey

P, S.
    I have received a copy of a deposition of a transcript from a trial of statements made by Allan Lampey.

**MICHAEL E. MILLER, M.D.**
ONE CLOCK TOWER PLACE
1251 NILLES ROAD
FAIRFIELD, OHIO 45014

TELEPHONE (513) 829-2420

*Exhibit 17*
*1dj*

~~CONFIDENTIAL~~

*for Dr. Fisher only*

July 7, 1990

Elaine Hohman
Lena Saylor
Champion Intl. EAP
Hamilton, Ohio

*CONFIDENTIAL*

Elaine & Lena:

As you both know, I have become reinvolved with the Jerry Carr case as of Friday June 29, 1990. On that day I was contacted about Jerry's letter which stated that he felt like a "time bomb." He and I then scheduled an appointment for July 2, 1990. The following material can be shared with you as I do have a release to contact you, Sheriff Holzberger, and Roger Fischer, Ph.D. Copies of these releases are enclosed for your benefit. Additionally, Sheriff Holzberger and Dr. Fischer will receive copies of this letter.

Mr. Carr was seen on the second of July for evaluation. He evidently quite stressed by the fact that the authorities did not recognize his claim which stated that his name had been forged by someone else on his bills. He had a run-in with McAlpins and was reported to a credit bureau. His attempts to prove forgery of his name included discussions with law enforcement agencies, finally culminating with the Hamilton County Sheriff's department. After a week of investigation they pressed him to take a lie detector test but, for whatever reason, this did not come to fruition. They walked him outside, he stated, and told him he was lucky <u>they</u> did not press charges against him. He became infuriated. As this occurred he became more uptight about his legal action against Champion and the rest of the world and felt like exploding inside, his paranoia now bringing others into his sense of being persecuted. Whenever he interacts with others, in fact, he brings



them into his psychotic world should he become frustrated with them or their ideas. On top of all this, he was upset by learning should another check be garnished at work his job would be terminated.

I learned that he does in fact have a weapon at home. At the time of the interview - July 2, 1990 - I felt that he was not an imminent risk for homicide. That is, was not planning to hurt anyone in the subsequent few days. The potential to explode, however, was enormous. He took great pains to deny any desire or plan to hurt at that time. He stated that should the future deal him a hand in which he loses the battle he is in, he would hurt someone.

I called Dr. Fischer while Jerry was out of the interview room and discussed my concerns. He was therefore seen on July 3, 1990. Dr. Fischer concurred that Jerry was very ill and paranoid. He suggested that we try to break the cycle whereby Jerry felt stressed and recommended psychiatric disability and leaving work. I concurred with such but Jerry balked and assumed Roger was a part of the grand plot against him. I recalled Roger and also contacted Sheriff Holzberger that day in compliance with my Tsarasoff obligation to warn of intent to harm. The two of you were also notified and this letter will be sent certified, return receipt also in compliance of such. The reason for this warning is that after Jerry became angry with Roger (during my phone conversation with Jerry) he restated his frustration with all of us. He said that if this continued he would probably lose it and become violent. He stated that such an act would be spontaneous as he would only do such if presented with no other option. I confronted him and said that just by virtue of his having a long range plan should he become frustrated, he was indeed predicting his own future violence and it was therefore premeditated. He did not rule out the possibility of hurting or killing others.

I recontacted Roger and Sheriff Holzberger and we initiated a 72 hour hold and he was subsequently brought to Rollman's Psychiatric Institute on the 3rd. As of the 6th, Roger told me that he was still institutionalized, awaiting a probate hearing. Roger added that he would probably be transferred to Dartmouth Hospital due to his insurance benefits. A hearing is pending.

CONFIDENTIAL

An interesting prologue to this situation is the fact that there were two mini - protests on the 6th. of July. The first occurred at Roger's office in Hamilton. Evidently a small group of people came to the Forensic Center to protest Jerry's hospitalization. Some of them were recognized by the Forensic staff as active or past psychiatric patients, some of whom had be probated themselves. The second group of eight or ten went to Rollman's and marched around with posters. The posters stated that Jerry Carr should be released and that Champion controls Butler County and/or the psychiatric system here. They also criticized Dr. Fischer.

At this point in time it is a positive step that Jerry might now receive the treatment he has twice refused with me in the past, i.e., antipsychotic medications. The outcome of his court hearing and stay will be interesting. As we discussed on the phone, Elaine, I am recommending that you strongly consider termination of his employment with Champion as his continued presence there only serves to fuel his omnipresent paranoid (psychotic) beliefs and might therefore expose employees to future potential harm. He is indeed a walking timebomb and will remain a thorn in your side for many years to come.

I would like to use this format to thank you two for your excellent response during this crisis and to thank Sheriff Holzberger and Dr. Fischer for their cooperation.

Respectfully yours,

Michael E. Miller, M.D.

cc: Sheriff Hozberger
    Roger Fischer, Ph.D.



# ROGER H. FISHER, PH.D.

CLINICAL PSYCHOLOGIST

222 HIGH STREET
HAMILTON, OHIO 45011
TELEPHONE (513) 896-5064

December 25, 1990

Exhibit 18

Mr. Frank Hawk, Manager
Human Resources and Organizational Development
Champion International Corporation
Knightsbridge Drive
Hamilton, Ohio  45011

Regarding:  **Jerry Carr**

Dear Mr. Hawk:

Please let me summarize for you findings of my recent psychological evaluation of Mr. Jerry Carr.  I interviewed him for about an hour on December 3, 1990.  As you know, at my insistence Mr. Carr was committed for involuntary psychiatric treatment at the Dartmouth Hospital between July 3 and August 23, 1990.  His attending psychiatrist was German V. Prada, M.D., who continues treat Mr. Carr on an out-patient basis.

Mr. Carr was neatly dressed and groomed for interview, though he smells strongly of body odor and cologne.  He is calmer and more rational than when I interviewed him earlier (July 3, 1990), apparently as the result of the removal of work-related stress and the extensive medical treatment he has received (including Haldol, an antipsychotic which he was given during his entire hospital stay and for about two months thereafter; and Prozac, an antidepressant, which he now receives from Dr. Prada).

Since his release from the hospital, Mr. Carr has begun living with his girl friend, Ms. Sharon Rennick, in an apartment in Fairfield.  He is not working but does receive a disability income.  Ms. Rennick, he says, has recently begun working for Glenway Chevrolet.  He says he feels "like a new person" and claims he is eager to return to work for Champion, saying (despite his earlier requests for a transfer to another plant) he now feels he would be very comfortable working again at the B Street facility.

Mr. Frank Hawk
December 26, 1990
Page 2

*Exhibit #18*

Despite significant improvement in his psychological condition, I believe Mr. Carr still manifests many symptoms of a continuing psychiatric illness of substantial proportions. He is still paranoid, though he tends to express his beliefs in a more restrained way. For example, he says his son Kevin (whom I interviewed at length in July after his father was probated) has been turned against Mr. Carr because

> "My mother and my ex-wife put things in his head that are not true. My mom has caused me problems throughout my life. She needs help herself. She has told Kevin that she raised him and that I didn't spend time with him or take care of him."

I also note Mr. Carr still lacks functional insight into his own behavior or the motives for it. He does not openly display as much anger as he did, but has the same delusional system in place. He does admit that his problems working for Champion Papers were caused because "So much anger was built up. But it's all relieved again. I'm a brand new person. I feel like a fog-cloud has lifted." However Mr. Carr still traces all his present difficulties to his (and his girl friend's) discharge from Champion in October, 1984. He was reinstated, but claims he was the victim of intense "harassment" thereafter, including an intentional attempt to run over him with a fork-lift.

For six years, Mr. Carr and his girl friend pursued a law suit against Champion: "I got so wrapped up, it started eating me alive. Sharon kept trying to get me to leave it alone. Maybe it was all over every-day stuff. Maybe I was misinterpreting it all." Though Mr. Carr is able to say that "maybe" he was misinterpreting events, and that "I think I need to talk to several supervisors and apologize" because "They may have been trying to help," and that "I look at people altogether differently now," he still works up considerable agitation discussing these events. He also clings to the same pathological logic about the events, though he has learned to step back from it and say (half-heartedly) "Maybe it was all a mistake."

Similarly, Mr. Carr reports "Stuff made me feel there was a connection" between his being physically assaulted in the parking lot of the Columbia Inn, his law suit against Champion, and problems he reports he has has had with stolen credit cards. He points in particular to the fact the Frost and Jacobs law firm represents not only Champion Papers but also a

Mr. Frank Hawk
December 26, 1990
Page 3

Exhibit 18

number of persons and organizations with whom he has had problems. Such autistic logic reflects Mr. Carr's long standing thought disorder and a tendency to such logic is still a part of Mr. Carr's psychological condition.

**Recommendations:**

Though I do not believe Mr. Carr is actively psychotic at this time, I believe he is still very vulnerable to a relapse into psychotic thinking and behavior. As noted, he is appropriately trying very hard to distance himself from the paranoid delusional system which governed him so totally in the past. Though he has made some progress with this, he still believes much of it--and still feels some sense of grievance at Champion for the injustices which he feels it did to him.

I think the limited extent to which Mr. Carr is able to be calm and rational at this point is due largely to the fact he is physically out of the Champion environment--and that he continues to receive psychiatric treatment and medication. In my opinion he continues to be disabled by his psychological condition. I strongly believe a return to work would exacerbate his symptoms and could very likely precipitate another psychotic episode such as he experienced before his hospitalization.

In summary, though he is improved with continuing psychiatric treatment and medication, Mr. Carr remains mentally ill. He profits from being away from work-related stress. I recommend that his disability be continued and that he not be returned to the work setting. If he were, I believe he still has the potential to be dangerous to himself and others.

Sincerely,

R Fisher

Roger H. Fisher, Ph.D.,
Clinical Psychologist

# MICHAEL E. MILLER, M.D.
### ONE CLOCK TOWER PLACE
### 1251 NILLES ROAD
### FAIRFIELD, OHIO 45014

TELEPHONE (513) 829-2420

*EXhibit 18*

## PATIENT AUTHORIZATION FOR
## RELEASE OF INFORMATION

I, _Jerry Carr_ , do hereby authorize

Michael E. Miller, M.D. to release information to / obtain

information from the following individuals or institutions:

3) ① Tom Knox        ② Sheriff's Dept        ③ Lena Saylor & Elaine Hohman
   Hamilton Police      Butler Cty              Champion Intl.

The purpose of these contacts is to help facilitate my care

and treatment. If there are any restrictions on the information

that I consent to have discussed, I do hereby stipulate that

these include: _none_

This consent is good for a period of _12_ months starting

today. In addition, I may revoke this permission at any time.

Signed: X _Jerry Carr_

Date: _7/2/90_

Witness: _M. Miller, MD_

_I never authorized these medical
releases. Jerry Carr_

**MICHAEL E. MILLER, M.D.**
ONE CLOCK TOWER PLACE
1251 NILLES ROAD
FAIRFIELD, OHIO 45014

TELEPHONE (513) 829-2420

*Exhibit 18*

## PATIENT AUTHORIZATION FOR RELEASE OF INFORMATION

*CONFIDENTIAL*

I, _Jerry Carr_, do hereby authorize

Michael E. Miller, M.D. to release information to / obtain

information from the following individuals or institutions:

_Hal Shepherd (Hamilton City Mgr.) & Roger Fisher, Ph.D._.

The purpose of these contacts is to help facilitate my care

and treatment. If there are any restrictions on the information

that I  consent to have discussed, I do hereby stipulate that

these include: _none_

This consent is good for a period of _12_ months starting

today. In addition, I may revoke this permission at any time.

Signed: _X Jerry Carr_

Date: _7/2/90_

Witness: _M Miller, MD_

*Exhibit 21*

## PSYCHIATRIC EXAMINATION

### ROLLMAN PSYCHIATRIC INSTITUTE

DATE:   7/3/90

**IDENTIFYING INFORMATION:** Jerry Carr is a 47-year-old divorced white male, who was referred from Butler County on emergency admission who is probably going to be probated. This is the first Rollman's admission.

**CHIEF COMPLAINT:** "I have no problem. I'm down here against my wish. As anything I say may be used against me, I have to have a lawyer."

**HISTORY OF PRESENT ILLNESS:** Patient had been employed with Champion International for the last 24 years. He gave his history reluctantly because he maintains that he has been brought to this facility against his wish and insisted he should have a lawyer. On being assured that the role of the physician is to get information pertinent for his welfare and not as an agent of the court, the patient went on to relate how in the last six years, he has been a champion of civil rights for the blacks and how every organ of the state has been used against him in order to liquidate him and put him into unusual expenses. Patient noted the irony of having been brought to the hospital by a black officer only to be interviewed by another black physician. Patient felt that the black race has numbed his efforts and he seems distressed at this.

**PAST HISTORY:** None.

**SOCIAL HISTORY:** The patient lives with his mother and he has done this for the last six years.

**EDUCATION:** Patient has 12 years of education and eight years of skilled trade training. Patient stated that he went through additional training and he is now an electrician with Champion International, a vocation he has had for the last 24 years. Patient until this arrest was still employed.

**MEDICAL HISTORY:** None. Patient stated he had been told he had a blood pressure problem but currently he is not on any medication, or has ever been on any medication.

**MENTAL STATUS EXAMINATION:** On contact, patient looks his stated age. He was calm and neatly groomed. He appeared rather angry. His orientation to the four spheres was intact. Patient described his previous mood as being normal and claimed to have been a born-

---

Carr, Jerry

69 26 50

S. Ayangade, M.D.

DATE   7/20/90

*Exhibit 21*

## PSYCHIATRIC EXAMINATION

## ROLLMAN PSYCHIATRIC INSTITUTE

PAGE 2.                                        DATE:  7/3/90

again Christian, who never hurts a fly. Patient related, however, his mood has changed ever since this harassment. Patient expressed a lot of litigiousness, a lot of paranoid ideation, a lot of delusions, claiming that everywhere he has turned he has been molested by the law officers simply because of what he believed. The patient claimed to have had suits against a variety of people in the state and seems paranoid that everywhere he goes somebody is out to do him in. He noted that he has spent over $50,000 in litigations. He says people have spent on his charge cards and have been drawing his social security benefits. The patient fears he has spent most of his life fighting for the blacks and laments that his civil right is in a backward step; and expresses his surprise that blacks don't even appreciate his efforts; and mentioned how a black psychiatrist also told a lie against him in the court. The patient denies any auditory or visual hallucinations. Patient denied any thought withdrawal or thought insertion. He, however, expresses a lot of delusional material and some grandiosity with some paranoid ideation. Patient's fund of information is adequate. His memory to rote, recent and remote events seems to be intact. Patient denies any suicidal or homicidal ideation, although the record indicated that he has threatened and claimed that he is a time bomb and was about to get a gun to do some people in. Patient's fund of information was adequate. Patient was able to handle similarities and dissimilarities. He was able to do additions and subtractions. His intellectual performance seems to be above average. The patient is articulate and very organized in his delusions. The patient has absolutely no insight into his problem and his judgment is warped at this time.

IMPRESSION:

                        Acute delusional disorder, rule out major
Type.                   affective disorder, probably hypomanic

ASSETS:

                        Work history, good health, and good
                        communication skills.

rr, Jerry

26 50                           S. Ayangade, M.D.

                                DATE  7/20/90

```
============================== ADMISSION RECORD ===================== PAGE 2 OF
                                                                 07/03/90  20:48
                                                                 SYSTEM DATE/TIME

============ GUARDIAN ==============    ======= FAMILY PHYSICIAN ========
```

*Exhibit 21*

```
========================== EMPLOYMENT INFORMATION ==========================

  CHAMPION PAPERS INTERNATIONAL        DATE LAST EMPLOYED: 07/03/1990
                                       EMPLOYMENT STATUS:  FULL TIME
  HAMILTON              OH   45013     OCCUPATION: ELECTRICIAN
    -       -                          INDIGENT:
============================================================================
```

ADMITTING DR.: AYANGADE, SAMUEL            WARD ASSIGNED: 1 WEST
ATTENDING DR.: SLAVIN, MARTIN A
SOCIAL WORKER: NICHOLS, MILDRED B

```
======================== ADMITTING DIAGNOSIS ========================
```

-- AXIS I   P/S/T/R   DESCRIPTION --
   0293.81    P    ORGANIC MENTAL DIS., SEC. 2 - DELUSIONAL SYNDROME
   0296.40    R    BIPOLAR DISORDER, MANIC, UNSPECIFIED
   0000.00

*I was taken at Gun point off the street!*

-- AXIS II  P/S/T/R   DESCRIPTION --
   0V71.09         NO DIAGNOSIS ON AXIS II
   0000.00
   0000.00

*I was never in Fort Hamilton Hughes on Outpatient or*

-- AXIS III  S/T/R   DESCRIPTION --
   0000.00
   0000.00
   0000.00

*Any type patient*

   PHYSICIAN'S COMMENTS:

*This is a Lie!*

```
=========== MOST RECENT NON-ODMH PSYCHIATRIC SERVICES ===========
```

FACILITY:   FORT HAMILTON HUGHES            OUTPATIENT
STREET:                                     DATE IN:    07/90
CITY/ST/ZIP: HAMILTON           OH          DATE OUT:   07/90

FACILITY:
STREET:
CITY/ST/ZIP:                                DATE IN:
                                            DATE OUT:

FACILITY:
STREET:
CITY/ST/ZIP:                                DATE IN:
                                            DATE OUT:

          NO PREVIOUS STATE HOSPITALIZATION ON PCS
  _M.A. Burchard_____    __7-03-90____    __ADm___
  SIGNATURE                            DATE            DEPT.

  PATIENT'S NAME                   PAT. #
  CARR, JERRY                      692650

*EXHIBIT NO 27*

## INFORMED CONSENT FOR MEDICATION

**Status:** ☐ Voluntary  ☐ Voluntary with Guardian  ☐ Incompetent to Stand Trial but Likely to be Restored  ☐ Involuntary  ☐ Involuntary with Guardian

1. I have had the opportunity to discuss this medication with members of my treatment team or treatment staff and had my questions answered.
2. The risks and benefits of this medication were explained to me.
3. The most common side effects were explained to me.
4. If I am to be taking a psychotropic medication, the risks of tardive dyskinesia have been explained to me.
5. If I encounter any side effects, I will report them to the physician or nurse at any time.  If they are not available, I will tell another staff person.
6. Treatment alternatives were discussed with me.
7. I understand that I have the right to accept or refuse medication by informing the physician or nurse at any time.
8. I also understand that if I refuse to take this medication, other hospital staff may be asked to review the proposed medication, and talk to me about my decision.
9. I have had the opportunity to consult with the Client Advocate or any other person before making this decision.
10. I will be kept informed of the progress of my treatment, and also understand that if I consent to this medication, the dosage range may not be increased or changed without my further agreement.

**Consents: the medication explained was:**

| 1. Medication Name | Dosage Range | Route | Frequency Range |
|---|---|---|---|
| Haldol 10 mg tid | 1g — 10 gd | po /in | tid |

| Patient's Signature if Agrees to Take | Date 7/9/90 | ☑ Patient agrees but won't sign. |
|---|---|---|
| Parent's/Guardian's Signature (if applicable) | | Date |
| Witness Signature  M. Flan ml | Date 7/9/90 | Witness Signature  NoGuardian | Date 7/4/90 |

| 2. Medication Name | Dosage Range | Route | Frequency Range |
|---|---|---|---|
| Ativan 2mg bid x/3 | 2gd — 8gd | po /in | BID |

| Patient's Signature if Agrees to Take | Date 7/9/90 | ☑ Patient agrees but won't sign. |
|---|---|---|
| Parent's/Guardian's Signature (if applicable) | | Date |
| Witness Signature  M. Flan ml | Date 7/9/90 | Witness Signature | Date 7/4/90 |

| 3. Medication Name | Dosage Range | Route | Frequency Range |
|---|---|---|---|
| Cogentin 2mg bid | 2x 6gd | po /in | BID |

| Patient's Signature if Agrees to Take | Date | ☑ Patient agrees but won't sign. |
|---|---|---|
| Parent's/Guardian's Signature (if applicable) | | Date |
| Witness Signature  M Flan ml | Date 7/9/90 | Witness Signature  KGuardian | Date 7/4/90 |

Carr, Jerry

692650

**Ward Name** 1 W

**Name and Discipline of Person Providing Information and Date**
M. Flan ml  7/4/90

DMH-0528  (4/87)

## INFORMED CONSENT FOR MEDICATION
DMH-MedR-1016A

✱ Mr. Carr Refused to sign consent.
✱ Mr. Carr was Held down and forced injections!

Exhibit 21

## INTERDISCIPLINARY PROGRESS NOTES

| Date & Time | Document significant events during clients course of treatment; implementation of treatment plan and response to treatment. Sign and title all notes. | Dept. or Discipline |
|---|---|---|
| | which he works and the State of Ohio. He doesn't wish this S.W. to contact his mother — he is only willing for S.W. to talk to Sharon Rennicke, 738-2837, the woman whom he states is involved in the suit c̄ him. M. Nichols, S.W. | |
| 7/5/90 2:40 pm | Social Service Note: Contact made c̄ Sharon Rennicke who verifies info. rec. from Client. Ms. Rennicke is an employee of Champion Paper Co. that is apparently connected with the pending law suit. M. Nichols, S.W. | |
| 7/5/90 6 pm | Pt. refused dinner. Pastor visited & brought meal from McDonald which he ate. Spoke c̄ Client who explained his situation as stated above per Social Service Note. Pt. interactive, pleasant, friendly, cooperative. ——— C.R.N.A.N. | |
| 7/5/90 6:59 PM | Prog Note. Pt. is engaged in a vicious struggle c̄ a company — his union. He has pulled to a low firm. The quash is he has must skills he this undergo. It doesn't appear psych. It is logical | reflected M. Lamme |

Carr Jerry

692650

DMH-0008   Rev. 7/82

(continue on reverse side)

Exh 21

## INTERDISCIPLINARY PROGRESS NOTES

| Date & Time | Document significant events during clients course of treatment; implementation of treatment plan and response to treatment. Sign and title all notes. | Dept. or Discipline |
|---|---|---|
| 7/3 | Admission note | |
| | 47 yr old divorced white male referred from Butte County on Emergency hold (? Probate) Patient who insisted on having his lawyer before he could talk to me gave a catalogue of a world-wide hatched conspiracy to liquidate him on account of sticking up for the black race. | |
| | Patient is well oriented - but grossly delusional and paranoid, grandiose. denies suicidal or homicidal ideation. Patient lacks insight, is litigious and suspicious. Judgement is poor. | |
| | Delusional Disorder R/O Major affective D/O | |
| | [signature] | |

[signature]
[date] 11-9-02

692650

(continue on reverse side)

DMH-0008    Rev. 7/82

**INTERDISCIPLINARY PROGRESS NOTES**
DMH-MedR-1007

# CERTIFICATE OF EXAMINATION *Exh 21*

### In accordance wih Section 5122.11 O.R.C.

| Person's Name | | Age | Sex | Race | Date of Birth | Place of Birth |
|---|---|---|---|---|---|---|
| Jerry Carr | | 47 | M | W | 11-09-42 | |

Person's Address (street, city, county, state, and zip code)
1261 Southern Hills, Hamilton, Ohio  45013   (Butler County)

The undersigned certifies that he/they is/are a psychiatrist or a licensed clinical psychologist and a licensed physician (underline as appropriate) of the State of Ohio, and that the following are facts relating to the examination of the above named person.

I further certify that I have with care and diligence personally observed and examined the named person on the ...third... day of ...July... in the year 19..90..A.D.

That said person was examined at (*state place*)...........................................................................

and as a result of such examination, I believe said person............................(*enter* IS *or* IS NOT *as applicable*) mentally ill and subject to hospitalization by Court order.

REMARKS — *Please report your findings which support your recommendations for admission. Please indicate any physical or mental condition demanding the immediate attention of the admitting hospital. (i.e., withdrawal symptoms due to addiction, need for insulin, recent severe head injury, tuberculosis, or other information examining physician considers important) Use reverse side if necessary.*

Mr. Carr is a 47-yr-old divorced white male.  He is extremely paranoid and litigious. He is currently in the process of suing Champion Papers and 135 other defendants for $250,000,000.  He also has a grievance against Frost & Jacobs Law Firm in Cincinnati-- and nearly everyone else whom he comes in contact with.  His paranoid delusional system is very inclusive and broad.  Recently, the patient says he wrote a letter to Champion Papers informing them that he is "a walking time bomb"and that they must award him a large sum of money or suffer the consequences.  In interview today he informs me he has recently purchased a gun which he keeps at home or carries with him "for protection."  I believe this man is seriously & severely mentally ill.  His diagnosis is Paranoid Delusional Disorder.  I believe his condition is exacerbated by stress.  Given enough stress I believe he could act out violently on his paranoid delusions.  Thus I consider him dangerous and in need of involuntary hospitalization.

Name and Title .................................M.D.    Name and Title ..*Roger H. Fisher, Ph.D.*...
                                                      Roger H. Fisher, Ph.D.,
Address ..................................................    Address ......Clinical Psychologist #149..
                                                      Forensic Center
License number ......................................    License number ..#149......................

Signed in the presence of ..*Debra Sims*.................................................... this ..6 *th*.. day of
....*July*.......................... in the year 19.*90*. A.D.

The undersigned certifies, under oath, that the person has refused to submit to an examination by a psychiatrist, or by a licensed clinical psychologist and licensed physician.

Name .............................................................................

Address .........................................................................

License Number ...............................................................

Signed in the presence of..................................................................... this ............... day of

.......................................... in the year 19.......... A.D.

MA-13

CERTIFICATE OF EXAMINATION
Rev. 8-76
MHMR

FOLLMAN PSYCHIATRIC INSTITUTE
DEPARTMENT OF NURSING
NURSING ASSESSMENT

*Exh. 21*

HISTORY OF PRESENT PROBLEMS

Reason for Admission (from documentation) _Process of suing Champion Paper #135 other dependants for $250,000,000. Grievance against Frost and Jacobs & nearly everyone else in State of Ohio. Has purchased gun for protection_

Factors Precipitating Hospitalization (in patient's own words) _Filed law suit against employer (Champion Paper) same ones that were involved to illegiate. Suing Champion #135 other defendants for 250,000,000. this grievance against Frost and Jacobs Law Firm_

When did problem begin? _1984_

Symptoms? _afraid of bodily harmor being shut up_

Have you had this problem before? _no_          When? _____

Previous Psychiatric Treatment? _no_

Hospitalized? _no_          Last Discharge Date: _____

MEDICAL HISTORY

Identify any significant illness/injury/surgeries? _three times Bit large portion of ear "Off because of this."_

Current Treatment? _none_

Medications used prior to admission: (include prescription and non-prescription drugs)

| MEDICATION | DOSE | FREQUENCY | REASON | TIME OF LAST DOSE |
|---|---|---|---|---|
| none | | | | |

Understands the need for medication:  Yes _____  No ✓

ALLERGIES (Drug, food, environmental) _none_

Reaction: _____

-2-

ROLLMAN PSYCHIATRIC INSTITUTE
DEPARTMENT OF NURSING
NURSING ASSESSMENT

*Exh. 21*

ALCOHOL USE   Yes *a whim* No
Amount per day ___ Type *Beer Wine likes __* Last Drink *1-2 mo. ago*
Blackouts: Yes/no:  If Yes, described: *n.l.__*
Presence/history of withdrawal symptoms/DTs: Yes/NO: Described: *n.l.__*

ILLICIT DRUG USE  Yes/No:  If Yes, complete the following: *n.l.__*
Type_____ Amount/Day _____ Frequency: _____
Duration: _____ Last Use: _____
Presence/history of withdrawal symptoms: Yes/NO: Describe: _____

FAMILY HISTORY
Have grandparents, parents, siblings or children had any of the following:

|  | Yes | No | Uncertain |
|---|---|---|---|
| Emotional problems | ( ) | (✓) | ( ) |
| Alcohol abuse | ( ) | (✓) | ( ) |
| Suicide attempts | ✓ | | |

REVIEW OF SYSTEMS

| REST/SLEEP | YES | NO | UNCERTAIN | |
|---|---|---|---|---|
| Average Hours of Sleep | | | | |
| restful sleep | ( ) | (✓) | ( ) | 3 hrs |
| Difficulty falling asleep | (✓) | ( ) | ( ) | |
| Interrupted sleep | (✓) | ( ) | ( ) | |

| PAIN | | | | |
|---|---|---|---|---|
| Presence of pain | ( ) | ( ) | ( ) | (R) wrist bruised from handcuffs |
| Does anything relieve | ( ) | (✓) | ( ) | |
| Does anything worsen | ( ) | (✓) | ( ) | |

| GASTRO-INTESTINAL | | | | |
|---|---|---|---|---|
| Special diet/preference | ( ) | (✓) | ( ) | |
| Appetite | (✓) | ( ) | ( ) | Excessive, Good, Poor, Absent |
| Weight Gain | ( ) | (✓) | ( ) | Amount |
| Weight loss | ( ) | (✓) | ( ) | Amount |
| Difficulty swallowing | ( ) | (✓) | ( ) | |
| Difficulty chewing | ( ) | (✓) | ( ) | |
| Bowels - regular | ( ) | (✓) | ( ) | |

| GENITO-URINARY | | | |
|---|---|---|---|
| Incontinence | ( ) | (✓) | ( ) |
| Dysuria | ( ) | (✓) | ( ) |
| Hematuria | ( ) | (✓) | ( ) |
| UTI (present or history of) | ( ) | (✓) | ( ) |
| VD (present or history of) | ( ) | (✓) | ( ) |

Carr, Jerry
DOB 11-9-42   692650

-3-

R.P.I.-M-NUR-200
Revised 2/8/89

*Rollmans Mental Institute*

### INTERDISCIPLINARY PROGRESS NOTES          Exh 21

| Date & Time | Document significant events during clients course of treatment; implementation of treatment plan and response to treatment. Sign and title all notes. | Dept or Disciplin |
|---|---|---|
| 7-5-70 | PSYCHOLOGY — Initial Notes. | |
| 8:30 AM | Pt. sleeping when I saw, seem to have continuing begun adjustment to milieu, On Ed., is not yet outwardly [illegible], much by [illegible]. Need to [illegible] the issues of dangerousness and the possible need to [illegible] if Mr. [illegible] has not yet done so. Diagnostically, this may have begun as reactive and [an effective treatment], but has [illegible] moving towards [illegible], thought [illegible] keep to follow + rule out [illegible] schizophrenic outbreak. On observing on other [illegible], will [illegible] approaching for projective testing if he will comply and [illegible]? [illegible] Clinical Psychology | |
| 7/5/90 | 12:00 na  Pt up + about the unit, stays to himself, went down for 1 meal. 72-Hr [illegible] [illegible] | |
| 7/5/90 | pm Social Service Note: Spoke to Client who denies anything is wrong with him — views his hospitalization as an effort on the part of authorities to discredit any actions he's taking against the company for | |

INTERDISCIPLINARY PROGRESS NOTES    Exh 21

| Date & Time | Document significant events during clients course of treatment; implementation of treatment plan and response to treatment. Sign and title all notes. | Dept / Discipline |
|---|---|---|
| | Progress Note (continued) to hopefully test the patient. Also Dr. Slavin feels that a neutral psychiatrist as well may be recommended due to patients current feelings of distrust — | C.R.A. |
| 2/6/90 12²⁷p | Pt came up to talk to staff psychologist. Pt is very agitated stated "I want the social security numbers of all the staff that work here. I'm going to sue this hospital." | |
| 2/6/90 3:00 pm | Social Services discharge Note: Rec. info. from Adm. Office that Client had been probated since arrangements have been made for his transfer to Dittmonts Hosp. in Dayton via Shoemaker ambulance. Client was advised of the arrangement — he doesn't want family notified because he stated "I have nothing to do with my family" — He also refused to sign form for withdrawal of his $30.00 from the business office. Mr. Nichols, SW. | |
| 2/6/90 ³° | Pt transferred to other facility per Shoemaker. Pt refuses to keep his clothes & personal effects. Business office above. Will send money for Certified check after Our business office. | |
| 7-9-90 4⁴⁵ Pm | Nursing discharge summary — Patient admitted from Butler in a very exhausted state. | |

OMH-MedR-1007

*Exh. 21*

FOLLMAN PSYCHIATRIC INSTITUTE
DEPARTMENT OF NURSING

NURSING ASSESSMENT

Strengths and assets (list strong points, self-likes, etc.) _____

_would not answer_

_____

_____

_____

Feelings about illness and hospitalization: _____

_Down here against my will. Subjecting me to a lot of lies_

_____

Additional Comments: _None_

_____

_____

_____

_____

Record attempts to complete assessment interview:  Indicate name, date and time.

_Attempted_  7-3-90  8:10 pm
_____              _____
R.N. Signature        Date/time            R.N. Signature        Date/time

_____              _____
R.N. Signature        Date/time            R.N. Signature        Date/time

_____              _____
R.N. Signature        Date/Time            R.N. Signature        Date/time

INITIAL CARE PLAN:  See Attached Sheet

-6-

EXh 21

## PSYCHIATRIC EXAMINATION

## ROLLMAN PSYCHIATRIC INSTITUTE

PAGE 3.

DATE:  7/3/90

DEGREE OF DANGER:                    Significant but minimal at this time.
                                     Patient will be kept on escape precautions.

D:  07/03/90
T:  07/05/90
SA/kbn:MTCO


Carr, Jerry

69 26 50


S. Ayangade, M.D.


DATE


PSYCHIATRIC EXAMINATION



*Exh. 21*

To Whom It May Concern,

This is a report on Mr. Jerry Lee Carr, 47 year old, white male, admitted to The Dartmouth Hospital as an order of detention from Probated Court of Butler County, Ohio on 7-6-90.

The patient was examined by his examiner on 7-7-90 and found him superficially cooperative, his speech was fluent and informative with a slight increase in tone and speed. His thought process was well integrated but extraordinarily contaminated with fixed ideation of the paranoid kind about a "set-up" from his Company and multiple lawsuits that involved over 135 persons. His paranoid thinking has been impairing his functioning to the point that he was not sleeping, he was not eating, and has been for the past 6 years completely obsessed over this multiple lawsuit. His mood was depressed. He was anxious and became agitated at some point of the interview to the point that he became hostile to this examiner.

Impression
1.  Paranoid Psychosis
2.  psychosocial stressors of extraordinary proportions
3.  Global Assessment of Functioning of 20 (very low).

Conclusion,
Mr. Carr is suffering from extraordinary stress producing a Paranoid Psychosis that needs to be treated in an inpatient setting. This paranoid psychosis has been impairing his livelihood to the point that he has been impairing his life by not sleeping and not eating. He is in need of medication that he refused to take. I did not find suicidal or homicidal ideation, nor hallucinations. He has impaired reality testing. He has need of continued skilled observation. He has incapacitating anxiety and depression and has been impaired in his social and familial functioning as well as his judgement.

Recommendation to continue hospitalization with psychotropic medication.

Present medication: Haldol Decanoate 50mg was given injectable I.M. on 7-7-90. Also he continues with Haldol orally on a daily basis that had been reduced to 20mg HS today, and Cogentin which had been reduced to 1mg bid.

Sincerely,

German V. Prada, M.D.

5350 Lamme Road • Dayton, Ohio 45439 • (513) 299-9511
Accredited by the Joint Commission on Accreditation of Hospitals

EXHIBIT #21

# FOR THE RECORD

Journal-News

Wednesday, May 9, 20[...]

**LOCAL**

**CALENDAR**

# Forensic Center declines to press charges

## Former employee accused of falsifying information, forging doctors' signatures

By Jessica Brown
Butler County Bureau

HAMILTON

The Butler County Center for Forensic Psychology will not pursue charges against a former employee accused of falsifying information and forging doctors' signatures on medical reports used in Probate Court.

"The forensic center did not wish to prosecute," said Hamilton police Public Affairs Officer Dave Crawford on Tuesday.

He added the police investigation was completed by Monday.

He said he could not reveal the employee's name or details of the investigation, nor could he say what the potential charges would have been.

Kenneth Tepe, the center's chief clinical officer, was unavailable for comment Tuesday.

The center is a contract agency for the county Mental Health Board, which processes psychologists' reports on clients who have been court ordered to receive mental health care.

Mental Health Board Director John Staup filed the complaint in March after it was discovered that the employee allegedly falsified information and forged signatures on medical reports for Probate Court hearings.

He said he couldn't comment on the decision not to pursue charges without knowing the reasoning behind it.

Staup added that the case might not be completely closed yet. He said since out of the five alleged forgeries and falsifications, one involved the Comprehensive Counseling Center in Middletown and one involved the Butler Behavioral Health Services Inc. that has an office in Fairfield, the police departments in those areas may also have investigations underway. The other three incidents stemmed from reports generated at the forensic center in Hamilton.

Fairfield police, Lt. Ken Colburn said on Tuesday he was not aware of any investigation into the matter by his department. Likewise, Middletown police Chief Bill Becker was unable Tuesday evening to confirm any investigation.

The employee was fired after the incidents were discovered, and clients in all five cases received a new hearing, Staup said.

# TFA

Bellevue
103 Landmark Dr.
#240
Bellevue, KY
41073

(606) 292-3900

West Chester
7334 Kingsgate Way
West Chester, OH
45069

(513) 777-3333

7-26-01

Michael Hogan
Director of Mental Health
Department of Mental Health
30 E - Broad St -
Columbus, Ohio 43266- 0414

Exhibit 22

Dear Auditor Hogan,

I have been treating Mr. Jury Carr (11/9/42) (288- 36- 6157) for symptoms of unresolved Post Traumatic Stress Disorder as a result of an unlawful probate detention to Rollman Psychiatric Institute July 3, 1990. We are writing to request an investigation into this probate status and how it was derived - Dr. Michael Miller and Dr. Roger Fisher of Butler County sign the probate order and Mr. Carr has true to obtain information without avail. Your input investigative approach would be greatly appreciated - Looking forward to a reply, contact me at 513- 777-3333

Joy Arthur LI
Faye H Pass LI

Exhibit 23

Settlement Proposal                    6-25-90

Item 1) $500,000.00 in a cashiers check or terminate my employment with Champion Int. for $750,000.00.

Item 2) If I remain at Champion Int., I want a salary position with job security or a transfer to another Champion location of my choice and job security there.

Item 3) Employment for my son Kevin, who was denied employment.

Item 4) Toyota and Bill Woecte replace my Toyota Supra with a 1991 Corvette.

Item 5) Clean up my bad credit.

In exchange for the aforementioned proposals, I will dismiss my claims against all Defendants. This of course is providing the Defendants do not seek Action or any kind of claim including attorney fees or costs of any kind.

Exh 23

If the aforementioned proposals are met the Plaintiff will never discuss this action with anyone. If this proposal is not answered by the end of the working day Thursday 6/28-90, this proposal is voided and will not be offered again.

Jerry Carr 6/25/90

Exh 23

# Settlement Proposal                6·25·90

Item 1) $750,000.00 in a Cashiers Check.

Item 2) Clean up my bad Credit.

Item 3) Clean up my police record from the Wa Wa Jones incident.

In exchange for the aforementioned Items, Plaintiff will dismiss her action against all Defendants. This is on the condition all Defendants dismiss any claims now or in the future against the Plaintiffs This includes attorney fees and any Cost. If the above Items are agreeable the Plaintiff will never discuss this action with anyone.

If this proposal is not answered by the end of the working day Thursday 6·28·90, this proposal will then be voided and not offered again.

Sharon Rennich  6/25/90

**U.S. Department of Justice**

Civil Rights Division

---

ANM:kc:amb
DJ 144-58-0

*Criminal Section - PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

Exhibit 24

MAR 30 2005

Mr. Jerry Carr
Ms. Sharon Carr
1261 So. Hills Blvd.
Hamilton, OH  45013

Dear Mr. and Ms. Carr:

This is in response to telephone calls to our staff on
February 26, 2004, and April 4, 2004, and the package of
documents you furnished to us.  You alleged numerous civil rights
violations committed by physicians, mental health specialists,
federal judges and magistrates, and a law firm located in
Cincinnati.  You stated that in 1984, Ms. Carr was wrongfully
terminated by her employer in violation of her civil rights.  You
have also stated that your involuntary commitment in 1990
violated your civil rights and you allege a general complaint of
obstruction of justice by various government entities.  You also
allege civil rights violations because you need prior court
approval to file your pleadings and you need to seek the
permission from federal judges in order to file any lawsuits.

The Criminal Section of the Civil Rights Division has the
responsibility of enforcing federal criminal civil rights
statutes.  The enforcement activity involves deprivation of civil
rights under color of law, generally police brutality (18 U.S.C.
§§ 241 and 242).  Remaining enforcement efforts are directed at
the forcible interference of specifically enumerated federally
protected activities based upon race, color, religion and
national origin (18 U.S.C. §§ 245, 247 and 42 U.S.C. § 3631),
as well as allegations of human trafficking, forced labor,
involuntary servitude or peonage (18 U.S.C. § 1581, § 1584,
§§ 1589-1594) and forcible interference with clinics under the
Freedom of Access to Clinic Entrances Act (18 U.S.C. § 248).

*Exh 24*

- 2 -

    We have carefully reviewed the information you submitted, and concluded that there is no prosecutable violation of federal criminal civil rights statutes.  In addition, the five-year statute of limitations prohibits any action on this matter.

    We note from your attachments that you have exhausted your efforts to seek legal assistance for your situation. Unfortunately, we are unable to assist you.  Thank you for bringing this matter to our attention.

                   Sincerely,

                   Albert N. Moskowitz
                    Section Chief
                   Criminal Section
                  Civil Rights Division

       By:

                    Kevin Callahan
                 Paralegal Specialist
                 Criminal Section

*X 24*



# Ohio Legal Rights Service

8 East Long Street, Suite 500, Columbus, Ohio 43215-2999

Telephone 614-466-7264
TOLL FREE 1-800-282-9181
TTY TOLL FREE 1-800-858-3542
FAX 614-644-1888

August 8, 2003

Mr. Jerry Carr
8296 Stahley Drive
Cincinnati, Ohio 45239

Dear Mr. Carr:

You contacted Ohio Legal Rights Service (OLRS) regarding issues involving your former employer and the circumstances leading to your civil commitment. OLRS agreed to review the information that you provided to us and to review the court file in the Butler County Probate Court.

With your signed consent, I reviewed the court file on July 30, 2003. You had alleged that the judge had not signed the commitment order. When I reviewed the file, I observed that the order was in fact signed by Judge Bruewer.

A hearing was held before the magistrate in your case. This occurred in the summer of 1990. You had an attorney who represented you at the hearing. Based in part on the testimony of Dr. Prada, your treating physician, you were found subject to civil commitment. Dr. Prada's report stated that you were experiencing paranoid psychosis as result of extraordinary stress.

There was an irregularity in your case. Dr. Fisher, who you allege to have been working with your former employer to silence you, was appointed as the independent expert in your case. Since Dr. Fisher had signed the initial affidavit, this was error that might have been grounds for a successful appeal at the time. However, the time for filing an appeal has long since expired. A notice of appeal must be filed within 30 days of the judgment.

For these reasons, OLRS will not be able to provide further assistance with your case. I have closed your case with us at this time. Enclosed you will find the originals of the documents that you have sent to me. If you

| CASE NUMBER: | 37989 | CLIENT NUMBER: | 37769 |
| CASE NAME: | CARR, JERRY | | |

*X24*

**PROBLEM DESCRIPTION**

CLIENT WAS PUT IN FACILITY AGAISNT HIS WILL AND AN UNLAWFULLY. EMPLOYEED SAID THE CLIENT NEEDED TO GO FOR A PHYSCHIATRIC EVALUATION...WANTS TO GET THE MENTAL ILLNESS WHICH WAS LABELEDAS WENT WAS SENT TO THE PSYCH EVALUATION.....AND WANT THE LABEL OF MENTALLY ILL TAKEN OFF OF HIS NAME AND WANTS TO KNOW HOW HE COULD GO ABOUT DOING THIS. ALL THIS TOOK PLACE 13 YEARS AGO AND HAS BEEN FIGHTING WITH EVERY SINCE.....

**ASSIGNMENT NOTES**

**SUPERVISOR NOTES**

**CLOSING COMMENTS**

---

**APPEAL**

APPEALED? ☐ Yes    DATE:                DECISION DATE:                OUTCOME: ○ Upheld    ○ Denied

Grievance

| CASE NUMBER: | 37989 | CLIENT NUMBER: | 37769 |

X24

CASE NAME:  CARR, JERRY

| PROPOSED MEETING | | | | |
|---|---|---|---|---|
| DATE | TIME | GRIEVANCE CTE. | ADDITIONAL STAFF | CTE. DECISION |
| 04/16/03 | | ☒ MK/WEW/TT/JTF | fw | ○ Upheld  ◉ Denie |
| ACTUAL MEETING | | ROUTE TO | FUND | |
| DATE | | jrh | MH | ☐ Document(s) attached |
| 09/03 | | | | |

## CLIENT

| FIRST NAME | INTAKE STAFF: JRH | INTAKE DATE: | 4/8/2003 |
|---|---|---|---|
| JERRY | M.I.   LAST NAME | PHONE | |
| ADDRESS | CARR | 513-385-1428 | |

ADDRESS

8296 STAHLEY DRIVE

| CITY | STATE | ZIP | FACILITY NAME |
|---|---|---|---|
| CINCINNATI | OH | 45239 | |
| ALTERNATIVE FORMAT NEEDED? | | | WARD |

## SOURCE

| FIRST NAME | MIDDLE | LAST NAME | PHONE |
|---|---|---|---|

ADDRESS

SOURCE RELATIONSHIP

| CITY | STATE | ZIP | ALTERNATIVE FORMAT NEEDED? |
|---|---|---|---|
| | OH | | |

**GRIEVANCE PROBLEM DESCRIPTION**

Client left voice message with JRH stating that he wants to file a grievance. JRH advised thatt we would not be able to file a lawsuit on his beahlf. Client states that he was illegally hospitalized, that the judge left the room and did not sign the order. He was at first held for five days and forcibly medicated and given no food or water. He was then transferred to a private hospital near Dayton. This occurred about 10 years ago.

Issues stem from a work situation. He was a union steward. Another employee came to him for help involving issues of racisim at the plant. He was fired but got his job back through arbitration. The other person was denied. Both filed lawsuits. He states that his attorney did not put forth evidence of KKK involvement. After he got his job back, he was hospitalized after the company set up a meeting with a psychologist. Client taped the meeting. The psychologist recently lost his license for dishonesty. No attorney in the Cincinnati area will take the case. Client has had a motion filed against him in federal court labeling him a "bad faith" litigator.

Client wants to submit formal grievance in writing.

## ORIGINAL CASE

| CASE NUMBER | DISABILITY | STAFF | AGE | AGE GROUP | |
|---|---|---|---|---|---|
| 37769 | Mental Illness | | 60 | (60-64) | ☐ CW Closed |

1

4/11/2003

**U.S. Department of Justice**

Criminal Division

*X24*

---

*Washington, D.C. 20530*

FEB 20 2003

Sharon and Jerry Carr
4745 Appaloosa Trail
Mason, Ohio 45040

Dear Mr. And Mrs. Carr:

This is in reply to your letter of May 11, 2002, to the Attorney General, in which you allege that federal Judges, Magistrates and a private law firm have engaged in criminal misconduct.

If you have evidence of a federal crime, you should report this information to the local office of the Federal Bureau of Investigation. The FBI is the component of the United States Department of Justice that is responsible for investigating possible federal crimes. However, since you indicate dissatisfaction with the responses of local, state, and federal agencies that you have contacted, you may wish to write to the FBI's Washington Headquarters, at the following address: Federal Bureau of Investigation, J. Edgar Hoover Building, 935 Pennsylvania Avenue, NW, Washington, DC 20535-0001.

Thank you for bringing this matter to our attention.

Sincerely,

Lisa Frank
Supervisory Litigation Support
 Specialist
Public Integrity Section

a. ott

April 30, 20

X 24

## Attention Special Agents Rick Coy and Anthony C. OTT.

Now Comes Sharon M. Carr (formerly Sharon Rennick) 4745 Appaloosa Trail, Mason, Ohio 4504

Mrs. Carr is requesting a formal investigation and charges of "Obstruction of Justice" be filed against the following indiviuals and under the following Codes:

1.) George Yund of Frost & Jacobs Law Firm
2.) Frost & Jacobs Law Firm
3.) Judge Jack Sherman
4.) Leonard Green Clerk of Courts
5.) Randy Freeking formerly of Frost & Jacobs
6.) Judge Herman Weber

Mrs. Carr is requesting the following charges be filed against the aforementioned indiviuals:

18 U.S.C. 1503 "Obstruction of Justice"
18 U.S.C. 1512 Tampering with a witness or victim
18 U.S.C. 1513 Retaliating against victim

Mrs. Carrs' complaints stem from a Civil Right Law Suit in 1984 with Champion Int. Corp. and Mrs. Carrs' Rights to this day have denied.

Reprimands for telling Ms. Rennick to "quit play grab ass with the niggers" Ms. Rennick was trying her own Civil Rights Suit for five days in Federal without an attorney to represent her. Judge Weber took her attorney away and made Ms. Rennick try her own case for 5 days in Federal Court. Mr. Carr a witness for Ms. Rennick was also threatened before this case was tried, by the Ku Klux Klan, and this was not allowed to be entered, Attached is a copy Federal Supoenas were not served, so some of Ms. Rennicks witnesses did not even show up for trial.

Ms. Rennick and Jerry Carr, Knowing they were wronged by the court and Frost & Jacobs, filed a RICCO suit on Nov. 6, 1989 in ColumBus Ohio, Case # C-1-89-749. This suit was filed in ColumBus because Frost & Jacobs indeed showed they controlled the Federal Courts at least in Cincinnati, Ohio, as Mr. Lampley stated in Court.

On July 3, 1990, Mr. Carr was "Unlawfully put in Rollsmans Mental Inst" to discredit him as a "Nut".

Ms. Rennick (now Mrs. Carr) and Jerry Carr have been persuing this "Cover Up" of Racism in Cincinnati in the Federal Courts.

24

Most Recently Mrs. Carr hired attorney James Whitaker of Mason to represent Mrs. Carr in a Civil Rights case against Joe Kidd Colerain Dodge. The case Carr vs. Colerain Dodge was being heard by Judge Jack Sherman. Mrs. Carr and Jerry Carr sued Judge Sherman in the RICCO Act Case # C-1-89-749 and yet Judge Sherman refused to "Recuse himself from Mrs. Carrs' Case. See James Whitakers motion telling Judge Sherman he must Recuse himself from her case. Judge Sherman refused and went on to "Dismiss with Prejudice her Case on a false affadavid from Colerain Dodge at Summary Judgement. Mr. Whitaker was outraged and ask for a Review of the case with Judge Susan DLott.

Mr. Whitaker went to that meeting in April 2001 and was as Mr. Whitaker admitted he was "Bitch Smacked" by Frost & Jacobs Georg Yund and made to withdraw from Mrs. Carr case. Mrs. Carr has a tape Recording of Mr. Whitaker admitting this on tape. Mr. Whitaker going on states its Looks Like RICCO Act needs to be filed. On May 14, 2001, Mr. Whitaker sent Mrs. Carr a Letter stating "Your Lawsuit (RICCO Ac C-1-89-749 involving the Federal Judges and Magistrates, I find it Unreasonably difficult to continue to Represent you in these matters.

MR. Whitaker at this time was also representin Mrs. Carr against Tom Sweeney Nissan at the Kings Auto Mall. MR. Whitaker withdrew from that case also, citing the same reasons of prejudic towards Mrs. Carr and Mr. Carr in the Courts.

At Tom Sweeneys Mrs. Carr witnessed employee harrassing a male employee named Chuck Moore MR. Moore is married to an AFRICAN AMERICAN woman. Once the white male co-workers found that out, they (employees) started referring to African Americans as "Porch Monkeys." Nigger MR. Moore complained to management about "the "Racial Slurs", they fired MR. Moore on "Martin Luther King Day" symbolic for his Love of African Americans. Mrs. Carr being a witness for MR. Moore was then harrassed and fired for to long a lunch break. Attached is MR. Moores' letter referring to the Porch Monkeys and the police report where Mrs. Carr had to called the police to Tom Sweeneys Dealership for protection. On Jan. 26, 2001, Carr vs Tom Sweeney, MR. Whitaker is warning Ms. Brennan that there is an Ethical problem with her and her Law Firm. Thompson, Hine & Florey. Frost & Jacobs has legal ties to Thompson, Hine & Florey.

The Federal Courts continue through Frost & Jacobs Assocation of people in High Places

that control the Courts Remain prejudice against Mrs. Carr and Jerry Carr for standing up against Racism. These people aforementioned in this complaint are Corrupt and need to be brought to Justice.

The races in Cincinnati and any other city will never get along and find harmony as Long as Corrupt Judges and Corrupt Attorneys Like George ~~Young~~ Yund, Randy Freking and Debra Brennan continue their corrupt practice of suppressing Racial Discrimination in the Federal Courts.

Mrs. Carr has more evidence including tape Recordings to prove her claims.

We Sharon Carr & Jerry Carr fear for our safety.

I, Sharon Carr, swear all of the aforementioned is truthful and factual.

Sharon Carr
4745 Appaloosa Trail
Mason Ohio 45040
513 573-0200

April 30, 20
24

Attention Special Agents, Rick Coy and
Anthony C. OTT.

On April 22, 2002, Sharon Carr and
Jerry Carr met with Mr. OTT to file formal
charges of Obstruction of Justice and
Unlawful Detention. Mr. OTT indicated
these charges must be put in writing.

Now comes Jerry Lee Carr, 4745 Appaloosa
Trail, Mason, Ohio 45040.
Mr. Carr is Requesting a formal in-
-vestigation and charges of "Obstruction of
Justice" and "Unlawful Detention" under
U.S. Code Title 18 Chapter 73 Section 1512 and
1513 to be filed by the F.B.I. against the
following individuals:

1.) George Yund of Frost & Jacobs Law Firm.
2.) Dr. Michael Miller M.D., Fairfield, Ohio 45014
3.) Dr. Roger H. Fisher PH.D, Fairfield, Ohio 45014
4.) Frost & Jacobs Law Firm

Mr. Carr also Request Title 42, Chapter 21
Civil Rights, Section 1985. Conspiracy to interfere
with Civil Rights to be applied also.
Statue(2) If two or more person in any
state or territory conspire to deter, by force

intimidation or threat any party, witness in any court of the United States from attending such court or from testifying to any matter pending therein, freely, fully and truthfully or to injure such party or witness in his person or property.

Mr. Carr in and on Nov. 6, 1989 filed a Criminal and Civil RICCO Act - case # C.1-89-7 and amended complaint case # C2-90-360 on July 16, 1990.

In order to dismiss these RICCO cases George Yund, Michael Miller and Roger Fisher conspired to discredit Mr. Carr, Label him a mental case and then dismiss the RICCO suit. Mr. Carr has supporting evidence in his possession including tape recordings. Mr. Carr was arrested at gunpoint by eight police officers. Mr. Carr was taken to Rollmans Mental Inst. on 72 hr. hold. Mr. Carr was held 4 days not 3 and was constantly injected against his will with drugs. On the 5th day, Mr. Carr was taken to Butler County Court for a Probate hearing. Judge Henry Bruewer refused to participate, so an attorney was brought in from out in the Lobby to Probate Mr. Carr to Dartmouth Hospital in Dayton. Mr. Carr was kept there for about 3 months until the RICCO suit was

dismissed, then Mr. Carr was Released. In May 2001, Mr. Carr was finally allowed his forensic Records. On a Fax Transmittal Document Cover Page, it shows the contact person Dr. Fisher (in his handwriting) at the bottom of the page is George Yunds' name phone # and his company Frost & Jacobs. Then the next page shows a copy of the RICCO Suit with again Dr. Fishers handwriting circeling the RICCO case # and writing Judge Manos' name and phone # in Cleveland and Columbus, Ohio.

Mr. Carr cannot begin to put all of his evidence, including tape recordings in this package.

Mr. Carr and Mrs. Carr is bringing this Cover up of Racism in Cincinnati by the Federal Courts. Mr. Carr is also making the F.B.I aware of the Statement by Faye Ross PH.D. Ms. Ross Listened to the tape Recordings and viewed Mr. Carrs evidence and concluded there was an "UnLawful Detention".

We (Jerry and Sharon Carr) fear for our safety

I, Jerry Carr, swear the aforementioned is truthful and factual.

Jerry Carr
4745 Appaloosa Trail
Mason, Ohio 45040

(513) 573-0200



**Attorney General
Betty D. Montgomery**

X 24

May 21, 2002

Jerry Carr
4745 Appaloosa Trail
Mason, Ohio 45040

Re:  Frost and Jacobs Law Firm

Dear Mr. Carr:

Thank you for your most recent correspondence to Attorney General Montgomery's office regarding your complaint with Frost and Jacobs Law Firm, as well as with several judges and magistrates.

If you believe that an attorney, or judge conducted himself in an unethical fashion, you may wish to file a complaint with the Ohio Supreme Court Disciplinary Counsel. The Disciplinary Counsel reviews complaints against attorneys and ensures that they abide by the Code of Professional Responsibility.  They can be contacted directly at the following address:

Supreme Court of Ohio
Office of the Disciplinary Counsel
175 South Third Street, Suite 280
Columbus, Ohio 43215-5134

Again, thank you for writing to our office. I hope the above information is helpful to you.

Sincerely,

Sarah Lambert
Constituent Liaison

× 2A



# ROBIN N. PIPER
## BUTLER COUNTY PROSECUTING ATTORNEY
Government Services Center • 11th Floor
P.O. Box 515 • 315 High St. • Hamilton, OH 45012-0515
Phone 513-887-3474 • Fax 513-785-5206



June 28, 2002

Mr. Jerry Carr
4745 Appaloosa Trail
Mason, Ohio 45040

Dear Mr. Carr,

Please find herein my reply to your letter of June 26, 2002.

While I met with you on June 26 and reviewed a portion of your evidence, it is neither conclusive, nor complete. I have sympathy for your plight but the multitude and seriousness of your allegations are not beyond significant concerns. Resolution of those concerns in your favor is doubtful when so much time has passed (12 years) and will likely come down to issues of credibility. Your own words in writing, referring to yourself as a "Time Bomb" together with seeking psychiatric treatment and your repeated concerns as to your stress are not helpful.

The statute of limitations is, of course, another issue. As I stated to you, it appears to have expired six years ago. It is very doubtful that the saving provision upon which you wish to rely would be of any value in tolling the statute. Presentation of the evidence twelve years after the incident is not presentation "in a timely manner", as you state in your correspondence. Additionally, you did nothing with the most recently obtained information, Dr. Fisher's medical records, for approximately a year before deciding to resurface your allegations. In reflection, it appears that Dr. Fisher's records would change little.

While I listened to you sympathetically, in piecing everything together, there is nothing I can do to be of assistance. Many of the individuals included in your RICO suit were only peripherally related to the problems you experienced and some appeared to have been trying to help you. Your efforts to send me correspondence forcing the prosecution of the case is unworkable. Significant and serious charges against individuals are not instituted simply because someone demands it. Your unsubstantiated series of conspiracies and alleged wrong doings do not appear plausible. Unsubstantiated allegations and mere differences in opinion render the events as you string them together as dubious.

For example, while you perceive that your tapes of Drs. Miller and Fisher indicate a certain scenario, other factors may have entered into the decisions which were made twelve years ago. While you find it highly unusual, a psychologist may have reasonably spoken with individuals at Champion about your issues, particularly if he was trying to assess the possibility of any danger you may have presented. I again refer you to your own words

Mr. Jerry Carr
Page 2
June 28, 2002

which may have given cause for concern by referring to yourself in writing as a "Time Bomb". Such statements are taken very seriously in the work place and could be considered as compounded by your obtaining a gun.

I wish to reiterate that I have great sympathy for your plight but I am afraid that too many things can be construed in several ways, thus rendering criminal prosecution impossible. If you find the need for further action, I would urge you to take up this matter with the State Board of Psychology which governs the license of practitioners like Dr. Fisher. I wish you and Sharon the best in your efforts.

Sincerely,

Dan Ferguson
Assistant Prosecuting Attorney

DF:jlf

X24

**U.S. Department of Justice**

Federal Bureau of Investigation

In Reply, Please Refer to
File No.

550 Main Street, Room 9000
Cincinnati, Ohio 45202
July 23, 2002

Jerry and Sharon Carr
4745 Appaloosa Trail
Mason, Ohio 45040

Dear Mr. and Mrs. Carr:

     This letter is to inform you that after a thorough
review of all the materials, including the videotape which you
provided, the Federal Bureau of Investigation (FBI) will take no
further action on this matter.

     In consultation with the Head of the Criminal Division
of the United States Attorney's Office, Cincinnati, Ohio, we have
concluded there is no basis or evidence of a Federal "criminal"
offense for which the FBI has investigative jurisdiction to
pursue. Furthermore, your attorney James A. Whitaker has a legal
obligation to bring any matters of a criminal nature to the
attention of the proper authorities. To date, neither he nor any
officer of the court involved in your legal actions has made any
such referral to this office.

     As I know you are aware, you may pursue these issues
through civil litigation; however, the FBI does not get involved
in civil matters.

Sincerely,

Robert M. Burnham
Special Agent in Charge

By:
Richard D. Coy
Supervisory Special Agent

X24



**Ohio House of Representatives**

**Thomas A. Raga**
*Member*

2nd House District
Warren County

**District Office**
*telephone:* (513) 459-1348

**Capitol Office**
Riffe Center
77 South High Street
Columbus, Ohio 43215-6111
*toll free:* (800) 282-0253
*telephone:* (614) 644-6027
*fax:* (614) 644-9494
*e-mail:* rep02@ohr.state.oh.us
*www.house.state.oh.us*

**Committees**

Rules & Reference
Finance & Appropriations
Public Utilities
Health & Family Services
  Children & Family Services
  Subcommittee

**Appointments**

Child Support Advisory Council
Fatherhood Commission
Tobacco Oversight Panel

**www.tomraga.org**

---

July 23, 2001

Mr. and Mrs. Jerry Carr
4745 Appaloosa Trail
Mason, Ohio 45040

Dear Mr. Carr:

Thank you for contacting my office with your request for a criminal investigation.

On your behalf, I contacted the Ohio Attorney General's office. I was informed that since your case involves federal issues that only The Department of Justice would have the authority to investigate your claims.

Enclosed is information about the Special Litigation Section of the U.S. Department of Justice. If their contact information is insufficient, please let my office know or you may contact your federal representative, Congressman Rob Portman at 513-791-0381.

Please feel free to contact me if you need any additional assistance or have any questions.

Yours truly,

Tom

Thomas A. Raga

TAR/nf
Cc: Rep. Rob Portman

**JAMES A. WHITAKER**   EXHIBIT # NB
ATTORNEY AT LAW                    24
226 READING ROAD
MASON, OHIO 45040
(513) 398-1910
FAX (513) 398-0181

September 6, 2001

Jerry Carr
4745 Appaloosa Trail
Mason, OH 45040

**RE:    CIVIL MATTER**

Dear Mr. Carr:

This letter is in reference to the current issues that you have had my office review in order to determine what course of action should be taken. Upon extensive research in relation to your claims of wrongful detainment, I have concluded that there is not a clear answer as to the survival of your claims in a court of law. There is a possibility of survival, but there is also research that supports that your claims are out of the time limitations to be heard in a court of law. As one issue seemed to become clearer, several more issues stemmed from the first, making this matter extremely complex. For example, if it can be proven that the records were concealed from you, there may be a cause of action. On the other hand, it must be proven that you exhausted all avenues to obtain the records and if you were in any way negligent in trying to obtain the records or to use judicial means to compel discovery, there is no cause of action. In my opinion, if a lawsuit is filed, it will most certainly have to be presented to the U.S. Court of Appeals for the Sixth Circuit. The case may not survive long in the District Court and would have to be appealed to the Sixth Circuit with the hope that the case would be remanded back to the District Court in order to have your day in court.

As I have previously discussed with you, I am willing to go to the authorities with you to discuss this matter. However, my office alone cannot and will not be able to represent you without the help of another law firm to co-counsel with me if a lawsuit is to be filed. Because this matter is extremely complex, I would require a retainer in the sum of $100,000.00 in order to represent you. Further, I would require an additional $100,000.00 in trust in order to hire another law firm to co-counsel this matter and to obtain the services of various experts. I would need separate counsel who specialize in U.S. Circuit Court Appeals. Therefore, I would require a total sum of $200,000.00 to pursue this matter.

Sincerely,

James A. Whitaker
Attorney at Law

JAW/lmc
w:\civil\carr\letterclt

*James A. Whitaker*                          X 24
226 Reading Road
Mason, OH 45040

Ph:513-398-1910              Fax:513-398-0181

Jerry Carr                                          September 27, 2001
4745 Appaloosa Trail
Mason, OH 45040

Attention:                              File #:    JC1-CV-001
                                        Inv #:        5764

RE:      Civil action

| DATE | DESCRIPTION | HOURS | AMOUNT | LAWYER |
|------|-------------|-------|--------|--------|
| Aug-28-1 | reviewed notes; research | 1.00 | 75.00 | CL |
| Aug-29-1 | research on wrongful detainment | 0.50 | 37.50 | CL |
| Aug-30-1 | research on detainment and statute of limitations | 3.25 | 243.75 | CL |
| Aug-31-1 | research on detainment and statute of limitations | 1.75 | 131.25 | CL |
| | Totals | 6.50 | $487.50 | |

**Total Fees & Disbursements**                    **$487.50**

Previous Balance                                      $0.00
Previous Payments                                     $0.00

**Balance Due Now**                                **$487.50**

X24

**JAMES A. WHITAKER**
ATTORNEY AT LAW
226 READING ROAD
MASON, OHIO 45040
(513) 398-1910
FAX (513) 398-0181

October 10, 2001

Jerry Carr
4745 Appaloosa Trail
Mason, OH 45040

RE:    **CIVIL MATTER**

Dear Mr. Carr:

This letter is in response to the letter you dropped off to my office on October 9, 2001. As previously stated in my letter dated September 6, 2001, I am willing to go to the authorities with you to discuss this matter, but I must be retained to do so. My office alone cannot and will not be able to represent you without the help of another law firm to co-counsel with me if a lawsuit is to be filed. Because this matter is extremely complex, I would require a retainer in the sum of $100,000.00 in order to represent you. Further, I would require an additional $100,000.00 in trust in order to hire another law firm to co-counsel this matter and to obtain the services of various experts. I would need separate counsel who specialize in U.S. Circuit Court Appeals.

Therefore, as previously stated, I would require a total sum of $200,000.00 to pursue this matter.

Sincerely,

James A. Whitaker
Attorney at Law

JAW/lmc
w:\civil\carr\respltr.clt

### James A. Whitaker
226 Reading Road
Mason, OH 45040

*X 24*

Ph: 513-398-1910           Fax: 513-398-0181

Jerry Carr
4745 Appaloosa Trail                                    October 27, 2001
Mason, OH 45040

Attention:                          File #:    JC1-CV-001
                                    Inv #:        5980

RE:      Civil action

| DATE | DESCRIPTION | HOURS | AMOUNT | LAWYER |
|------|-------------|-------|--------|--------|
| Sep-06-1 | meeting with paralegal to review research on statute of limitations issue and detailed letter to client | 1.25 | 200.00 | WJ |
| | meeting with JAW on research and cause of action; drafted letter to client | 1.75 | 131.25 | CL |
| | Totals | 3.00 | $331.25 | |

**Total Fees & Disbursements**                       **$331.25**

Previous Balance                                      $487.50
Previous Payments                                     $0.00

**Balance Due Now**                                   **$818.75**

*X24*

### *James A. Whitaker*
226 Reading Road
Mason, OH 45040

Ph: 513-398-1910         Fax: 513-398-0181

Jerry Carr                                                November 23, 2001
4745 Appaloosa Trail
Mason, OH 45040

Attention:                                    File #:    JC1-CV-001
                                              Inv #:        6193

RE:    Civil action

| DATE | DESCRIPTION | HOURS | AMOUNT | LAWYER |
|------|-------------|-------|--------|--------|
| Oct-10-1 | reviewed letter from client; drafted letter from client | 0.33 | 24.75 | CL |
| | Totals | 0.33 | $24.75 | |

**Total Fees & Disbursements**                              **$24.75**

Previous Balance                                            $818.75
Previous Payments                                           $0.00

**Balance Due Now**                                        **$843.50**

**JAMES A. WHITAKER**
ATTORNEY AT LAW
226 READING ROAD
MASON, OHIO 45040
(513) 398-1910
FAX (513) 398-0181



April 3, 2002

7001 1940 0002 4257 1492

Jerry Carr
4745 Appaloosa Trail
Mason, OH 45040

RE:    CIVIL MATTER

Dear Mr. Carr:

This letter is in response to the letter you sent to my office dated March 31, 2002. As previously stated in my letters dated September 6, 2001 and October 10, 2001, I am willing to go to the authorities with you to discuss this matter, but I must be retained to do so. My office alone cannot and will not be able to represent you without the help of another law firm to co-counsel with me if a lawsuit is to be filed. Because this matter is extremely complex, I would require a retainer in the sum of $100,000.00 in order to represent you. Further, I would require an additional $100,000.00 in trust in order to hire another law firm to co-counsel this matter and to obtain the services of various experts. I would need separate counsel who specialize in U.S. Circuit Court Appeals.

Therefore, as previously stated, I would require a check made out to the James A. Whitaker Trust Account for the total sum of $200,000.00 to pursue this matter.

Sincerely,

James A. Whitaker
Attorney at Law

JAW/lmc
w:\civil\carr\respltr2.clt

EXHiBiT #~~03~~ 24

JAMES A. WHITAKER
ATTORNEY AT LAW
226 READING ROAD
MASON, OHIO 45040
(513) 398-1910
FAX (513) 398-0181

May 14, 2001

Sharon Carr
4745 Appaloosa Trail
Mason, OH 45040

RE:   CARR V. SWEENEY, INC.
      CARR V. COLERAIN DODGE, INC.

Dear Ms. Carr:

This letter is notice that I will be filing a Motion for Leave to Withdraw as Counsel regarding the above cases with the United States District Court, Southern District of Ohio, Western Division. Upon receipt and review of the information you provided my office regarding your lawsuit involving the federal judges and magistrates, I find it unreasonably difficult to continue to represent you in these matters. If I had prior knowledge of this information before you retained me, I would have referred you to another attorney for legal services. Pursuant to the fee agreements executed with my office, I have the authority to request leave to withdraw as counsel in these matters and will be doing so in my Motions for Leave to Withdraw as Counsel that will be filed with the Court. Upon Orders from the Court granting leave to withdraw as counsel, I will refund any money to you that is currently held in the James A. Whitaker Trust Account, and I will provide you with a copy of each of your files. I will then refer you to the Cincinnati Bar Association through which you will be able to obtain new legal counsel.

Thank you for your cooperation.

Sincerely yours,

James A. Whitaker
Attorney at Law

JAW/lmc

W:\EMPLOY\CARR\SWEENEY\LETTERS\withdrawltr.wpd

Exhibit 25

# FAX TRANSMITTAL DOCUMENT
## COVER PAGE

SENDER:   Center for Forensic Psychiatry
          Hamilton Center Building
          222 High Street, Suite 225
          Hamilton, OH   45011
          (513-867-5866)

          FAX #:  (513) 867-5875

          Contact Person:   _Dr Fisher_____

REGARDING:   _= Confidential =_____

SENT TO:   _Mr. Hohman_____

           _____

           _____

           _____

DATE OF TRANSMISSION:   _7-12-90_____

Number of pages sent:   _—02—_____
                        (including cover page)

Frost + Jacobs —
George Yund
651-6824

CONFIDENTIAL



# FACSIMILE TRANSMITTAL SHEET

TO:           Public Records Requester :     **Sharon Carr**
                                              **8296 Stahley Dr.**
                                              **Cincinnati, OH 45239**

FAX:

FROM:         Enforcement Division, State Board of Psychology, by:    **Kelli L. Coleman, M.S.**

RE:           **Roger Fisher, Ph.D. -- License # 149, issued 24 February 1973**
              **Consent Agreement: December 2002 -- License Surrender/Permanent Revocation**

DATE:         **December 13, 2002**

Enclosed (if by mail) or following (if by fax), please find a copy of any dispositions and, in certain cases, charging documents relative to the disciplinary record on file with the State Board of Psychology regarding the licensee about whom you have inquired.

It is the policy of the State Board of Psychology generally to make this category of primary "procedural" documents available upon request to any party making inquiry regarding any disciplinary matter reflected as public record in Board files.

This is also to advise you that there is a more extensive public record available from the Board regarding this matter.   The full 2002 public record, consisting of **to be compiled** pages are available for inspection at no charge at the Board's offices, or by copying at a reasonable fee.  Please be advised that the Board does not presume to decide on behalf of any requester which if any documents or portions of documents might be pertinent to any individual request.

The full public record in these matters is available for a charge of **$ to be calculated**, including regular postage, by check or money order made payable to:

### Treasurer, State of Ohio

and sent to the Enforcement Division, State Board of Psychology, at the above address, with a copy of this letter.

If you have any questions in this regard, please feel free to call us at 614/644-9177.

## COVER + 4 PAGES

### MAILED 12/13/02.

fullrec.mem/KLC
12/9/2002

*Exhibit 1A*

Case 1:06-cv-01893-JR Document 27-22 Filed 02/12/2007 Page 3 of 16

X 1A

in written and oral testimony in violation of prevailing professional standards of care, allowed himself to inadvertently risk the loss of objectivity by blending evaluative and treatment roles with individuals in the same families, and risked violating terms of his June 2001 CONSENT AGREEMENT.

DR. FISHER asserts that in all of these matters he attempted to conduct his psychological practice in a manner consistent with his best professional judgment as to the best interests of the children with whom he interacted professionally. DR. FISHER contends that he offered professional opinions in all of the matters referenced above in an attempt to provide for the safety and wellbeing of the children at issue.

Based upon the above STATEMENTS AND UNDERSTANDINGS, and in the mutual interest of the BOARD and DR. FISHER to resolve these matters without proceeding to a lengthy and mutually costly hearing, the BOARD and DR. FISHER agree as follows:

A.    DR. FISHER agrees that he will voluntarily retire from the practice of psychology and agrees to surrender his license to practice psychology. DR. FISHER waives his right to seek restoration at any future date.

B.    DR. FISHER understands that this license surrender shall be recorded by the BOARD as a PERMANENT REVOCATION effective February 28, 2003. DR. FISHER agrees that he will arrange for the continuity of care for clients by notifying all current clients in writing, in addition to any face-to-face notifications, of his retirement. DR. FISHER shall by February 27, 2003 make reasonable efforts to plan for the continuity of care for his clients in the event that psychological services will be interrupted by his retirement. DR. FISHER agrees to make written notice of his retirement to the Clerk of the Butler County Court of Common Pleas. DR. FISHER agrees to make written notice of his retirement to the appropriate management staff of any telephone directory or other public forum listing his psychological practice as of the effective date of this CONSENT AGREEMENT. DR. FISHER agrees to send to the BOARD photocopies of all correspondence to advertisers and to Courts by February 28, 2003. DR. FISHER shall also surrender his original certificate to practice psychology along with his renewal card to the Board's office on or February 28, 2003.

C.    DR. FISHER certifies that he does not hold a license or certificate to practice psychology in any other jurisdiction. He further stipulates and agrees that he will not apply for or otherwise seek such licensure or certification in any other jurisdiction.

D.    In exchange for the agreements of DR. FISHER set forth in this CONSENT AGREEMENT, the BOARD agrees not to proceed further with any disciplinary action against DR. FISHER for the matters enumerated under STATEMENTS and UNDERSTANDINGS of this CONSENT AGREEMENT or for other matters in the possession of the BOARD as of the effective date of this CONSENT AGREEMENT.

E.    By his signature on this agreement, DR. FISHER agrees that in the event the BOARD, in its discretion, does not approve this CONSENT AGREEMENT, this settlement offer is

hearing, he will assert no claim that the BOARD was prejudiced by its review and discussion of this CONSENT AGREEMENT or of any information relating thereto.

F.   If, in the discretion of the BOARD, DR. FISHER appears to have breached any terms or conditions of this CONSENT AGREEMENT, the BOARD reserves the right to declare the CONSENT AGREEMENT null and void. Once declared null and void, the BOARD then may provide formal notice to DR. FISHER and proceed to conduct a hearing on the charges set forth in a Notice of Opportunity for Hearing.

G.   DR. FISHER waives any and all claims or causes of action he may have against the State of Ohio, the BOARD, and members, officers, employees and/or agents of either, arising out of matters which are the subject of this CONSENT AGREEMENT.

H.   This CONSENT AGREEMENT shall be reflected in the minutes of a regularly scheduled Board Meeting, and as a Formal Action recorded on the license history of DR. FISHER, License #149, original date of licensure February 29, 1973.

I.   This CONSENT AGREEMENT shall be considered a public record as that term is used in Section 149.43 of the Ohio Revised Code.  For purposes of this CONSENT AGREEMENT, formal notification consists of written notice to the following:  (1) the Association of State and Provincial Psychology Boards (ASPPB); (2) Ohio licensees receiving any newsletter issued by the BOARD; (3) individuals/organizations who have requested formal notification of Board actions; and (4) the Healthcare Integrity Protection Data Bank (HIPDB), and/or any reporting required by the federal legislation creating HIPDB or any similar state or federal legislation. Further, DR. FISHER agrees to cooperate with the BOARD in providing any information required for the BOARD to complete such a mandated report within the required time period(s).

J.   DR. FISHER agrees that the BOARD may release his social security number (SSN) to the ASPPB Disciplinary Data Bank and other organizations that are legally required to request it for tracking or monitoring purposes.  DR. FISHER acknowledges that by signing this CONSENT AGREEMENT he knowingly and voluntarily waives any expectation of privacy or constitutional privacy interests that he may have in maintaining the confidentiality of his social security number as regards such entities.  DR. FISHER understands and does not contest that the BOARD is required to collect and report his SSN pursuant to 42 U.S.C. sec. 1320a-7e(b), 5 U.S.C. sec. 552a, and 45 C.F.R. pt. 61 for compliance with the U.S. Department of Health and Human Services' Healthcare Integrity and Protection Data Bank (HIPDB).

K.   This CONSENT AGREEMENT is not an adjudication order within the meaning of Section 119.01 (D) of the Ohio Revised Code.

L.   If DR. FISHER violates the terms and conditions of this CONSENT AGREEMENT in any respect, the BOARD, after giving notice and the opportunity to be heard, may institute whatever disciplinary action it deems appropriate as provided by chapter 4732.17 of the Ohio Revised Code.  Any administrative action initiated by the BOARD based on an alleged, found or admitted violation of this CONSENT AGREEMENT shall comply with the Administrative Procedures Act, Chapter 119 of the Ohio Revised Code.

X 1A

Ohio Revised Code. Any administrative action initiated by the BOARD based on an alleged, found or admitted violation of this CONSENT AGREEMENT shall comply with the Administrative Procedures Act, Chapter 119 of the Ohio Revised Code.

M.    Upon consent of DR. FISHER and the BOARD, the terms and conditions of this CONSENT AGREEMENT may be modified or terminated in writing.

N.    This CONSENT AGREEMENT shall take effect upon the last date of signature by the parties and their representatives as indicated below.

THE (OHIO) STATE BOARD OF PSYCHOLOGY BY:

Roger Fisher, PhD   12-5-02          Cathy F. Telzrow   12-6-02
ROGER H. FISHER, PH.D.        Date          CATHY F. TELZROW, PHD, ABPP        Date
Licensee                                      President

James Scheper   12/6/12              Kelley R. Haddox   12-6-02
JAMES SCHEPER        Date          KELLEY R. HADDOX        Date
Attorney at Law                               Assistant Attorney General for
Counsel to Dr. FISHER                         the State Board of Psychology



**Champion**
Champion International Corporation

July 18, 1990

ELAINE

Mr. Jerry Carr
The Dartmouth Hospital
5350 Lamme Road
Dayton, Ohio    45439

Dear Mr. Carr:

Pursuant to the recommendation of Dr. Fisher, you are
hereby advised that you are being removed from the
Champion payroll effective immediately; further, you are
to be denied access to Champion property.

You will continue to be eligible for coverage under
Champion's disability and medical programs pursuant to the
terms of those programs.

Information relative to the temporary and long term
disability plans will be sent to you under separate cover.

Very truly yours,

Richard L. Vanasse
Director Administration
Printing and Writing Papers

RLV/dem

cc:  R. Fisher, Ph.D.
     G. Prada, M.D.

Exhibit 2A

Exhibit 3A







EXHIBIT 3A





Exhibit        Sat. Jan. 17, 1998

To whom it may concern,    # _4A_

I Elvin Moore, as an employee of Jim Sweeny Nissan, am making a written complaint regarding the harassment and retaliation by Jim Sweeny. On numerous occasions I have suffered harassment, sometimes in front of other fellow employees. I was berated, told I was incompetent, called names, "Scum", "Piece of Shit", "Kiss his Ass", told I would go back to Dodge. There were also other instances witnessed by other employees who knew much of the harassment is direct retaliation. The stalking and harassment by Sham Chin the salesperson Don Overly. I have made management that I do not support this behavior in the place of employment or any place of employment and when called upon, I will give sworn statement when needed. I am writing this letter to inform that said employer, Don Overly told myself and employees that I was going to be fired and he knew about it as other he had known about who eventually were terminated. This employee also the made racial remarks about other employees. African Americans were regarded and called porch monkeys. This type of attitude and behavior foments a hostile environment and should not be tolerated.

Copies of this letter will be forwarded Nissan, the owner Jim Sweeny, Leon Sweeny, Kevin Sweeny, and Gary Herbert

*Exh 5A*

# IN THE COURT OF COMMON PLEAS, FRANKLIN COUNTY, OHIO
## CIVIL DIVISION

GERMAN V. PRADA, M.D.                         *         Case No. 04CVF-04-3743

      Appellant,                                *         Judge Dale Crawford

-vs-                                          *         **FINAL APPEALABLE ORDER**

STATE MEDICAL BOARD OF OHIO,                  *

      Appellee.                                 *

> TERMINATION NO. *10*
> BY *[signature]*

## JUDGMENT ENTRY AFFIRMING THE STATE MEDICAL BOARD'S MARCH 10, 2004 ORDER SUSPENDING APPELLANT'S LICENSE TO PRACTICE MEDICINE AND SURGERY IN OHIO

This case is before the Court upon the appeal, pursuant to R.C. 119.12, of the March 10, 2004 Order of the State Medical Board of Ohio which suspended Appellant, German Prada, M.D.'s license to practice medicine and surgery in Ohio. For the reasons stated in the decision of this Court rendered on September 13, 2004, and filed on September 14, 2004, which decision is incorporated by reference as if fully rewritten herein, it is hereby.

ORDERED, ADJUDGED AND DECREED that judgment is entered in favor of Appellee, State Medical Board of Ohio, and the March 10, 2004 Order of the State Medical Board in the matter of German V. Prada, M.D., is hereby AFFIRMED. Costs to Appellant.

IT IS SO ORDERED.

_9-27-04_
Date

_____
**JUDGE DALE CRAWFORD**

CLERK OF COURTS    2004 SEP 28 AM 9: 10    FILED COMMON PLEAS COURT OHIO

*Eric Plinke by Rebecca Allen* per phone
Eric J. Plinke (0059463)   *authorization*
John P. Carney (004436)   9/24/04
PORTER WRIGHT MORRIS & ARTHUR
41 South High Street
Columbus OH 43215-6194
(614) 227-2000
(614) 227-2100 *facsimile*

*Counsel for Appellant,*
*German V. Prada, M.D.*

*Tara Berrien by Rebecca Allen*
Tara L. Berrien (0074314)
Assistant Attorney General
30 East Broad Street, 26th Floor
Columbus OH 43215-3428
(614) 466-8600
(614) 466-6090 *facsimile*

*Counsel for Appellee,*
*State Medical Board of Ohio*

*X 5A*

## IN THE COURT OF COMMON PLEAS, FRANKLIN COUNTY, OHIO

GERMAN V. PRADA, M.D.,     ]

                                ]

               **Appellant,**     ]     **CASE NO. 04CVF-04-3743**

**vs.**                          ]     **JUDGE CRAWFORD**

                                ]

**STATE MEDICAL BOARD OF OHIO**   ]

                                ]

              **Appellee**

2004 SEP 14  AM 8: 44  CLERK OF COURTS  FILED COMMON PLEAS COURT OHIO

## <u>DECISION AFFIRMING THE ORDER OF THE OHIO STATE MEDICAL BOARD</u>

Rendered this *13ᵗʰ* day of *Sept.*, 2004

**CRAWFORD, JUDGE**

     This is an appeal pursuant to R.C. 119.12 of a March 10, 2004 Order of the State Medical Board of Ohio ("the Board") which suspended the medical license of Appellant German v. Prada, M.D. for an indefinite period, but not less than 180 days, and imposed conditions for reinstatement of his license.

## I.    HISTORY OF THIS MATTER

     On September 10, 2003, the Board notified Appellant that it proposed to take disciplinary action against his medical license. The Board alleged that Appellant had violated R.C. 4731.22(B)(11) and (B)(13) in that he had been found guilty of a misdemeanor committed in the course of practice and involving moral turpitude. The charges related to a misdemeanor count of sexual imposition against a patient.

     Appellant requested a hearing on the charges. An administrative hearing was held on December 4, 2003.

X 5A

On January 30, 2004, the Hearing Examiner issued a Report and Recommendation concluding that Appellant had committed the violations charged, and recommending a 90-day license suspension with probationary conditions.

The Board considered this matter at its March 10, 2004 meeting. At the conclusion of the discussion, the Board voted to confirm the Hearing Examiner's findings and amend the proposed order by imposing a minimum suspension of 180 days and conditions for reinstatement that included evaluations by two psychiatrists of Appellant's fitness to practice.

On April 2, 2004, Appellant filed this appeal of the Board's Order.

## II.    FACTS

Appellant received his medical degree in 1964 and has practiced psychiatry since 1975. Appellant maintains a private practice in psychiatry in Dayton, Ohio. (Tr. 78-80).

On June 16, 2003, Appellant met with a female patient for a scheduled appointment. During the office visit, Appellant placed his hands on the patient's breasts and buttocks. (Tr. 90-105). The patient was upset by the incident and reported it to police. (Tr. 122).

Appellant was charged with sexual imposition in violation of R.C. 2907.06, a misdemeanor. On July 22, 2003, Appellant entered a plea of no contest to the charge, and the trial court found Appellant guilty. (State Ex. 4). The court ordered Appellant to attend counseling prior to sentencing. Appellant provided a report of a psychiatric evaluation by Percy D. Mitchell, Jr., M.D. to the court. On September 30, 2003, the court sentenced Appellant to sixty days incarceration and a $500.00 fine, but suspended the jail time and $300.00 of the fine. (State Ex. 4).

2

At the administrative hearing, Appellant acknowledged that he pled no contest and was found guilty of the crime charged. (Tr. 84-85). He stated that his conduct was terrible, that the patient was offended, and that he was sorry. (Tr. 100, 122-123).

A number of witnesses testified on Appellant's behalf and stated that this was an isolated incident inconsistent with Appellant's character. (*See, e.g.,* Tr. 142-143).

Appellant presented the letter from Dr. Mitchell to the trial court. (Respondent Exhibit E). The letter stated that Dr. Mitchell had interviewed Appellant on three occasions for a total of three hours. Appellant was described as being "in an extremely distraught manner, extremely upset with himself, and very remorseful for the actions which he exhibited in his office toward a 50-year-old female patient." The letter stated: "It is very clear to me that Dr. Prada has taken full responsibility for his actions. He is extremely remorseful. He is not a danger to his patients. He is not a danger to his community. This action has never happened before and it will never happen again." (Respondent Exhibit E).

## III.    FINDINGS OF THE BOARD

In her Report and Recommendation, the Hearing Examiner found that the judicial finding that Appellant was guilty of sexual imposition constituted a "plea of guilty to, a judicial finding of guilt of ... a misdemeanor committed in the course of practice" under R.C. 4731.22(B)(11) and a "plea of guilty to, a judicial finding of guilt of ... a misdemeanor involving moral turpitude" under R.C. 4731.22(B)(13). (Report, p. 15).

The Hearing Examiner stated that such conduct warranted permanent license revocation, but that there was extensive mitigating evidence. Appellant was cooperative in the investigation and admitted that he had made a terrible mistake. The evidence was

3

X 5A

that Appellant had not acted in a similar manner with any other patient. The Hearing

Examiner stated that Appellant was remorseful and "the evidence is persuasive that Dr.

Prada will not act in a similar manner with any patient in the future." Citing the letter

from Dr. Mitchell, the Hearing Examiner stated: "it is unlikely that Dr. Prada's

continued practice of medicine presents a threat of harm to the public." (Report, p. 16).

The Hearing Examiner recommended a 90-day license suspension with

probationary conditions that included quarterly reports, appearances before the Board,

and an ethics course. (Report, p. 17-18).

The Board considered this matter at its March 10, 2004 meeting. Appellant and

his counsel addressed the Board, as did counsel for the State. At the conclusion of its

deliberations, the Board voted to confirm the Hearing Examiner's findings of fact and

conclusions. The Board voted to amend the proposed order by imposing a minimum

suspension of 180 days and imposing conditions for reinstatement. The conditions

included the following:

> **Psychiatric Reports Evidencing Fitness to Practice; Recommended
> Limitations:** At the time Dr. Prada submits his application for
> reinstatement or restoration, Dr. Prada shall provide the Board with
> written reports of evaluation by two psychiatrists acceptable to the Board
> indicating that Dr. Prada's ability to practice has been assessed and that he
> has been found capable of practicing in accordance with acceptable and
> prevailing standards of care. ... The reports of evaluation shall describe
> with particularity the bases for the determination that Dr. Prada has been
> found capable of practicing according to acceptable and prevailing
> standards of care and shall include any recommended limitations upon his
> practice.

## IV.    LAW

When considering an appeal from an order of the Medical Board, a common pleas

court must uphold the order if it is supported by reliable, probative, and substantial